Michael Newdow
*Pro hac vice* (pending)
2985 Lakeshore Blvd
Upper Lake, CA 95485
(626) 532-7694
NewdowLaw@gmail.com

Morgan Smith
2900 Washington Ave North
Minneapolis, MN 55411
(612) 379-0674
smith_and_raver@elitemail.org

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

Civil Action No. .

# ORIGINAL COMPLAINT

NEW DOE CHILD #1; NEW DOE CHILD #2; NEW DOE CHILD #3; NEW DOE PARENT; NEW ROE CHILD; NEW ROE PARENT; NEW BOE CHILD; NEW BOE PARENT; NEW POE CHILD; NEW POE PARENT; NEW COE CHILD #1; NEW COE CHILD #2; NEW COE CHILD #3; NEW COE PARENT; GARY LEE BERGER; MARIE ALENA CASTLE; CHARLES DANIEL CHRISTOPHER; PATRICK ETHEN; BETTY GOGAN; THOMAS GOGAN; ROGER W. KAYE; CHARLOTTE LEVERETTE; DR. JAMES B. LYTTLE; KYLE PETTERSEN-SCOTT; ODIN SMITH; ANDREA DAWN SAMPSON; ERIC WELLS; ATHEISTS FOR HUMAN RIGHTS (AFHR); SALINE ATHEIST & SKEPTIC SOCIETY;

Plaintiffs,

v.

THE CONGRESS OF THE UNITED STATES OF AMERICA; THE UNITED STATES OF AMERICA; JACOB J. LEW, SECRETARY OF THE TREASURY; RHETT JEPPSON, PRINCIPAL DEPUTY DIRECTOR, UNITED STATES MINT; LEONARD R. OLIJAR, DIRECTOR, BUREAU OF ENGRAVING AND PRINTING;

Defendants.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

***New Doe Child #1 v. The Congress of the United States***

## TABLE OF CONTENTS


**CORPORATE DISCLOSURE STATEMENT .......... v**

**TABLE OF AUTHORITIES .......... vi**

**JURISDICTION AND VENUE .......... 1**

**PARTIES .......... 2**

**A. PLAINTIFFS .......... 2**

**B. DEFENDANTS .......... 19**

**INTRODUCTION .......... 20**

**HISTORICAL BACKGROUND .......... 21**

**A. BRIEF HISTORY OF AMERICAN RELIGIOUS FREEDOM .......... 21**

**B. HISTORY OF "IN GOD WE TRUST" ON THE NATION'S MONEY .......... 29**

**(1) THE ORIGINAL COINAGE ACTS .......... 29**

**(2) THE ORIGIN OF "IN GOD WE TRUST" ON THE COINAGE .......... 30**

**(3) THE ATTEMPT TO REMOVE "IN GOD WE TRUST" FROM THE COINAGE .......... 35**

**(4) THE LEGISLATIVE MANDATE FOR "IN GOD WE TRUST" ON <u>ALL</u> COINS AND ON THE CURRENCY .......... 43**

**C. THE LEGISLATIVE MANDATE FOR "IN GOD WE TRUST" ON ALL COINS AND CURRENCY REFLECTED THE (CHRISTIAN) RELIGIOUS FERVOR AND ANTI-ATHEISM OF THE 1950s .......... 49**

**D. CURRENT CIRCUMSTANCES ARE LITTLE CHANGED FROM THE 1950s ........ 59**

**(1) "IN GOD WE TRUST" ON THE MONEY CONTINUES TO REPRESENT (CHRISTIAN) MONOTHEISM AND TO BE UTILIZED IN RELIGIOUSLY DISCRIMINATORY WAYS ........ 59**

**(a) Presidents Continue to Use the Motto to Advocate for (Christian) Monotheism ........ 59**

**(b) Congress Continues to Use the Motto to Advocate for (Christian) Monotheism ........ 63**

**i. The Sequence of Events Regarding Edge-Incusion Demonstrates that the Motto Stands for (Christian) Monotheism ........ 63**

**ii. Congress's Motto "Reaffirmations" Reveal that Our Legislators Continue to Believe the Motto Stands for (Christian) Monotheism ........ 64**

**iii. Individual Congressmen Continue to Demonstrate that the Motto Stands for (Christian) Monotheism ........ 69**

**iv. "In God We Trust" Clearly Has a (Christian) Monotheistic Meaning to Congress's Chaplains ........ 71**

**(c) Society Continues to Use the Motto for (Christian) Monotheistic Advocacy ........ 72**

**(2) IN EXTOLLING (CHRISTIAN) MONOTHEISM, "IN GOD WE TRUST" CONTRIBUTES TO A CULTURE THAT DENIGRATES ATHEISM AND ATHEISTS ........ 73**

**(3) PURSUANT TO THEIR RELIGIOUS BELIEFS, PLAINTIFFS ARE BURDENED BY "IN GOD WE TRUST" ON THE MONEY ........ 75**

**CLAIMS FOR RELIEF ........ 82**

**CLAIM 1. DEFENDANTS' ACTS SUBSTANTIALLY BURDEN PLAINTIFFS' EXERCISE OF RELIGION IN VIOLATION OF RFRA ........ 82**

**CLAIM 2. DEFENDANTS HAVE PLACED RELIGIOUS VERBIAGE ON THE NATION'S MONEY WITHOUT ANY ENUMERATED POWER AUTHORIZING THAT ACTIVITY ........ 83**

**CLAIM 3. DEFENDANTS HAVE VIOLATED PLAINTIFFS' EQUAL PROTECTION RIGHTS ........ 83**

**CLAIM 4. DEFENDANTS HAVE VIOLATED THE CONSTITUTIONAL LIMITS PLACED ON GOVERNMENT SPEECH ........ 84**

CLAIM 5. DEFENDANTS HAVE ESTABLISHED MONOTHEISM ....................... 85

CLAIM 6. DEFENDANTS HAVE VIOLATED THE NEUTRALITY REQUIRED BETWEEN "RELIGION" AND "NONRELIGION" ......... 86

CLAIM 7. DEFENDANTS HAVE ACTED WITH A RELIGIOUS PURPOSE ........ 86

CLAIM 8. CONSISTENT WITH THEIR RELIGIOUS PURPOSE, DEFENDANTS' ACTS HAVE RELIGIOUS EFFECTS .......................... 87

CLAIM 9. DEFENDANTS HAVE ENDORSED THE RELIGIOUS BELIEF THAT THERE EXISTS A GOD ........ 88

CLAIM 10. DEFENDANTS' ACTS TURN PLAINTIFFS INTO POLITICAL OUTSIDERS ON THE BASIS OF THEIR RELIGIOUS BELIEFS ........ 89

CLAIM 11. DEFENDANTS' ACTS PLACE THE POWER, PRESTIGE AND FINANCIAL SUPPORT OF GOVERNMENT BEHIND THE PARTICULAR RELIGIOUS BELIEF THAT THERE EXISTS A GOD ........ 91

CLAIM 12. DEFENDANTS HAVE LENT THEIR POWER TO ONE SIDE IN WHAT IS ARGUABLE THE GREATEST CONTROVERSY OVER RELIGIOUS DOGMA ........ 91

CLAIM 13. DEFENDANTS HAVE DETERMINED THE PLAUSIBILITY OF THE RELIGIOUS CLAIM THAT "GOD" EXISTS ........ 92

CLAIM 14. DEFENDANTS' ACTS PLACE GOVERNMENT'S IMPRIMATUR ON THE RELIGIOUS IDEA THAT THERE EXISTS A GOD ........ 92

CLAIM 15. DEFENDANTS' ACTS APPLY COERCION TO PLAINTIFFS IN REGARD TO THEIR RELIGIOUS BELIEFS ........ 93

CLAIM 16. DEFENDANTS' ACTS VIOLATE PLAINTIFFS' FREE EXERCISE RIGHTS ........ 94

CLAIM 17. ANY AND ALL SECULAR JUSTIFICATIONS FOR DEFENDANTS' ACTS ARE SHAMS AND/OR PRETEXTS ........ 94

PRAYER FOR RELIEF ........ 97

LIST OF APPENDICES ........ APP-01

## CORPORATE DISCLOSURE STATEMENT

No corporate party to this action has any parent corporation or publicly held company that owns 10% or more of its stock.

# TABLE OF AUTHORITIES

## Cases


*Abington School District v. Schempp*, 374 U.S. 203 (1963) .................................................. 93

*Adarand Constructors, Inc. v. Mineta*, 534 U.S. 103 (2001) .................................................. 84

*Allegheny County v. Greater Pittsburgh ACLU*, 492 U.S. 573 (1989) .................................. 90

*Bradwell v. State*, 83 U.S. 130 (1873) .................................................................................... 75

*Corporation of Presiding Bishop v. Amos*, 483 U.S. 327 (1986) ........................................... 87

*Engel v. Vitale*, 370 U.S. 421 (1962) ...................................................................................... 91

*Galloway v. Town of Greece*, 681 F.3d 20 (2012) ................................................................ 88

*Grand Rapids School District v. Ball*, 473 U.S. 373 (1985) ............................................ 89, 93

*Lee v. Weisman*, 505 U.S. 577 (1992) .................................................................................... 93

*Loving v. Virginia*, 388 U.S. 1 (1967) .................................................................................... 76

*Lynch v. Donnelly*, 465 U.S. 668 (1984) ................................................................................ 91

*McCollum v. Board of Education*, 333 U.S. 203 (1948) ........................................................ 93

*McCreary County v. ACLU of Kentucky*, 545 U.S. 844 (2005) .................................. 69, 86, 94

*Minersville v. Gobitas*, 310 U.S. 586 (1940) .......................................................................... 49

*Petition of Plywacki*, 107 F. Supp. 593 (1952) ...................................................................... 55

*Petition of Plywacki*, 115 F. Supp. 613 (1953) ...................................................................... 55

*Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000) ..................................... 90

*Stone v. Graham*, 449 U.S. 39 (1980) .................................................................................... 87

*Wallace v. Jaffree*, 472 U.S. 38 (1985) .................................................................................. 88

*Westside Community Bd. of Ed. v. Mergens*, 496 U.S. 226 (1990) ....................................... 92

*Wooley v. Maynard*, 430 U.S. 705 (1977) .............................................................................. 81

*Zelman v. Simmons-Harris*, 536 U.S. 639 (2002) ............................................................ 87, 88


## Constitutional Provisions


Ark. Const. art. XIX, § 1 ......................................................................................................... 74

Md. Const. art. XXXVII ........................................................................................................... 74

Miss. Const. art. XIV, § 265 .................................................................................................... 74

N.C. Const. art. VI, § 8 ........ 74
Pa. Const. art. I, § 4 ........ 74
S.C. Const. art. XVII, § 4 ........ 74
Tenn. Const. art. IX, § 2 ........ 74
Tex. Const. art. I, § 4 ........ 74
U.S. Const. amend. I ........ passim
U.S. Const. amend. V ........ 1
U.S. Const. art. I ........ 19
U.S. Const. art. II ........ 21
U.S. Const. art. VI ........ 22, 25, 27
U.S. Const. pmbl. ........ 21, 28, 32

## Statutes

28 U.S.C. § 1331 ........ 1
28 U.S.C. § 1346 ........ 1
28 U.S.C. § 1361 ........ 1
28 U.S.C. § 1391 ........ 1
31 U.S.C. § 301 ........ 19
31 U.S.C. § 303 ........ 19
31 U.S.C. § 304 ........ 19
31 U.S.C. § 3112 ........ 75
31 U.S.C. § 321 ........ 19
31 U.S.C. § 5112 ........ passim
31 U.S.C. § 5114 ........ 20, 48, 85, 97
36 U.S.C. § 119 ........ 53
36 U.S.C. § 302 ........ 85, 95
42 U.S.C. § 2000bb through 2000bb-4 ........ passim
Act in Amendment of 1857 Coinage Act, 13 Stat. 54 (1864) ........ 33
Act of April 17, 1952, 66 Stat. 64 ........ 53

Act of July 11, 1955, 69 Stat. 290 ........ 48, 53

Act of July 30, 1956, 70 Stat. 732 ........ 53, 59, 95

Act of June 14, 1954, 68 Stat. 249 ........ 53

Act of May 18, 1908, 35 Stat. 164 ........ 42

Act to Authorize the Coinage of Three-Cent Pieces, 13 Stat. 517 (1865) ........ 34

Act to Establish the Treasury Department, 1 Stat. 65 (1789)........ 29

Act to Regulate the Time and Manner of Administering Certain Oaths, 1 Stat. 23 (1789)........ 23

Coinage Act of 1792, 1 Stat. 246 ........ 29

Coinage Act of 1837, 5 Stat. 136 ........ 29

Coinage Act of 1865, 13 Stat. 518 ........ 34

Consolidated Appropriations Act of 2008, 121 Stat. 1844 ........ 64

H.R. Con. Res. 253, 109th Cong. (2005) ........ 68

H.R. Con. Res. 60, 83d Cong. (1953)........ 53

Presidential $1 Coin Act of 2005, 119 Stat. 2664 (2005) ........ 63

*Statutes at Large … December 1863, to December 1865* (George P. Sanger ed., 1866)........ 33, 34

Treaty of Tripoli, 8 Stat. 154 (1796) ........ 25

Va. Code Ann. § 57-1 (2012) ........ 21

## Congressional Record and Reports

100 Cong. Rec. 14919 (1954)........ 52

100 Cong. Rec. 1700 (1954)........ 52

100 Cong. Rec. 6085 (1954)........ 52

100 Cong. Rec. 7764 (1954)........ 52

100 Cong. Rec. 7765 (1954)........ 52

100 Cong. Rec. 7833 (1954)........ 52

100 Cong. Rec. 8617 (1954)........ 53

101 Cong. Rec. 4384 (1955)........ 44, 46

101 Cong. Rec. 7796 (1955)........ 44

101 Cong. Rec. 8156 (1955)........ 52

101 Cong. Rec. 9448 (1955) ........ 44
151 Cong. Rec. H6386 (daily ed. July 25, 2005) ........ 71
153 Cong. Rec. H10311 (daily ed. Sept. 7, 2007) ........ 63
153 Cong. Rec. H2674 (daily ed. Mar. 20, 2007) ........ 71
157 Cong. Rec. H2334 (daily ed. Apr. 6, 2011) ........ 71
157 Cong. Rec. H7169-75 (daily ed. Nov. 1, 2011) ........ 65, 66, 68
157 Cong. Rec. H7186 (daily ed. Nov. 1, 2011) ........ 77
157 Cong. Rec. H7215 (daily ed. Nov. 2, 2011) ........ 93
157 Cong. Rec. H949 (daily ed. Feb. 16, 2011) ........ 69, 71
42 Cong. Rec. 3384-91 (1908) ........ passim
97 Cong. Rec. 5863 (1951) ........ 44
Annals of Cong., vol. 1 (1789) (J. Gales ed. 1834) ........ 22, 24
H. Con. Res. 411, 109th Cong. (2006) ........ 64, 65
H.R. 619 (United States Currency Inscription), Hearing, 84th Cong. (1956) ........ passim
H.R. Doc. No. 234 (1956), Architect of the Capitol, *The Prayer Room in the United States Capitol* ........ 53
H.R. Rep. 143 (1874) ........ 28
H.R. Rep. No. 1106 (1908) ........ 37, 43, 87
H.R. Rep. No. 271 (1830) ........ 27, 28
H.R. Rep. No. 662 (1955) ........ passim
S. Rep. No. 1287 (1954) ........ 48
S. Rep. No. 637 (1955) ........ 48

### Historical Documents

*A Compilation of the Messages and Papers of the Presidents, 1789-1897* (James D. Richardson ed., 1897) ........ 25
Act for Religious Freedom (1786) ........ 21
Articles of Confederation (1781) ........ 21
Benjamin Rush, *A Plan of a Peace-Office for the United States*, in *The Selected Writings of Benjamin Rush* 20 (Dagobert D. Runes ed., 1947). ........ 24

Benjamin Rush, *Letters* 517 (L.H. Butterfield ed., 1951) (letter of June 15, 1789) ........ 24

*Debates in the Several State Conventions … 1787* (J. Elliot ed., 2d ed. 1836) ........ 22

Declaration of Independence (1776) ........ 21

James Madison, *A Memorial and Remonstrance* (1786) ........ 89, 90

James Madison, *To Edward Livingston*, in 9 *The Writings of James Madison* (Gaillard Hunt ed., 1910) ........ 24

*Journals of the Continental Congress 1774-1789*, vol. 22 (1914) ........ 95

*Journals of the Continental Congress 1774-1789*, vol. 5 (1904) ........ 95

*Old Family Letters: Copied from the Originals* (Biddle ed., 1892) ........ 26

*Proceedings of the National Convention to Secure the Religious Amendment of the Constitution of the United States* (1872) ........ 32

Raymund Harris, *Scriptural Researches on the Licitness of the Slave-Trade* (1788) ........ 75

*Report [of the Director of the Mint]*, in *Report of the Secretary of the Treasury … Year … 1862* (1863) ........ xii, 31, 33

*Report of the Director of the Mint*, in *Report of the Secretary of the Treasury … Year … 1863* (1863) ........ xii, 31

*Report of the Director of the Mint*, in *Report of the Secretary of the Treasury … Year 1864* (1864) ........ xii, 34

*Report of the Director of the Mint*, in *Report of the Secretary of the Treasury … Year 1865* (1865) ........ xii, 35

*Report of the Director of the Mint*, in *Report of the Secretary of the Treasury … Year 1866* (1866) ........ xii, 35

Sabbath Sch. Soc., *New England Primer* (rev. ed. 1843) ........ 77

The Records of the Federal Convention of 1787 (Max Farrand ed. 1911) ........ 23

Timothy Dwight, *A Discourse in Two Parts* (1812) ........ 26, 27

**Biblical References**

1 *Timothy* 6:15 ........ 31

2 *Corinthians* 6:14 ........ 57

*Leviticus* 24:16 ........ 57

*Proverbs* 3:5 ........ 75

*Psalms* 14:1 .......... 57

*Psalms* 46:9 .......... 34

*Psalms* 65:7 .......... 34

*Revelation* 17:14 .......... 31

*Revelation* 19:16 .......... 31

## Other Authorities

A. Roy Eckardt, *The New Look in American Piety*, 71 The Christian Century 1395 (1954) .......... 51

Am. Inst. of Pub. Op., Gallup Poll conducted July 21, 1965 .......... 58

*American Aurora: A Democratic-Republican Returns* (1998) .......... 26

Anson Phelps Stokes, *Church and State in the United States* (1950) .......... 30

Ashley Parker, *In Romney's Hands, Pledge of Allegiance is Framework for Criticism*, N.Y. Times (Sept. 9, 2012) .......... 62

*Billy Graham: A New Kind of Evangelist*, Time, Oct. 25, 1954 .......... 56

*Camden Man Asks Treasury to Put Religious Motto on Bills*, Ark. Gazette, Dec. 6, 1953 .......... 43

Clement D. Johnston, *The Spiritual Responsibility of American Business and Industry*, 22 Vital Speeches of the Day, Dec. 15, 1955 .......... 56

*Coin Symbols*, N.Y. Times, Nov. 15, 1907 .......... 36

D.W. Brogan, *Unnoticed Changes in America*, Harper's Mag., Feb. 1957 .......... 51

Douglas T. Miller & Marion Nowak, *The Fifties: The Way We Really Were* (1977) .......... 51, 56, 57

Ed Rochette, *The Man Who Put God's Trust in Your Pocket*, *Antiques & Collecting*, July 1987 .......... 44

*Eisenhower Joins in a Breakfast Prayer Meeting*, N.Y. *Times*, Feb. 5, 1954 .......... 55

Fred Petrucelli, *Almighty Dollar Mentions God Because of Arkansan*, Ark. Gazette, Mar. 4, 1955 .......... 43

*Funk & Wagnalls New Practical Standard Dictionary of the English Language* (1956) .......... 57

*In God We Trust*, 63 The Independent 1196 (1907) .......... 36

J. Ronald Oakley, *God's Country: America in the Fifties* (1986) .......... passim

Martin Marty, *Under God, Indivisible, 1941-1960* (1996) .......... 49, 50

Michael W. McConnell, *Symposium: New Directions in Religious Liberty: "God is Dead and We Have Killed Him!"* 1993 BYU L. Rev. 163 (1993).......................... 89

*Motto on Coinage*, 87 The Outlook 707 (1907) ........................................................... 36

*New Century Dictionary of the English Language* (1948) ............................................... 57

*New Legend on Our Coins*, *N.Y. Times*, Dec. 18, 1865..................................................... 35

Norman Vincent Peale, *The Power of Positive Thinking* (1952) ........................................ 56

Penny Edgell et al., *Atheists as "Other": Moral Boundaries and Cultural Membership in American Society*, 71 Am. Soc. Rev. 211 (2006) ...................................... 74

Peter Lewis, *The Fifties* (1978) ........................................................................................ 56

*President and the Motto on Our* Coins, 44 Current Literature 68 (Jan.-June 1908) ...................................................................................................................... 37

*Report of the American Bible Society at Its 138th Annual Meeting*, Time, May 24, 1954 ............................................................................................................ 56

Richard J. Ellis, *To the Flag* (2005) .................................................................................. 49

Samuel Stouffer, *Communism, Conformity, and Civil Liberties* (1955) ............................ 57, 58

*Supreme Court on Church and State* (Joseph Tussman ed. 1962) ........................................ 58

Ted Schwarz, *A History of United States Coinage* 228 (1980) ............................................. 35

U.S. Mint, *2003 United States Mint Annual Report* ............................................................. 78

*Webster's New Twentieth Century Dictionary of the English Language – Unabridged* (2d ed. 1956) ............................................................................................ 57

*What Makes a Christian State?* 63 The Independent 1263 (1907) ....................................... 36

Will Herberg, *Protestant-Catholic-Jew* (1960) ........................................................ 51, 55, 56

Will M. Gervais et al., *Do You Believe in Atheists? Distrust Is Central to Anti-Atheist Prejudice*, 101 J. of Personality & Soc. Psychol. 1189 (2011)......................... 73

William Lee Miller, *Piety Along the Potomac*. The Reporter, Aug. 17, 1954 ......................... 53

William Lee Miller, *The 'Moral Force' Behind Dulles's Diplomacy*, The Reporter, Aug. 9, 1956 ...................................................................................................... 51

*William Randolph Hearst: A Portrait in his Own Words* (Edmond D. Coblentz ed. 1952) ........................................................................................................ 57

Wilton B. Persons, *Your Future: A Stupendous Stimulating Challenge* (May 30, 1954), in 20 *Vital Speeches of the Day* 688 (1954)............................................... 51

*Words and Works*, Time, Sept. 20, 1954 ............................................................................. 57

**Websites**

archive.org/stream/ proceedingsofn00nati#page/1/mode/1up................................................ 32

Baptist Press, *Day of Prayer May Have Been Largest Ever* (May 3, 2012) www.bpnews.net/BPFirstPerson.asp?ID=37756 ............................................................ 72

Bureau of Engraving & Printing, U.S. Dep't of the Treas., Category: U.S. Currency, moneyfactory.gov/faqlibrary.html..................................................................... 81

Bureau of Engraving and Printing, U.S. Dep't of the Treas., *About the BEP*, www.moneyfactory.gov/aboutthebep.html................................................................ 19

Colonial Charters, Grants and Related Documents, avalon.law.yale.edu/subject_menus/statech.asp................................................................. 21

Congressional Prayer Caucus Foundation, Inc., *About the Cause: Why Is This Significant?* www.ingodwetrustmotto.us/ about-the-cause.......................................... 72

Dwight D. Eisenhower, *Remarks Recorded for the "Back-to-God" Program of the American Legion*, Feb. 20, 1955, www.presidency.ucsb.edu/ws/index.php?pid=10414 .................................................. 49, 59

Frank Newport, Gallup Politics, *In U.S., 46% Hold Creationist View of Human Origins* (June 1, 2012) (citing a Gallup poll conducted May 3-6, 2012, www.gallup.com/poll/155003/Hold-Creationist-View-Human-Origins.aspx ............................................................................................................ 76

George H.W. Bush, *Remarks at the Annual National Prayer Breakfast*, May 4, 1989, bushlibrary.tamu.edu/research/public_papers. php?id=388&year= 1989&month=all ....................................................................... 60

George W. Bush, *50th Anniversary of Our National Motto, "In God We Trust,"* [July 27,] *2006*.................................................................................................... 61

Gerald Ford, *Proclamation 4338 – National Day of Prayer*, [Dec. 5,] *1974*.......................... 59

Gerald Ford, *Remarks at the Professional Athletes Prayer Brunch*, Feb. 16, 1976, www.presidency.ucsb.edu/ws/?pid=5492 ..................................................... 59, 60

Jeffrey M. Jones, Gallup, *Atheists, Muslims See Most Bias as Presidential Candidates* (June 21, 2012), www.gallup.com/poll/155285/Atheists-Muslims-Bias-Presidential-Candidates.aspx........................................................................ 74

Jessica Yellin, *Just In*, CNN.com Politics (Sept. 5, 2012), politicalticker.blogs.cnn.com/2012/09/05/ just-in-democrats-to-update-platform-with-jerusalem-reference/ ...................................................................... 62

Jimmy Carter, *Independence, Missouri Remarks and a Question-and-Answer Session at a Townhall Meeting*, Sept. 2, 1980 ....................................................... 60

Little League, *Pledge*, www.littleleague.org/learn/about/pledge.htm.................................... 56

*Merriam-Webster*, *Dictionary*, www.merrriam-webster.com/dictionary/motto ........ 85

Pew Forum on Religious & Pub. Life, *Public Expresses Mixed Views of Islam*, Mormonism (Sept. 25, 2007), pewforum.org/Public-Expresses-Mixed-Views-of-Islam-Mormonism.aspx ........ 73

Pew Res. Ctr., The Pew Global Attitudes Project 33, Oct. 4, 2007, pewglobal.org/ files/pdf/258.pdf ........ 73

Ronald Reagan, *Proclamation 4826 – National Day of Prayer*, [Mar. 19,] *1981* ........ 60

Ronald Reagan, *Question-and-Answer Session with Students at Farragut High School in Farragut, Tennessee*, June 14, 1983 ........ 60

*Transcript of Marco Rubio's Speech at the RNC,* FoxNews.com, Aug. 30, 2012, www.foxnews.com/politics/2012/08/30/transcript-marco-rubio-speech-at-rnc/ ........ 62

U.S. Dep't of the Treas., *About: History of 'In God We Trust'*, www.treasury.gov/about/education/Pages/in-god-we-trust.aspx ........ 28, 30, 81

U.S. Mint, *About the United States Mint*, www.usmint.gov/about_the_mint/ ........ 19

U.S. Mint, *In God We Trust*, www.usmint.gov/about_the_mint/fun_facts/?action= fun_facts5 ........ 33

White House, *James Madison* ........ 22

Wikipedia, *Symbols of Europe*, en.wikipedia.org/wiki/ European_symbols#Motto ........ 80

William J. Clinton, *Proclamation 6991, National Day of Prayer*, [Apr. 18,] 1997, www.presidency.ucsb.edu/ws/index.php?pid=54013........ 60

www.congress.gov/bill/109th-congress/ house-concurrent-resolution/411/all-info#cosponsors ........ 64

www.frc.org/mission-statement ........ 72

www.goddiscussion.com/96308/congressman-urges-respect-for-nonbelievers-but-doesnt-think-atheists-truly-exist-in-america/ ........ 77

www.lettersofnote.com/2009/ 10/word-god-is-product-of-human-weakness.html ........ 75

www.whitehouse.gov/the-press-office/2011/11/02/remarks-president-urging-congress-pass-infrastructure-piece-american-job. ........ 61

**"Congress shall make no law respecting an establishment of religion,**

**or prohibiting the free exercise thereof; …"**

- U.S. Const. amend. I

**"Our national coinage in its devices and legends should indicate the Christian character of our nation, and declare our trust in God."**

- 1862 Annual Report of the Director of the Mint

**"We claim to be a Christian nation -- … Our national coinage … should declare our trust in God -- in Him who is the 'King of Kings and Lord of Lords.'"**

- 1863 Annual Report of the Director of the Mint

**"Why should this distinct and unequivocal recognition of the sovereignty of God, of Him who is 'the King of kings and Lord of lords,' be confined to our bronze coinage? … Let our nation in its coinage honor Him …."**

- 1864 Annual Report of the Director of the Mint

**"[T]he gold and silver coins of the mint of the United States will have impressed upon them, by national authority, the distinct and unequivocal recognition of the sovereignty of God, and our nation's trust in Him. We have added to our nation's honor by honoring Him who is 'King of kings and Lord of lords.'"**

- 1865 Annual Report of the Director of the Mint

"'**Happy is that nation whose God is the Lord**.'"

- 1866 Annual Report of the Director of the Mint

Plaintiffs in this action challenge the use of the phrase "In God We Trust" on the nation's money. They do so alleging as follows:

## JURISDICTION AND VENUE

1. This is a civil action claiming violations of 42 U.S.C. § 2000bb through § 2000bb-4 (2012), the Religious Freedom Restoration Act of 1993 (RFRA). As such, this Court has jurisdiction under 42 U.S.C. § 2000bb-1(c) and 28 U.S.C. § 1331.
2. This is a civil action claiming violations of the First and Fifth Amendments of the Constitution of the United States of America. As such, this Court has jurisdiction under 28 U.S.C. § 1331.
3. This action is founded in part upon the Constitution of the United States of America. As such, this Court has jurisdiction over Defendant United States of America under 28 U.S.C. § 1346(a)(2).
4. This action is in the nature of mandamus and seeks to compel the Congress of the United States of America, the United States of America, its agents and its officers to perform their duties owed Plaintiffs under RFRA and under the terms of the First and Fifth Amendments of the Constitution of the United States. As such, this Court has jurisdiction under 28 U.S.C. § 1361.
5. Defendants are each an officer or employee of the United States, an agency of the United States, or the United States. At least one individual Plaintiff resides in and/or has a dwelling in this judicial district. Venue is therefore proper under 28 U.S.C. § 1391(e)(1)(C).
6. A substantial part of the events or omissions giving rise to this claim occurred, occur, or will occur in this judicial district. Venue is therefore proper under 28 U.S.C. § 1391(b)(2) and § 1391(e)(1)(B).

## PARTIES

### A. PLAINTIFFS

7. Plaintiff New Doe Child #1 is 10 years old and a resident of Minnesota. Although he has not yet come of age in terms of fully declaring his religious ideology, he has expressed that he does not believe in any gods. He has had, continues to have, and will in the future have regular and frequent contacts with the nation's money. When he is confronted with "In God We Trust" on every coin and currency bill he handles or learns about in school, the power and prestige of the federal government is brought to bear upon him, with the message that his father's (and, possibly, his own) Atheism is false. This unwarranted influence upon the religious opinions of an impressionable minor child is a substantial burden upon his exercise of religion.

8. Plaintiff New Doe Child #2 is 15 years old and a resident of Minnesota. He has declared himself to be an Atheist. He has had, continues to have, and will in the future have regular and frequent contacts with the nation's money. When he is confronted with "In God We Trust" on every coin and currency bill he handles or learns about in school, the power and prestige of the federal government is brought to bear upon him, with the message that his father's (and his own) Atheism is false. This unwarranted influence upon the religious opinions of an impressionable minor child is a substantial burden upon his exercise of religion.

9. Plaintiff New Doe Child #3 is 17 years old and a resident of Minnesota. She has declared herself to be an Atheist. She has had, continues to have, and will in the future have regular and frequent contacts with the nation's money. When she is confronted with "In God We Trust" on every coin and currency bill she handles or learns about in school, the power and prestige of the federal government is brought to bear upon her, with the message that her father's (and her own) Atheism is false. This unwarranted influence upon the religious opinions of an impressionable minor child is a substantial burden upon his exercise of religion.

10. Plaintiff New Doe Parent is the father of Plaintiffs New Doe Child #1, New Doe Child #2 and New Doe Child #3. He is a resident of Minnesota who served honorably both on active duty in the United States Marine Corps and in the United States Army Reserve - National Guard. He is a member of Minnesota Atheists, the Freedom From Religion Foundation, and Americans United for the Separation of Church and State. He frequently handles United States currency.

New Doe Parent is an Atheist; he does not believe that any gods exist, and accordingly does not trust in any god or "God". He attends and volunteers as a Religious Education teacher at a local Universalist Church. As a Unitarian Universalist, he believes that ultimate truths about life, death, meaning, and the human spirit cannot be captured in a narrow statement of faith.

When using United States currency, New Doe Parent is unwillingly confronted with the governmentally-mandated "In God We Trust" phrase. This substantially burdens him in the exercise of his religion in a number of ways. First, he is essentially forced to choose between either relinquishing the convenience of carrying the nation's money, or bearing on his person a religious message that is the complete antithesis of his Atheistic beliefs. Furthermore, by limiting trust to "God," the inscriptions suggest that New Doe Parent #1 is wrong in his Unitarian Universalist beliefs that other faiths, and non-faith beliefs, can offer wisdom worthy of trust. Second, exercise of his Atheism requires that he maintain honesty, and it is absolutely dishonest for him to carry the false message that "We" (i.e., Americans, of which he is one) trust in God. Third, by passing American money to others (at times during foreign travel), he is proselytizing for a religious notion (i.e., Monotheism) that he finds false. Such proselytizing is absolutely forbidden in the exercise of his Atheism, and is contrary to Unitarian Universalism. Fourth, by collecting, contributing to, and passing on American money containing this message during his duties as a Unitarian Universalist religious education teacher, he is undermining the lessons he teaches to children as his exercise of his faith, as children observe a message inconsistent with the faith lessons he is attempting to impart to them. In addition the message on American currency clearly conveys to Unitarian Universalist students that Unitarian

Universalism is a disfavored religion. Finally, New Doe Parent #1 suffers alienation himself as he is constantly reminded that – solely on the basis of his sincerely-held religious views – he is an outsider in his own country, deemed unpatriotic and a lesser American.

The government's placement of “In God We Trust” presumes that God exists and that God is to be trusted. This government statement directly contradicts New Doe Parent #1’s message to his children. In addition, it proclaims that one religious belief - trust in a God - is not, according to the government, to be questioned. This message directly conflicts with New Doe Parent #1’s encouragement to his children to question any notions of gods. Additionally, because Defendants’ acts can cause societal alienation of non-theists, New Doe Parent #1 has advised his children not to assert their religion at school, in order to protect them from adverse consequences.

In these ways and others, the government's actions substantially burden New Doe Parent #1’s ability to exercise his religion, and to direct the religious education of his children.

11. Plaintiff New Roe Child is 11 years old and a resident of Missouri. He is an Atheist. Because he is not old enough to have a credit card, New Roe Child has no option but to use U.S. coins and currency when he wishes to engage in general commerce. Thus, he is unwillingly forced to confront the “In God We Trust” motto.

In school, New Roe Child’s teachers talk about money and god in class. In that setting, he receives the message that the government and teachers think Atheists are wrong and stupid and bad people. More importantly, he has been led to sense that his disbelief in God has resulted in others thinking bad things about him. In fact, in combination with the public humiliation he has suffered due to his refusal to pledge allegiance “under God,” the religious message on the money has taken on a meaning that the majority of the country thinks bad things about him, including that he is an unpatriotic and bad American.

New Roe Child feels that the government is asking him to pretend that he holds a religious belief that he does not hold. In other words, the government is asking him to lie, which, in and of itself, substantially burdens his religious tenets (which include a proscription against lying). When it is realized that this lie relates to his personal religious views, the substantial burden on his free exercise rights is unequivocal.

12. Plaintiff New Roe Parent is a parent who is raising Plaintiff New Roe Child. She is a resident of Missouri. She is an Atheist, who denies there exists any God. When she engages in everyday commerce, she wishes to enjoy the convenience of using the coins and currency bills produced by the government. Yet, in doing so, she is unwillingly forced to confront the "In God We Trust" inscriptions placed on those monetary instruments by Defendants here. Furthermore, she is forced to spread the "In God We Trust" message, which causes her stress and personal injury, both to her conscience and her wellbeing.

New Roe Parent does not wish to have her children taught that there is exists a God, and feels that, by condoning their use of U.S. currency, she is fostering a situation that will lead to their being subjugated, oppressed, and relegated to second-class status. This limitation of their ability to express their religious views, combined with the coercion that has them expressing the views of others, is a substantial burden on her free exercise (and parental) rights.

Because her religious views incorporate the idea that her body and the bodies of her children are inviolable, subject to their own will alone, New Roe Parent #1 finds the governmental coercion to carry the "In God We Trust" motto violates her and her children's religious rights to personal autonomy.

13. Plaintiff New Boe Child is 17 years old and a resident of Iowa. He is a non-theist who is regularly unwillingly confronted with Defendants' "In God We Trust" claims. This occurs as he uses the nation's coins and currency bills in everyday commerce as he makes purchases and as he earns money.

14. The free exercise of Plaintiff New Boe Child's non-theistic beliefs is substantially burdened as the power, prestige and financial support of the federal government is used to make the religious claim that "In God We Trust," as he is repeatedly told that he (as one of the "We" in that phrase) trusts in God, and as he is essentially forced to bear that false religious claim and proselytize its message to others.

15. Plaintiff New Boe Parent is a parent who is raising Plaintiff New Boe Child. He is a resident of Iowa and a member of the American Humanists Association, as well as its local chapter, Humanists of Linn County. His personal faith is non-theist, with no belief in any gods or supernatural deities.

Plaintiff New Boe Parent is unwillingly confronted with Defendants' "In God We Trust" inscriptions on a regular basis as he pays rent, shops and banks. His free exercise of his religious beliefs is substantially burdened as he is forced to bear coins and currency bills bearing that government-sponsored message which he believes to be false. Especially with the message being attributed to him (as a member of the "We" in those inscriptions), New Boe Parent is burdened as he seeks to engage in commerce without use of the coins or currency bills that serve as the nation's legal tender. His exercise of religion is further burdened as the power, prestige and financial support of government influences his child.

16. Plaintiff New Poe Child is 2 years old and a resident of Arkansas. She will in the future have regular and frequent contacts with the nation's money. When she is confronted with "In God We Trust" on every coin and currency bill she handles or learns about in school, the power and prestige of the federal government will be brought to bear upon her with the message that her father's (and her own) Atheism is false. Additionally, she will be taught to carry and promote a religious message (which her father is teaching her to at least consider denying), and to also make a completely false declaration as to what is likely to be her own religious view on the matter of God's existence. Moreover, she will suffer alienation and other harms as she finds that, solely on the basis of sincere religious beliefs, her family exists as a collection of outsiders in their own homeland.

17. Plaintiff New Poe Parent is a resident of Arkansas who is the founding member of the Saline Atheist & Skeptic Society. He is an Atheist who, accordingly, definitely does not trust in any God.

Plaintiff New Poe Parent frequently handles United States currency. This forces him to unwillingly confront the governmentally-mandated “In God We Trust” phrase on a regular basis. This substantially burdens him in the exercise of his religion in a number of ways. First, he is essentially forced to choose between either relinquishing the convenience of carrying the nation’s money, or bearing on his person a religious message that is the complete antithesis of his Atheistic beliefs. Second, exercise of his Atheism requires that he maintain honesty, and it is absolutely dishonest for him to carry the false message that “We” (i.e., Americans, of which he is one) trust in God. Finally, by passing American money to others (at times during foreign travel), he is proselytizing for a religious notion (i.e., Monotheism) that he finds false. Such proselytizing is absolutely forbidden in the exercise of his Atheism.

New Poe Parent suffers alienation as he is constantly reminded that – solely on the basis of his sincerely-held religious views – he is an outsider in his own country. He has been excluded from social events due in no small part to the pervasive governmental message of denigration for Atheists.  His organization has already seen push back in his community, unlike any that might occur with a Monotheistic organization. For instance, after adopting a mile of local highway and having a sign erected, citizens have contacted local politicians in an effort to have the sign moved. Interestingly – as is the case for New Poe Parent with the money – those citizens objected to having to unwilling confront the message on the sign. (Of course, New Poe Parent’s sign is private speech, whereas the “In God We Trust inscriptions are government speech.) Plaintiff New Poe Parent is also burdened with handling currency in the attempt to promote his organization through the sale of t-shirts, which completely contradicts his mission and the mission of the organization.

18. Plaintiff New Coe Child #1 is four years old and a resident of Iowa. He has already been introduced to this country's currency, and his interactions with money will quickly increase as he begins to learn and understand it in public school. Thus, no matter how thoroughly his parents have instilled and will continue to instill Atheistic values into him, he will have his beliefs challenged and doubted by the power, prestige and financial support of the federal government. This type of unwilling confrontation with the “In God We Trust” religious statement substantially burdens New Coe Child #1’s free exercise of religion.

19. Plaintiff New Coe Child #2 is two years old and a resident of Iowa. He is about to be introduced to this country's currency, and his interactions with money will quickly increase as he begins to learn and understand it in public school. Thus, no matter how thoroughly his parents have instilled and will continue to instill Atheistic values into him, he will have his beliefs challenged and doubted by the power, prestige and financial support of the federal government. This type of unwilling confrontation with the “In God We Trust” religious statement substantially burdens New Coe Child #2’s free exercise of religion.

20. Plaintiff New Coe Child #3 is five months old and a resident of Iowa. She is about to be introduced to this country's currency, and her interactions with money will quickly increase as she begins to learn and understand it in public school. Thus, no matter how thoroughly his parents have instilled and will continue to instill Atheistic values into her, she will have her beliefs challenged and doubted by the power, prestige and financial support of the federal government. This type of unwilling confrontation with the “In God We Trust” religious statement substantially burdens New Coe Child #3’s free exercise of religion.

21. Plaintiff New Coe Parent is a parent who is raising Plaintiffs New Coe Child #1, New Coe Child #2 And New Coe Child #3. He is a lifelong resident of Iowa. He is an Atheist who leads the Delaware County Coalition of Reason (which he also founded), which seeks to raise awareness of those without a belief in a god/several gods/or any supernatural being.

Thus, when using United States currency, his religious freedom is substantially burdened (and mocked) as he is confronted with the phrase "In God We Trust," sponsored by the federal government each time he purchases goods and/or services. New Coe Parent #1 is also a business owner so he often has no control over whether or not this experience will repeat itself. As a result, New Coe Parent is almost daily unwillingly confronted by the government with what he believes is a false and offensive religious statement on the currency that he uses to make a living and enjoy his life.

Upholding the civil rights and equal treatment of all Americans--especially Atheists and non-believers--is not only a personal issue for New Coe Parent, but one that he promotes through his role as Vice Chair with the Delaware County Democrats. Ensuring that Atheists and those that don't honor any gods, let alone one Christian god, are treated with the same amount of respect as believers in God is something that cannot be achieved when government endorses an exclusionary religious notion (such as Monotheism).

Plaintiff New Coe Parent wishes to raise his children in an environment where they are allowed to question the existence of any God without the undue influence of the government. That cannot be done when those children are repeatedly and unwillingly confronted with the nation's currency proclaiming "In God We Trust." The religious statement on the money subtly but yet unapologetically interferes and burdens New Coe Parent's family's ability to exercise its belief system and Atheistic views.

22. Plaintiff Gary Lee Berger is a resident of Arkansas. He is co-founder of Secular Professionals Alliance at Walmart, (Bentonville, AR), is a long-time member in good standing of the Freedom From Religion Foundation (Madison, WI), was a founding board member of Atheists of Silicon Valley (Mountain View, CA) and has produced Atheist-theme videos under the banner Friendly Neighborhood Atheist Video Productions. He frequently uses United States currency.

Plaintiff Berger has always been an Atheist. He bases his decisions, morals and behavior on the fact that no gods have ever existed in reality. He places no trust in any god. Thus, when using United States currency, he is unwillingly confronted with the governmentally-mandated "In God We Trust" phrase. This substantially burdens him in the exercise of his religion in a number of ways. First, he is essentially forced to choose between either relinquishing the convenience of carrying the nation's money, or bearing on his person a religious message that is the complete antithesis of his Atheistic beliefs. Second, exercise of his Atheism requires that he maintain honesty, and it is absolutely dishonest for him to carry the false message that "We" (i.e., Americans, of which he is one) trust in God. Finally, by passing American money to others, he is proselytizing for a religious notion (i.e., Monotheism) that he finds false and dangerous. Such proselytizing is absolutely forbidden in the exercise of his Atheism.

Plaintiff Berger is a step-parent who has raised his children to question the existence of any God. Defendants' placement of "In God We Trust" on the coins and currency – which uses the power and prestige of the federal government to say, essentially, that Americans do not (or should not) question God's existence – interferes with Plaintiff Berger's decisions in this regard and undermines his parental role in rearing his children in a manner consistent with his religious values.

In these ways and others, Defendants' actions substantially burden Plaintiff Berger's ability to exercise his religion.

23. Plaintiff Marie Alena Castle is a resident of Minnesota. She is the Communications Director of Atheists for Human Rights and the author of Culture Wars: The Threat to Your Family and Your Freedom. She handles United States coins and currency on a regular basis, and (being an Atheist) is unwillingly forced to confront the "In God We Trust" inscriptions.

Plaintiff Castle believes that a basic human need is to feel accepted by one's community. Yet, because of Defendants' actions, she is unable to have that need met. Worse, she is ostracized because of her religious beliefs as a result of the "In God We Trust" inscriptions on the money.

Plaintiff Castle was laid off from the last pre-retirement job she had specifically because of her Atheism, which had come up occasionally in conversations with co-workers. The governmental inscriptions of "In God We Trust" likely influenced her employer in believing he was justified in terminating Plaintiff Castle's employment on that religious ground.

Plaintiff Castle is substantially burdened in the exercise of her Atheism by the challenged inscriptions. First, she is forced to choose between having the convenience of using coins and currency and violating her religious tenets (by bearing a message that starkly contradicts her personal religious views) or sacrificing the ability to engage in everyday commerce so that she can adhere to those views. Second, if she carries the money, she is forced to make a false claim: that "Americans" trust in God. As a member of that group who definitely does not trust in God, she is bearing false witness. Finally, as she travels, she is forced to proselytize for a religious belief with which she sharply disagrees.

24. Plaintiff Charles Daniel Christopher is a resident of Missouri who was raised in a Christian household. Unfortunately, Plaintiff. Christopher was abused – emotionally, physically and sexually – not only within that household, but by the Deacons of two distinct churches. As a result, Plaintiff Christopher suffers from post-traumatic stress disorder (PTSD)

As a result of his current condition, religion and its trappings trigger a significant number of Plaintiff Christopher's emotional outbursts and rages that have wrought great physical damage to his surroundings, to people with whom he has had close relationships, his career, and himself.

Although he trusted in God when he was an impressionable child, Plaintiff Christopher's experiences, education, and reasoning have caused him to view God not only as a fiction, but a fiction that, upon careful analysis, appears to be somewhat of a psychopathic monster.

All in all, the foregoing leads to discomfort for Plaintiff Christopher when he handles and spends money marked with the "In God We Trust" inscriptions. In fact, rather than perpetuate that blatant lie, Plaintiff Christopher tries to arrange for all his transactions to be made with credit or debit cards. This need to endure that process, which is often quite arduous, is a substantial burden upon Mr. Christopher's exercise of his Atheism.

25. Plaintiff Patrick Ethen is a resident of Minnesota and a member of American Atheists. As a homeowner and a businessman, he frequently needs to handle United States currency.

Mr. Ethen is an Atheist. Accordingly, he does not trust in anyone's "god". Every time he uses U.S. currency, he is forced to confront the "In God We Trust" inscriptions against his will. This puts him in the position of either not using the money or promoting the message that he is part of a nation that trusts in a god, which is a notion that is counter to his religious beliefs. This violation of his constitutional rights compels him to violate one of the most important aspects of his religious belief system, honesty, every time he uses his nation's currency. A further affront to his integrity is that by passing out currency with the "In God We Trust" message, he is am put in a position of proselytizing for a monotheistic deity that is in exact opposition to the tenets of his faith.

Mr. Ethen is also a father. When he provides money to his children, he is put in the uncomfortable position of adding legitimacy to a message he believes is false, while also denigrating the religious values he wishes to instill in his children. Finally, the "In God We Trust" phrase communicates the idea that he and his children are political outsiders in their own nation, solely on the basis of their Atheistic religious views.

26. Plaintiff Betty Gogan is a resident of Missouri who frequently handles United States coins and currency. She is a member of the Freedom from Religion Foundation. As an Atheist, she is unwillingly forced to confront the "In God We Trust" inscriptions. This has resulted in ridicule and alienation. In fact, she once went to pay for some items with a currency bill that had the Monotheistic inscription crossed out (by someone other than her). The cashier at the store refused to take the money because of this. Another store employee was called, who also refused to take the money. Plaintiff Gogan asked to be shown some rule or law that prohibited accepting such currency bills. Meanwhile, others nearby began castigating Ms. Gogan for having such money (i.e., currency bills with "In God We Trust" crossed out, even though she was not the person who had done that act). Eventually, she was so embarrassed and humiliated that she left the items on the counter and left the store. Had she been a Monotheist who agreed that crossing out "In God We Trust" is a bad thing to do, she would have had no trouble. But because she was sympathetic to the idea of getting the religious verbiage off of the money, in large part because it shows absolute disrespect for her Atheistic religious views and turns her into a political outsider due solely to her religious choices, she suffered this emotionally traumatic experience that bothers her to this day, and likely will continue to bother her for the rest of her life.

27. Plaintiff Thomas Gogan is a resident of Missouri and an Atheist. He is a member of the Freedom from Religion Foundation. He has personally experienced multiple adverse incidents as a result of the religious motto on United States coins and currency bills.

For instance, his daughter once came home from school after she was involved in an altercation. The altercation resulted from his daughter expressing her view that there is no God. Other children apparently started making fun of his daughter, and one of those others pulled out a coin to demonstrate that the government says there is a God. This led to pushing and shoving, which led to severe emotional trauma sustained by his daughter. In fact, it took three days before she would return to school. Moreover, his daughter started doubting Plaintiff Gogan, especially when she realized that he, who denied God's existence, was saying the opposite when he gave her money for lunch, etc.

A few years ago, Plaintiff Gogan wrote a letter to the editor, criticizing the "In God We Trust" inscriptions on the money. Within two days, his property was set on fire and his mailbox was run over. About ten acres ended up being burned. Moreover, he received a message stating, "You will burn in hell if you do not change and come to Jesus." Plaintiff Gogan continues to worry about the harms he may suffer as a result of his having voiced his objections to the religious inscriptions.

Believing the inscriptions are false and unwilling to further the government's religions message, Plaintiff Gogan suffers the inconveniences associated with attempting to avoid using coins and currency. This is a substantial burden on the exercise of his Atheism.

28. Plaintiff Roger W. Kaye grew up in Minnesota, and returns to visit 2-3 times a year. During those visits, he does much shopping (since items are cheaper in Minnesota than in his current home state of Alaska). He is an Atheist, who finds it disconcerting (to the point of repulsiveness) that he has to unwillingly confront the "In God We Trust" language when he looks at his coins and currency bills. He is forced to feel quite hypocritical since the message he is furthering is contrary to his religious beliefs. When he has mentioned this internal conflict to a merchant, he has been told that the "In God We Trust" motto is on the currency because that is what America stands for, and if he didn't agree, he should leave the nation.

29. Plaintiff Charlotte Leverette is a resident of Arkansas who also frequently shops in Missouri. In both locations she frequently handles United States currency. She is affiliated with the Secular Coalition and American Humanists.

Plaintiff Leverette is an Atheist. Accordingly, she definitely does not trust in any God, and strongly feels that doing so would negate her personal sense of responsibility. Thus, when using United States currency, she is unwillingly confronted with the governmentally-mandated "In God We Trust" phrase. This substantially burdens her in the exercise of her religion in a number of ways. First, she is essentially forced to choose between either relinquishing the convenience of carrying the nation's money, or bearing on her person a

religious message that is the complete antithesis of her Atheistic beliefs. Second, exercise of her Atheism requires that she maintain honesty, and it is absolutely dishonest for her to carry the false message that "We" (i.e., Americans, of which she is one) trust in God. Finally, by passing American money to others (at times during foreign travel), she is proselytizing for a religious notion (i.e., Monotheism) that she finds false. Such proselytizing is absolutely forbidden in the exercise of her Atheism.

In addition, Plaintiff Leverette suffers alienation as she is constantly reminded that – solely on the basis of her sincerely-held religious views – she is an outsider in her own country. She has personally lost job opportunities and been excluded from social events due in no small part to the pervasive governmental message of denigration for unbelievers.

30. Plaintiff Dr. James B. Lyttle is a homeowner resident in Minnesota who frequently handles United States currency. He is a member of the Lake Superior Freethinkers and the non-theist "Church of Spiritual Humanism." Plaintiff Lyttle is also the father of a child who is now in kindergarten. Because Plaintiff Lyttle does not believe in God or other entities that lack scientific evidence, he does not want to bring up his daughter to believe that adult humans require imaginary friends to get by in life. Thus, when using United States currency, he is hampered in his ability to raise his child as he sees fit, being confronted with the governmentally-mandated phrase "In God We Trust." Plaintiff Lyttle does not believe in or trust God or other entities that lack scientific evidence. Thus, using the official currency of the United States confronts Plaintiff with a government-sanctioned contradiction to his parenting message that humans can solve problems through science and reason, without consulting supernatural figures who are likely imaginary. Furthermore, by carrying and using the official currency of the United States, he is in effect proselytizing a religious belief (Monotheism) that he finds to be probably false. These are his sincerely held religious beliefs (that people can do fine without imaginary friends who are thought to evoke magic) and his parenting is substantially interfered with by the phrase "In God We Trust" being mandated by the government on its official currency.

31. Plaintiff Kyle Pettersen-Scott is a resident of Minnesota who regularly handles United States currency when engaging in personal matters, business matters, and the social aspects of her life. She is also a Humanist and an Atheist. Her beliefs require her to act ethically and honestly and prohibit her from dishonestly and unethically proclaiming belief in a deity or imposing monotheistic ideas upon others.

On a daily basis (in fact several times a day) she is unwillingly confronted with the "In God We Trust" inscriptions on U.S. currency. This mandated inscription is burdensome and interferes with the free exercise of her religious beliefs. The carrying and use of U.S. currency containing this religious message puts her in the position of unwillingly proselytizing a message she does not agree with and which is inconsistent with her religious beliefs. It is not practical to avoid carrying U.S. currency without enduring substantial inconvenience. Thus, she is substantially burdened in the exercise of her religious beliefs by being unwillingly forced to proselytize a message that, for her, is untrue.

Plaintiff Pettersen-Scott considers herself to be a strong patriot of the United States. Yet Defendants' inscriptions of "In God We Trust" on each item of currency creates and perpetuates a situation which causes her to suffer alienation from the country she so dearly loves and supports, all because she wishes to remain true to her religious ideals. Those ideals are disparaged by Defendants when they exalt the "In God We Trust" claim.

32. Plaintiff Odin Smith is a resident of Minnesota. He is and has always been an Atheist. He is a mature minor whose parents are members of Minnesota Atheists, with his father being a member of that organization's board of directors. Plaintiff Smith has read and studied much about religion, and has concluded that no religion based on any god(s) is worthy of his beliefs or support. In addition to his general aversion to unfounded belief, he is especially alienated by mankind's history of numerous wars and other atrocities perpetrated in the name of some supernatural being. He is unaware of any such activity ever being perpetrated in the name of Atheism.

Plaintiff Smith is a hard worker, who is offended by the fact that every time he recycles cans or otherwise earns money, he is paid with currency claiming "In God We Trust." Furthermore, especially after having previously been placed in the situation where he has been forced to object to being led in prayer in public school, Mr. Smith is loath to object to the use of the Monotheistic inscriptions on the money lest he encounter hostility, harassment and, possible, physical injury. Defendants' actions substantially burden Mr. Smith's free exercise of his religious choices by not only forcing him to unwillingly confront religious dogma with which he disagrees, but to personally bear that dogma as he goes about his life. Moreover, he is forced to further a religious message that he finds offensive, and he is turned into a political outsider when he objects to these violations of his basic liberties.

33. Plaintiff Andrea Dawn Sampson is a resident of Missouri. She is an Atheist whose rights are violated and whose freedom of religion is hindered any time she uses United States currency. As an Atheist, Ms. Sampson does not worship to any deity. Thus, whenever she uses U.S. currency, Plaintiff Sampson confronts a religious statement that she is opposed to. She feels that she is harmed every time she sees currency that promotes a particular religious ideology that she does not subscribe to or endorse. Likewise, she feels she experiences psychological distress in exposing others to this forced religion when exchanging U.S. currency with other Atheists or other religious people who do not hold specifically Christian beliefs. Sampson also feels that this wording psychologically affects her in being a constant reminder that she does not fit in within her country due to the supposedly established "official religion" that is endorsed on U.S. currency.

34. Plaintiff Eric Wells is a resident of Missouri in which he frequently handles United States currency. He is a business owner and a self-employed construction contractor.

Plaintiff Wells is an Atheist and believes that no gods actually exist and therefore cannot trust in any god. Accordingly, when using United States currency, he is unwillingly confronted with the governmentally-mandated "In God We Trust" phrase. This substantially burdens him in the exercise of his religion in a number of ways. First, he is

essentially forced to choose between either relinquishing the convenience of carrying the nation's money, or bearing on his person a religious message that is the complete antithesis of his Atheistic beliefs. Second, exercise of his Atheism requires that he maintain honesty, and it is absolutely dishonest for her to carry the false message that "We" (i.e., Americans, of which he is one) trust in God. Finally, by passing American money to others (at times during foreign travel), he is proselytizing for a religious notion (i.e., Monotheism) that he finds false. Such proselytizing is absolutely forbidden in the exercise of his Atheism.

35. Plaintiff Atheists For Human Rights (AFHR) is a national, ethics-driven organization headquartered in Minnesota. It seeks to uphold an Atheism that is confidently held and morally active, and it vigorously opposes religions that are politically and socially predatory or harm innocent people. It helps groups victimized by our nation's religion-based laws - laws that have no secular justification.

36. Plaintiff Saline Atheist & Skeptic Society is a subsidiary of the Arkansas Society of Freethinkers under the Central Arkansas Coalition of Reason umbrella. As such, it promotes the secular, non-theistic, Humanist viewpoint as a valid contribution to public discourse. The organization strives to protect the First Amendment guarantee of separation of church and state and works in coalition with like-minded people and organizations where joint action is needed to maintain this separation. It also seeks to enrich the community by hosting and developing informative activities and events, and to encourage and facilitate public dialogue in matters of science, reason and tolerance.

**B. DEFENDANTS**

37. Defendant the Congress of the United States of America is the branch of government granted all legislative powers under Article I, Section 1, of the United States Constitution.

38. Defendant the United States of America is the constitutionally established government of the United States of America.

39. Defendant Jacob J. Lew is being sued in his official capacity as the nation's Secretary of the Treasury. Pursuant to 31 U.S.C. § 301(b), he is "head of the Department [of the Treasury]." Pursuant to 31 U.S.C. § 321(a)(4), Defendant Lew "shall … mint coins, [and] engrave and print currency."

40. Defendant Rhett Jeppson is being sued in his official capacity as the Principal Deputy Director of the Mint. "The primary mission of the United States Mint is to serve the American people by manufacturing and distributing circulating, precious metal and collectible coins and national metals, and providing security over assets entrusted to us."[1] Defendant Jeppson, pursuant to 31 U.S.C. § 304(b)(2), "shall carry out duties and powers prescribed by the Secretary of the Treasury."

41. Defendant Larry R. Felix is being sued in his official capacity as the Director of the Bureau of Engraving and Printing (BEP). According to the BEP website, "The mission of the Bureau of Engraving and Printing is to develop and produce United States currency notes, trusted worldwide. As its primary function, the BEP prints billions of dollars – referred to as Federal Reserve Notes – each year for delivery to the Federal Reserve System."[2] Defendant Felix, pursuant to 31 U.S.C. § 303(b)(1), "shall carry out duties and powers prescribed by the Secretary [of the Treasury]."

---

[1] U.S. Mint, *About the United States Mint*, www.usmint.gov/about_the_mint (last visited on Dec. 9, 2015).

[2] Bureau of Engraving & Printing, U.S. Dep't of the Treas., *About the BEP*, www.moneyfactory.gov/about.html (last visited on Dec. 9, 2015).

## INTRODUCTION

42. Defendants produce the coins and currency bills that serve as this nation's legal tender.

43. Pursuant to 31 U.S.C. § 5112(d)(1)[3] and 31 U.S.C. § 5114(b),[4] Defendants inscribe the phrase "In God We Trust" on every one of those coins and currency bills.

44. In order to transact much of their everyday commerce, Plaintiffs wish to utilize the coins and currency bills that Defendants produce.

45. Pursuant to their religious beliefs, Plaintiffs specifically do not trust in any "God." In fact, NOT trusting in God is a basic tenet of their religious belief systems.

46. Additionally, their non-theistic religious ideologies mandate that they act with honesty.

47. Accordingly, by being compelled to personally bear and propagate the religious claim that "In God We Trust," they are substantially (and doubly) burdened in their religious exercise.

48. In other words, Defendants' acts force Plaintiffs to choose between either relinquishing their rights to participate in much of their everyday commerce (by using the nation's monetary instruments) or violating their religious beliefs.

49. Forcing individuals to make such a "choice" is impermissible under both the Free Exercise Clause and under the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb through § 2000bb-4, unless Government has a compelling interest, and uses the least restrictive means to serve that interest.

50. Government has no compelling interest in placing "In God We Trust" on the money. In fact, the only compelling interest in regard to that motto is to NOT inscribe it, since (as provided in the first ten words of the Bill of Rights) "Congress shall make no law respecting an establishment of religion."[5]

51. In view of the foregoing, and for the further reasons set forth in this Complaint, Plaintiffs are challenge the legality of 31 U.S.C. § 5112(d)(1) and 31 U.S.C. § 5114(b) and Defendants' inscriptions of "In God We Trust" pursuant to those statutes.

---

[3] "United States coins shall have the inscription 'In God We Trust'." 31 U.S.C. § 5112 (d)(1).

[4] "United States currency has the inscription 'In God We Trust' in a place the Secretary decides is appropriate." 31 U.S.C. § 5114 (b).

[5] U.S. Const. amend. I.

## HISTORICAL BACKGROUND

### A. BRIEF HISTORY OF AMERICAN RELIGIOUS FREEDOM

52. The text of the Constitution of the United States does not reference any deity. This is in striking contrast to the Articles of Confederation it replaced,[6] to the state constitutions then in existence,[7] to the Declaration of Independence,[8] and even to Virginia's Act for Religious Freedom.[9]

53. Thus, there is no reference to God in the Preamble to the United States Constitution.[10]

54. Similarly, the only oath in the Federal Constitution is completely secular.[11]

---

[6] The Articles of Confederation (1781) referenced "the Great Governor of the World." *See* Art. XIII, *available at* avalon.law.yale.edu/18th_century/artconf.asp.

[7] In four of the original thirteen colonies, governmental officials were required to be Protestant (New Jersey, Georgia, North Carolina and South Carolina). Delaware required its legislators to state, "I … do profess faith in God the Father, and in Jesus Christ His only Son, and in the Holy Ghost, one God, blessed for evermore; and I do acknowledge the holy scriptures of the Old and New Testament to be given by divine inspiration." Pennsylvania similarly mandated adherence to Christianity ("I do believe in one God, creator and governor of the universe, the rewarder of the good and the punisher of the wicked. And I do acknowledge the Scriptures of the Old and New Testament to be given by Divine inspiration."), as did Massachusetts, New Hampshire and Maryland. Although the constitutions of New York and Virginia did not have religious test oaths, neither prohibited such a requirement. Only the federal constitution contained this unique notion. *All available at* Colonial Charters, Grants and Related Documents, http://avalon.law.yale.edu/subject_menus/statech.asp and/or Center for Constitutional Studies Source Documents, www.nhinet.org/ccs/docs.htm.

[8] The Declaration of Independence (1776) has four references to a supernatural power: "Nature's God," "their Creator," "the Supreme Judge of the World," and "Divine Providence." *See* www.archives.gov/exhibits/charters/declaration_transcript.html.

[9] The Act, passed by Virginia's General Assembly on January 16, 1786, began: "Whereas, Almighty God hath created the mind free … ." Va. Code Ann. § 57-1 (2012). It also speaks of "the Holy author of our religion." *Id*.

[10] "We the People of the United States, in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defence, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, do ordain and establish this Constitution for the United States of America." U.S. Const. pmbl.

[11] "Before he enter on the Execution of his Office, he shall take the following Oath or Affirmation:--'I do solemnly swear (or affirm) that I will faithfully execute the Office of President of the United States, and will to the best of my Ability, preserve, protect and defend the Constitution of the United States.'" U.S. Const. art. II, § 1, cl. 8.

55. Moreover, the Constitution specifically states that "no religious test shall ever be required as a qualification to any office or public trust under the United States."[12]

56. In other words, as James Madison (the "Father of the Constitution"[13]) wrote: "There is not a shadow of right in the general government to intermeddle with religion. Its least interference with it would be a most flagrant usurpation."[14]

57. The extent to which this governmental design was meant to apply can be seen by examining the very first statute of the government of the United States.

58. That statute, promulgated by the First Federal Congress and signed into law by President Washington, had its inception on April 6, 1789, when a quorum was finally obtained in both houses of Congress.

59. Meeting in New York City, the members of the House of Representatives recognized that, pursuant to the Constitution's Article VI, they "shall be bound by Oath or Affirmation, to support this Constitution."

60. Accordingly, the House members resolved:

> That the form of the oath to be taken by this House, as required by the third clause of the sixth article of the Constitution of the Government of the United States, be as followeth, to wit: "I, A B, a Representative of the United States in the Congress thereof, do solemnly swear (or affirm, as the case may be) **in the presence of Almighty GOD**, that I will support the Constitution of the United States. **So help me God**."[15]

61. Consequentially, on April 8, 1789, this oath was subscribed to by thirty-four of the thirty-six House members who attended the Congress after arriving in New York.[16]

---

[12] U.S. Const. art. VI, cl. 3.
[13] *See* White House, *James Madison*, www.whitehouse.gov/history/presidents/jm4.html (last visited Dec. 9, 2015).
[14] 3 *The Debates in the Several State Conventions … 1787* 330 (J. Elliot ed., 2d ed. 1836), *available at* press-pubs.uchicago.edu/founders/documents/amendI_religions49.html.
[15] 1 Annals of Cong. 101 (1789) (J. Gales ed. 1834), memory.loc.gov/cgi-bin/ampage?collId=llac&fileName=001/llac001.db&recNum=51 (enter p. 101) (emphases added).
[16] *Id*. at 106.

62. Despite this precedent, Congress reconsidered the oath (pursuant to "the third clause of the sixth article of the Constitution"). In fact, the oath was addressed in some manner sixteen times during that April and May.[17]

63. The result was a revised oath specified in the nation's first statute: "An Act to Regulate the Time and Manner of Administering Certain Oaths."[18] The revised oath was identical to the oath that had been taken, except that three phrases were deleted.

64. The first deleted phrase was "a representative of the United States in the Congress thereof." This was because the new oath would not only be required for our federal legislators, it would be mandatory for "the members of the several State Legislatures, and all executive and judicial officers of the several States"[19] as well.

65. The second and third deleted phrases were "in the presence of Almighty GOD" and "So help me God." Accordingly, signed into law on June 1, 1789, was "the oath or affirmation required`` by the sixth article of the Constitution … : 'I, A.B., do solemnly swear or affirm (as the case may be) that I will support the Constitution of the United States.'"

66. In other words, **the very first statute of the government of the United States involved the specific and affirmative removal of the two references to God** in the oath of office that had already been used by Congress itself.

67. This is not to say that none sought an alternative governmental framework. Luther Martin – Maryland's attorney general for 28 years (1778-1805) and one of that state's delegates to the Constitutional Convention[20] – complained about his colleagues' failure to require "a belief in the existence of a Deity" as part of the oath to support the Constitution, arguing that "in a Christian country, it would be at least decent to hold out some distinction between the professors of Christianity and downright infidelity or paganism."[21]

---

[17] Actions related to formulating the oath occurred on nine different occasions in the House (April 6, 14, 16, 20, 22, 25, 27 and May 6, with the Speaker signing the bill on May 21) and on seven different occasions in the Senate (April 28, 29 and May 2, 4, 5, 7, with the Vice President signing the bill on May 22).

[18] 1 Stat. 23 (1789), *available at* memory.loc.gov/cgi-bin/ampage?collId=llsl&fileName=001/llsl001.db&recNum=2 (enter p. 23).

[19] *Id*. at 24. A separate oath – also with no reference to God – was specified for Secretary of the Senate and the Clerk of the House of Representatives. *Id*.

[20] 3 The Records of the Federal Convention of 1787, at 172 (Max Farrand ed. 1911).

[21] *Id*., at 227.

68. That Martin lost that debate is evidenced not only by the Oath Act (which, again, was the very first "law" promulgated by United States government), but by the Bill of Rights.

69. Introduced into Congress by James Madison exactly one week after the Oath Act was signed into law, the suggested prose included:

> The civil rights of none shall be abridged on account of religious belief or worship, nor shall any national religion be established, nor shall the full and equal rights of conscience be in any manner, or on any pretext, infringed."[22]

70. Again, a desire to favor (Christian) Monotheism (and to limit the ideals of complete religious freedom and equality inherent in Madison's words) was soon voiced.

71. Such a desire can be seen in a letter penned by the esteemed physician and renowned statesman, Benjamin Rush (who claimed that, in America, "the Christian religion should be preferred to all others," and that "every family in the United States [should] be furnished at public expense … with a copy of an American edition of the BIBLE."[23]).

72. Addressed to John Adams – who, as Vice President, was President of the Senate (where the Bill of Rights would be debated) – Rush wrote:

> Many pious people wish the name of the Supreme Being had been introduced somewhere in the new Constitution. Perhaps an acknowledgement may be made of his goodness or of his providence in the proposed amendments.[24]

73. When the Bill of Rights was finalized, however, the language of the Religion Clauses ran completely counter to Rush's request: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."[25]

74. In other words, as was later expressed by Madison: "Every new & successful example … of a perfect separation between ecclesiastical and civil matters, is of importance. … [R]eligion & Govt. will both exist in greater purity, the less they are mixed together."[26]

---

[22] 1 Annals of Cong. 451 (1789) (J. Gales ed. 1834), available at memory.loc.gov/cgi-bin/ampage?collId=llac&fileName=001/llac001.db&recNum=51 (enter p. 451).

[23] Benjamin Rush, *A Plan of a Peace-Office for the United States*, in *The Selected Writings of Benjamin Rush* 20 (Dagobert D. Runes ed., 1947).

[24] 1 Benjamin Rush, *Letters* 517 (L.H. Butterfield ed., 1951) (letter of June 15, 1789).

[25] U.S. Const. amend. I.

[26] James Madison, *To Edward Livingston* (letter of July 10, 1822), in 9 *The Writings of James Madison* 101-02 (Gaillard Hunt ed., 1910).

75. The extraordinary reach of this principle can be seen in the deliberations that occurred regarding the first census, which took place in 1790. To Madison, simply tallying the numbers of "those employed in teaching and inculcating the duties of religion"[27] was problematic. This was because, under the Establishment Clause, "the general government is proscribed from interfering, in any manner whatever, in matters respecting religion; and it may be thought to do this, in ascertaining who, and who are not, ministers of the gospel."[28]

76. The separation principle was further illustrated in what has become known as the Treaty of Tripoli,[29] which the Senate approved unanimously less than six years after the Bill of Rights was ratified.

77. That treaty specifically stated that "the government of the United States of America is not in any sense founded on the Christian religion."[30]

78. Thus, when the treaty was signed on June 10, 1797, a specific component of the "supreme Law of the Land"[31] was that the nation lacked any Christian foundation.

79. That the original intention of those in the founding era was to have the federal government stay out of the religion business was seen again when President John Adams, in 1798 and 1799, issued proclamations directing the citizenry to engage in "solemn humiliation, fasting, and prayer" to God.[32]

---

[27] *Available at* press-pubs.uchicago.edu/founders/documents/a1_2_3s19.html. *See also* founders.archives.gov/documents/Madison/01-13-02-0017 (James Madison, 1790, Papers, 13:16).

[28] *Id*.

[29] 8 Stat. 154. The treaty was officially entitled the "Treaty of Peace and Friendship." *Available at* memory.loc.gov/cgi-bin/ampage?collId=llsl&fileName=008/llsl008.db&recNum=14 (enter p. 154).

[30] *Id*. (enter p. 155).

[31] U.S. Const. art. VI, cl. 2 ("This Constitution … and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land.").

[32] John Adams, Proclamations of March 23, 1798, and March 6, 1799, in *A Compilation of the Messages and Papers of the Presidents, 1789-1897* 269, 285 (James D. Richardson ed., 1897).

80. The response was a severe criticism:

> Because there is nothing in the constitution giving authority to proclaim fasts ... Because prayer, fasting, and humiliation are matters of religion and conscience, with which government has nothing to do ... And Because we consider a connection between state and church affairs as dangerous to religious and political freedom and that, therefore, every approach towards it should be discouraged ...[33]

81. In fact, according to Adams himself:

> The National Fast recommended by me turned me out of office. ... This principle is at the bottom of the unpopularity of national Fasts and Thanksgiving. Nothing is more dreaded than the National Government meddling with Religion.[34]

82. Thus it was an attempt to involve the government in religious activity that led to the only occasion in the first forty years of our nation's existence that the President was voted out of office after only one term.[35]

83. The subsequent wails of those that bemoaned the lack of an official (Christian) Monotheistic foundation for our nation further attests to the original understanding of the Constitution as one opposed to "the National Government meddling with Religion."

84. Timothy Dwight, for instance, President of Yale College from 1795-1817, spoke of "*the sinful character of our nation*"[36] when he referred to the Framers' failure to invoke God's name.

---

[33] Benjamin Franklin Bache, *Aurora*, May 9, 1798, as cited in Richard N. Rosenfeld, *American Aurora: A Democratic-Republican Returns* 113 (1998).

[34] Letter from John Adams to Benjamin Rush (June 12, 1812), in *Old Family Letters: Copied from the Originals for Alexander Biddle*. Ser. A, at 392 (Alexander Biddle ed., 1892). Interestingly, after noting in that he had been "represented as a Presbyterian," Adams wrote that his enemies were of the opinion that it would be better to have "'Jefferson, Madison, Burr, any body, whether they be Philosophers, Deists, **or even Atheists**, rather than a Presbyterian President.'" *Id*. (emphasis added).

[35] In 1829, Adams's son, John Quincy Adams became the next President to suffer that fate. *See* Terms of Office for United States Presidents, www.loc.gov/exhibits/treasures/inaugural-terms.html (last visited Dec. 9, 2015).

[36] Timothy Dwight, *A Discourse in Two Parts: Delivered July 23, 1812, on the Public Fast, in the Chapel of Yale College* 46 (1812).

85. As Dwight accurately argued:

> We formed our Constitution without any acknowledgement of GOD; without any recognition of his mercies to us, as a people, of his government, or even of his existence. The Convention, by which it was formed, never asked, even once, his direction, or his blessing upon their labours. Thus we commenced our national existence under the present system, without GOD.[37]

86. Not everyone, however, was complaining. In fact, Congress (i.e., the entity to whom the First Amendment was addressed) strongly supported the prohibition against the National Government "meddling with Religion." This can be seen in an 1830 report from a House committee that responded to a religious lobby's request to halt Sunday mail delivery.[38]

87. Alluding to both the Constitution's Article VI Test Oath Clause and to the Religion Clauses of the First Amendment, the committee determined that the matter "does not come within the cognizance of Congress,"[39] because it "would constitute a legislative decision of a religious controversy."[40]

88. Referencing the history of religious intolerance in the world, the Report's authors highlighted that the framers of our Constitution "evinced the greatest possible care in guarding against the same evil."[41]

89. In other words, halting Sunday mail delivery was an issue "involving the dearest rights of all – the rights of conscience."[42]

90. Noting that "Religious zeal enlists the strongest prejudices of the human mind,"[43] the 1830 Congressmen highlighted that "[w]ith the exception of the United States, the whole human race … is in religious bondage."[44]

91. Thus, they found that "the conclusion is inevitable, that the line cannot be too strongly drawn between Church and State."[45]

---

[37] *Id.*
[38] H.R. Rep. No. 271 (1830). *See* Appendix A.
[39] *Id.* at 1.
[40] *Id.* at 2.
[41] *Id.*
[42] *Id.*
[43] *Id.* at 3.
[44] *Id.*
[45] *Id.*

92. Perfectly applicable to the gravamen of the instant action, the reporters wrote that "if their motive be to induce Congress to sanction, by law, their *religious opinions* and *observances*, then their efforts are to be resisted."[46]

93. Remarkably, they continued: "So far from stopping the mail on Sunday, the committee would recommend the use of all reasonable meanse [sic] to give it a greater expedition and a greater extension."[47]

94. In other words, "It is the duty of this Government to afford to *all* – to Jew or Gentile, Pagan or Christians, the protection and the advantages of our benignant institutions, on *Sunday*, as well as every day of the week."[48]

95. In 1874, a similar view was expressed in response to a proposal to amend the Constitution by inserting "'an acknowledgment of Almighty God and the Christian religion'" into its preamble.[49] Rejecting the proposal, the House Judiciary Committee wrote:

> [T]he fathers of the Republic in the convention which framed the Constitution … with great unanimity [decided] that it was inexpedient to put anything into the Constitution or frame of government which might be construed to be a reference to any religious creed or doctrine.[50]

96. Between those two eras, however, came the Civil War, with the nation on the verge of dissolution. As Defendant Lew's Treasury Department has noted, that brought along "increased religious sentiment,"[51] leading to a fracturing of Defendant Congress's adherence to constitutional principles.

---

[46] *Id*. at 4 (emphases in original).
[47] *Id*. at 5.
[48] *Id*. at 5-6 (emphases in original). As an aside, it is noteworthy that Defendant Jeppson's Mint is open on Sundays, with live customer service representatives available for taking orders at (202) 756-6468, 8:00 am - 12:00 midnight ET.
[49] H.R. Rep. 143 (1874).
[50] *Id.*
[51] U.S. Dep't of the Treas., *About: History of 'In God We Trust'*, www.treasury.gov/about/education/Pages/in-god-we-trust.aspx (last visited Dec. 9, 2015).

## B. HISTORY OF "IN GOD WE TRUST" ON THE NATION'S MONEY

### (1) The Original Coinage Acts

97. The Treasury Department was established by Defendant Congress of the United States on September 2, 1789.[52]

98. Two and a half years later (in 1792) Defendant Congress passed "An Act establishing a Mint, and regulating the Coins of the United States."[53]

99. That Coinage Act of 1792 specified the coins to be minted.[54] The Act further prescribed that:

> Upon one side of each of the said coins there shall be an impression emblematic of liberty, with an inscription of the word Liberty, and the year of the coinage ; and upon the reverse of each of the gold and silver coins there shall be the figure or representation of an eagle, with this inscription, "UNITED STATES OF AMERICA" and upon the reverse of each of the copper coins, there shall be an inscription which shall express the denomination of the piece, namely, cent or half cent, as the case may require.[55]

100. On January 18, 1837, Defendant Congress enacted "An Act supplementary to the act entitled 'An Act establishing a mint, and regulating the coins of the United States.'"[56]

101. That Coinage Act of 1837 provided that "[t]he engraver shall prepare and engrave, with the legal devices and inscriptions, all the dies used in the coinage of the mint and its branches."[57]

---

[52] An Act to Establish the Treasury Department, 1 Stat. 65 (1789), *available at* memory.loc.gov/cgi-bin/ampage?collId=llsl&fileName=001/llsl001.db&recNum=2 (enter p. 65).
[53] Coinage Act of 1792, 1 Stat. 246 (1792), *available at* memory.loc.gov/cgi-bin/ampage?collId=llsl& fileName=001/llsl001.db&recNum=2 (enter p. 246).
[54] *Id*. (enter p. 248). The prescribed coins were "Eagles" ("each to be of the value of ten dollars or units"), "Half Eagles," "Quarter Eagles," "Dollars or Units," "Half Dollars," "Quarter Dollars," "Dismes," "Half Dismes," "Cents," and "Half Cents."
[55] *Id*.
[56] Coinage Act of 1837, 5 Stat. 136, *available at* memory.loc.gov/cgi-bin/ampage?collId=llsl& fileName=005/llsl005.db&recNum=2 (enter p. 136).
[57] *Id*.

102. That Act also provided for "an inscription of the word Liberty, and the year of the coinage" in language virtually identical to that used in the Act of 1792:

> [U]pon one side of each of said coins there shall be an impression emblematic of liberty, with an inscription of the word Liberty, and the year of the coinage ; and upon the reverse of each of the gold and silver coins, there shall be the figure or representation of an eagle, with the inscription United States of America, ….[58]

103. It is to be noted that – in keeping with the constitutionally-derived notion "that it was inexpedient to put anything into the … frame of government which might be construed to be a reference to any religious creed or doctrine"[59] – there was no religious inscription of any kind on any United States coin through 1837.

104. That situation would change, however, with the "increased religious sentiment"[60] that erupted during the nation's great civil war.

### (2) The Origin of "In God We Trust" on the Coinage

105. On November 13, 1861, Rev. M.R. Watkinson – characterizing himself as a **"Minister of the Gospel"**[61] – wrote to Secretary of the Treasury Salmon P. Chase seeking "the **recognition of the Almighty God** in some form in our coins."[62]

106. Noting to the Secretary that "**[y]ou are probably a Christian**," Rev. Watkinson claimed that such recognition was important to "relieve us from the ignominy of heathenism."

107. Additionally, the minister argued that such recognition "would place us under the Divine protection we have personally claimed. From my heart I have felt **our national shame in disowning God** as not the least of our present national disasters."[63]

---

[58] *Id.* at 138.
[59] *See supra* ¶ 95.
[60] *See supra note* 51.
[61] H.R. Rep. No. 662, at 2 (1955) (emphases added).
[62] *Id*. (emphasis added).
[63] *Id*. (emphasis added). Other clergy also felt that a reference to God should be on the nation's coins. *See* 3 Anson Phelps Stokes, *Church and State in the United States* 601 (1950). In fact, as provided by the U.S. Dep't of the Treas., *supra* note 51, "Secretary of the Treasury Salmon P. Chase received many appeals from devout persons throughout the country, urging that the United States recognize the Deity on United States coins."

108. In response, on November 20, 1861, Secretary Chase wrote a short note to James Pollock, then the Director of the Mint in Philadelphia, making the purely religious claim that "**No nation can be strong except in the strength of God**, or safe except in His defense. **The trust of our people in God** should be declared on our national coins."[64]

109. Secretary Chase then instructed Director Pollock to "cause a device to be prepared without unnecessary delay with a motto expressing in the fewest and tersest words possible this national recognition."[65]

110. Director Pollock took this directive to heart, commenting upon it in each of the annual reports he submitted to Secretary Chase during his five year tenure as Mint Director.

111. In his official 1862 Annual Report, for example, Director Pollock wrote that "[t]he **distinct and unequivocal recognition of the divine sovereignty** in the practical administration of our political system is **a duty of the highest obligation**."[66]

112. Thus, continued the Director: "Our national coinage in its devices and legends should indicate **the Christian character of our nation, and declare our trust in God**."[67]

113. The following year (in the 1863 official Annual Report), Director Pollock again called for a "distinct and unequivocal National **recognition of the Divine Sovereignty**"[68] on the nation's coins.

114. He then continued:

> **We claim to be a Christian nation.** Why should we not vindicate our character by **honoring the God of Nations**, in the exercise of our political Sovereignty as a Nation? Our national coinage should do this. Its legends and devices **should declare our trust in God**; **in Him who is the "King of kings and Lord of lords."** … Let us **reverently acknowledge his sovereignty**, and let our coinage **declare our trust in God**.[69]

---

[64] H.R. Rep. No. 662, at 3 (emphases added).
[65] *Id.*
[66] *Report on the Finances*, in *Report of the Secretary of the Treasury … Year Ending June 30, 1862* 46 (1863), *available at* fraser.stlouisfed.org/docs/publications/treasar/AR_TREASURY_1862.pdf (emphases added).
[67] *Id.* (emphasis added).
[68] *Report of the Director of the Mint*, in *Report of the Secretary of the Treasury … Year Ending June 30, 1863* 190 (1863), *available at* fraser.stlouisfed.org/docs/publications/treasar/AR_TREASURY_1863.pdf (emphasis added).
[69] *Id*. at 190-91 (emphases added). "King of kings and Lord of lords" is, of course, explicitly Christian. 1 *Timothy* 6:15, *Revelation* 17:14 and 19:16.

115. It is noteworthy that, while Mint Director, Pollock was a vice president in an organization that began with an 1863 convention of "representatives from eleven different denominations of Christians"[70] seeking to amend the Constitution so that its preamble would read:

> We, the people of the United States, [**recognizing the being and attributes of Almighty God, the Divine Authority of the Holy Scriptures, the law of God as the paramount rule, and Jesus, the Messiah, the Saviour and Lord of all**], in order to form a more perfect union … .[71]

116. Those individuals met again in 1864, forming "The National Association to secure the Religious Amendment to the Constitution of the United States."[72]

117. When the Association re-convened in November of that year, it was James Pollock, still serving as Mint Director, who presided.[73] Under his leadership, it was resolved:

> **That a national recognition of God, the Lord Jesus Christ, and the Holy Scriptures, as proposed in the memorial of this Association to Congress, is clearly a scriptural duty, which it is national peril to disregard.**[74]

---

[70] *Proceedings of the National Convention to Secure the Religious Amendment of the Constitution of the United States* iv (1872), *available at* archive.org/stream/proceedingsnati00statgoog#page/n8/mode/2up. (The vice presidency is noted at page 2.)

[71] *Id*. at v (brackets in original; emphasis added).

[72] *Id*. at viii.

[73] *Id*. at xiii.

[74] *Id*. (emphasis added). Also at that convention was William Strong, who served on Pennsylvania's Supreme Court while Pollock was that state's governor. In 1870, President Grant appointed Strong to the Supreme Court of the United States, where he remained until he retired in 1880. In 1871 (while on the nation's high court) he was also president of the National Association, seeking "to secure the recognition of God as over all in our fundamental law." *id.* at 13. In 1873, leading its national convention, he spelled out the Association's goal:

> [S]ecuring such an amendment to the Constitution as will suitably acknowledge Almighty God as the author of the nation's existence and the ultimate source of its authority, Jesus Christ as its Ruler, and the Bible as the fountain of its laws, and thus indicate that this is a Christian nation … ."

*See* APPENDIX B (included in this Complaint because of the remarkable parallels between the claims then (when Constitutional principles prevailed) and the claims here (where those principles, so far, have been disturbingly violated)). *See also* archive.org/stream/proceedingsofn00nati#page/1/mode/1up.

118. Prior to presiding over this convention to interlard the Constitution with Christian religious verbiage, Director Pollock had responded to Secretary Chase's request, suggesting "Our country; our God," and "God our trust" as monetary inscriptions.[75]

119. Secretary Chase replied on December 9, 1863:

> I approve your mottoes, only suggesting that on that with the Washington obverse the motto should begin with the word "Our," so as to read, "Our God and our country." And on that with the shield it should be changed so as to read: "In God we trust."[76]

120. On April 22, 1864, a coinage act amendment was passed. That amendment stated that "there shall be from time to time struck and coined at the mint a two-cent piece … ; and the shape, mottoes, and devices of said coin[] shall be fixed by the director of the mint, with the approval of the Secretary of the Treasury … ."[77]

121. What specific "mottoes" or "devices" would be permissible was obviously not addressed in this prose.

122. However, as Director Pollock himself noted, any decision to have coins that "**indicate the Christian character of our nation, and declare our trust in God** … [or] to introduce **a motto** upon our coins, **expressing a national reliance on divine support** … is under the control of Congress; and without a change in the existing laws, no alteration in the legends and devices of most of our national coins can be made; … ."[78]

123. Immediately following these words, Director Pollock made the contradictory contention that "a motto, however, may be added without additional authority or violation of the present law."[79] Thus, lacking the congressional authorization he had just acknowledged was necessary, he arranged for the first time to have "In God We Trust" inscribed upon United States coinage, using the above-mentioned two-cent piece for that purpose.[80]

---

[75] H.R. Rep. No. 662, at 3 (1955).
[76] *Id*.
[77] An Act in Amendment of 1857 Coinage Act, 13 Stat. 54-55 (1864), in 13 *The Statutes at Large … December 1863, to December 1865* (George P. Sanger ed., 1866), *available at* memory.loc.gov/cgi-bin/ampage?collId=llsl&fileName=013/llsl013.db&recNum=2 (enter p. 54).
[78] *Report on the Finances*, *supra* note 66, at 46-47 (emphases added).
[79] *Id*. at 47.
[80] U.S. Mint, *In God We Trust*, www.usmint.gov/about_the_mint/fun_facts/?action=fun_facts5 (last visited Dec. 9, 2015).

124. Director Pollock described the change as follows in the Mint's annual report for 1864:

> The two-cent piece is a most convenient and popular coin. Its size and weight contribute to its usefulness. The motto—"In God we trust"—stamped upon this coin, has been highly approved by the public, not only as improving the artistic beauty of the piece, but also **expressive of our nation's reliance upon the "God of nations"** in this hour of peril and danger.[81]

125. He then wasted no time in seeking to expand the inscription, asking rhetorically, "Why should this **distinct and unequivocal recognition of the sovereignty of God, of Him who is 'the King of kings and Lord of lords,'** be confined to our bronze coinage?"[82]

126. With the question posed in such a purely Christian manner, he answered himself by quoting from the Bible:

> The silver and the gold are **His**, and upon it should be impressed, by national authority, the declaration of **our nation's confidence and trust in Him** "who maketh war to cease unto the ends of the earth," and "who stilleth the raging of the sea and the tumult of the people." **Let our nation in its coinage honor Him, in whom is our strength and salvation.**[83]

127. On March 3, 1865, with this religious precedent now in place, another Act of Congress was passed. That Act authorized the creation of a three-cent piece, and it allowed that "the shape, mottoes, and devices of said coin shall be determined by the director of the mint, with the approval of the Secretary of the Treasury."[84]

128. That Act also included the first codified reference to religious dogma on the coinage:

> *And be it further enacted*, That, in addition to the devices and legends upon the gold, silver, and other coins of the United States, it shall be lawful for the director of the mint, with the approval of the Secretary of the Treasury, to cause the motto "In God we trust" to be placed upon such coins hereafter to be issued as shall admit of such legend thereon.[85]

---

[81] *Report of the Director of the Mint*, in *Report of the Secretary of the Treasury … Year 1864* 213 (1864), *available at* fraser.stlouisfed.org/docs/publications/treasar/AR_TREASURY_1864.pdf (emphasis added).
[82] *Id*. at 213-14 (emphasis added).
[83] *Id*. at 214 (quoting *Psalms* 46:9 and 65:7, respectively) (emphases added).
[84] An Act to Authorize the Coinage of Three-Cent Pieces (Coinage Act of 1865), 13 Stat. 517 (1865), in 13 *Statutes at Large* (1866), *available at* memory.loc.gov/cgi-bin/ampage? collId=llsl&fileName=013/llsl013.db&recNum=2 (enter p. 517).
[85] Coinage Act of 1865, 13 Stat. 518.

129. Society immediately recognized that this act was purely religious. The *New York Times*, for instance, characterized the placement of "In God We Trust" on the coins as a "**new form of national worship**."[86]

130. Director Pollock apparently agreed. In his Mint Director's Report of 1865, he once more used his now familiar religious prose:

> [T]he gold and silver coins of the mint of the United States will have impressed upon them, by national authority, **the distinct and unequivocal recognition of the sovereignty of God, and our nation's trust in Him. We have added to our nation's honor by honoring Him who is "King of kings and Lord of lords."**[87]

131. The following year, Director Pollock concluded his tenure at the Mint. His last report (for the year 1866) also had a section on the motto, ending this time with the words "**Happy is that nation whose God is the Lord**."[88]

### (3) The Attempt to Remove "In God We Trust" from the Coinage

132. Although the March 3, 1865 Act permitted "the director of the mint, with the approval of the Secretary of the Treasury, to cause the motto 'In God we trust' to be placed upon such coins hereafter to be issued as shall admit of such legend thereon," *see supra* ¶ 128, that placement was discretionary.

133. Thus, when President Theodore Roosevelt, in 1905, commissioned the sculptor Augustus Saint-Gaudens to help create new coinage, the latter designed a twenty-dollar gold coin without the motto, which he considered to be "an inartistic intrusion not required by law."[89]

---

[86] *The New Legend on Our Coins*, N.Y. Times, Dec. 18, 1865, at 4, *available at* www.nytimes.com/1865/12/18/news/the-new-legend-on-our-coins.html (emphasis added).

[87] *Report of the Director of the Mint*, in *Report of the Secretary of the Treasury … Year 1865* 233 (1865), *available at* fraser.stlouisfed.org/docs/publications/treasar/AR_TREASURY_1865.pdf (emphasis added).

[88] *Report of the Director of the Mint*, in *Report of the Secretary of the Treasury … Year 1866* 237 (1866), *available at* fraser.stlouisfed.org/docs/publications/treasar/AR_TREASURY_1866.pdf (emphasis added).

[89] Ted Schwarz, *A History of United States Coinage* 228 (1980) (citing a work by Saint-Gaudens's son).

134. President Roosevelt supported the omission of the "In God we trust" verbiage "**in the very interest of religion**."[90]

135. "[T]o put such a motto on coins," the President wrote, "… not only does no good, but does positive harm, and is in effect irreverence, which comes dangerously close to sacrilege."[91]

136. The motto on the coins, claimed the President, was "a constant source of jest and ridicule" (referencing "the innumerable cartoons and articles based on phrases like 'In God we trust for the other eight cents'; 'In God we trust for the short weight'; 'In God we trust for the thirty-seven cents we do not pay'; and so forth.").[92]

137. When the issue arose of a congressional response mandating that the phrase be inscribed on the coin, President Roosevelt opined, "I very earnestly trust that **the religious sentiment** of the country … will prevent any such action being taken."[93]

138. The President was quite mistaken. The absence of what the *New York Times* then referred to as "**one of the holiest religious expressions**"[94] was immediately decried by those wishing to maintain this governmental endorsement of (Christian) Monotheism.

139. That the hostility was religion-based can be immediately recognized by reports of "protests or expressions of regret **from many clergy**"[95] and from "**various religious organizations and individuals, especially clergymen**."[96]

140. After all, "a great many people … think that to take such an inscription off the coin is to disavow all trust in God and is therefore **an act of irreligion**. One clergyman is reported to have spoken of '**the religious sentiment of the American people**' as being 'effaced.'"[97]

---

[90] Editorial, *What Makes a Christian State?* 63 The Independent 1263, 1263 (1907) (emphasis added).
[91] Letter from Theodore Roosevelt to William Boldly (November 11, 1907), *reprinted in* Schwarz, *supra* note 89, at 230.
[92] *Id*.
[93] *Id*. (emphasis added).
[94] *Coin Symbols*, N.Y. Times, Nov. 15, 1907, at 8 (emphasis added).
[95] *In God We Trust*, 63 The Independent 1196, 1196 (1907) (emphasis added).
[96] *The Motto on Coinage*, 87 The Outlook 707, 707 (1907) emphases added).
[97] *Id*. at 708 (emphases added).

141. Another report spoke of the "great number of **religious people** in this country"[98] who considered President Roosevelt's decision "'a huge blunder.'"[99]

142. Further highlighting the fact that religion was at the root of the controversy, it was considered "'strange that he did not foresee that the great majority of **religious people, Protestant, Catholic, many Jews**, would be sensitive at the removal of those words at a time when every vestige of **national recognition of God** is of importance.'"[100]

143. Moreover, religious organizations "passed resolutions condemning the President's action" and "[s]imilar views [we]re expressed **by clergymen of all denominations.**"[101]

144. Using the coin-based (Christian) Monotheism , believers also disregarded and denigrated Atheists as they touted their self-assessed superiority. One clergyman, for instance, contended that the removal of the motto "would cause the deepest regret among a vast number of our most substantial citizens."[102] "Substantial citizens," obviously, were those who had trust in God, which somehow had become a requirement for one to be considered patriotic: "I have never heard of any body of men who believe in the sacred principles of patriotism passing resolutions asking to have the sentiment removed, but from my childhood I have heard **the blatant protests of infidels and unbelievers** against this custom.'"[103]

145. Of greater weight is the activity undertaken by the nation's legislators.

146. Specifically, a congressional subcommittee examined the matter, releasing its Report on February 26, 1908.[104] In that Report the subcommittee determined that the move to restore "In God We Trust" to the Saint-Gaudens coin "reflects **the reverent and religious conviction which underlies American citizenship**."[105]

---

[98] *The President and the Motto on Our* Coins, 44 Current Literature 68, 68 (Jan.-June 1908) (emphasis added).
[99] *Id*. (citation omitted).
[100] *Id*. at 69 (citing "the leading Methodist paper") (emphases added).
[101] *Id*. (emphasis added).
[102] *Id*. (citing the Rev. Dr. Charles Edward Locke) (emphasis added).
[103] *Id*. (emphasis added).
[104] H.R. Rep. No. 1106, at 1 (1908).
[105] *Id*. (emphasis added).

147. That each of the subcommittee members considered Christianity to be the "reverent and religious conviction" represented by "In God We Trust" was highlighted in the Report:

> Your subcommittee is unanimous in the belief that as **a Christian nation** we should restore the motto to the coinage of the United States upon which it was formerly inscribed "as an outward and visible form of the inward and spiritual grace," which should possess and inspire American citizenship, and as an evidence to all the nations of the world that the best and only reliance for the perpetuation of the republican institution is upon **a Christian patriotism**, which, **recognizing the universal fatherhood of God**, appeals to the universal brotherhood of man as the source of the authority and power of all just government.[106]

148. A month after the Report was issued, the matter was debated by the full House of Representatives.[107] During that debate, nine congressmen gave speeches. In each of these speeches, it was made clear that the "In God We Trust" phrase is religious and that it is intended to support (Christian) Monotheism.

149. Providing the introductory oration, Rep. Charles Creighton Carlin (VA) stated that "[t]his action … furnishes a lesson … that **this is a Christian nation** … [and] the world already understands that **we are a Christian, God-fearing, God-loving people**.[108]

150. He continued by citing to a litany of other societies and governments that throughout history had Monotheistic verbiage on their coins.[109]

151. In doing so, however, Rep. Carlin failed to note what is most important: none of those other societies and governments had an Establishment Clause.

152. Thus, Rep. Carlin freely admitted that "In God We Trust" represented **the nation's "faith in the Supreme Ruler of the Universe**" and that placing those words on the coins was a way "of giving expression to **religious belief**."[110]

153. Rep. Carlin also contended that, "**In every Christian heart** there beats the hope that you will by your action determine that the circulating coin of this country shall carry the knowledge that **we are a Christian people**,"[111]

---

[106] *Id*. (emphases added).
[107] 42 Cong. Rec. 3384-91 (1908).
[108] *Id*. at 3384 (emphases added).
[109] *Id*. at 3384-85.
[110] 42 Cong. Rec. at 3385 (statement of Rep. Carlin) (emphases added).
[111] *Id*. (emphases added).

154. Rep. Carlin ended his remarks by expressing "the hope and belief that … **Christian thought and Christian ideas** will control the hearts and minds of all men and upon the wall of every home throughout the universe there will hang, for the enlightenment and encouragement of all who may follow, the sacred motto, 'In God We Trust.'"[112]

155. Next to make a speech was Rep. Ollie M. James (KY), who began by asserting that "[t]he President of the United States made a great mistake in the judgment **of the Christian people of this Republic**."[113] Rep. James continued:

> This country is not only **a Christian nation**, but we are engaged in sending to foreign countries and to distant people our missionaries **to preach the religions of Jesus Christ**, and we want our money so that when this gold that you say is so good goes across the ocean and is held in the hands of those who do not know of **the existence of the Saviour of the world**, we can say: "Here are the dollars of the greatest nation on earth, one that does not put its trust in floating navies or in marching armies, but **places its trust in God**."[114]

156. Demonstrating intentional and specific disrespect for the Atheists in his congressional district, Rep. James included in his oration the Biblical statement, "The fool hath said in his heart 'there is no God,'" to which his audience immediately responded with applause.[115]

157. He then reinforced the favoritism for his own religion by stating that "**the Christian legions of this nation** will hail with delight favorable action upon this bill."[116]

158. Although the third speaker in the debate, Rep. Gustav Küstermann (WI), supported President Roosevelt's decision to remove the "In God We Trust" inscription, he did so because "I do not believe in … any person that always hangs out his shingle '**I am a Christian**,'" and because he, too, felt that having the motto on coins was "'in effect irreverence, which comes dangerously close to sacrilege.'"[117]

---

[112] *Id*. (emphasis added).
[113] *Id*. (statement of Rep. James) (emphasis added).
[114] *Id*. (emphases added).
[115] *Id*.
[116] *Id*. (emphasis added).
[117] *Id*. at 3386 (quoting the President) (emphasis added).

159. The next speaker, Rep. John P. Moore (PA), stated he felt the motto belongs on the coins "because in my community there was a desire that it should be made known to the world generally that in this country **we do trust in God**."[118]

160. Rep. Moore then felt it necessary to respond to what he called an "unsavory extract"[119] that he had previously read in a newspaper editorial:

> "Those who do not believe in God in this country look upon his removal of that unconstitutional, untruthful, and unwarranted deific motto from our coinage as one of the most sensible acts ever performed by the President. They do not trust in God, … and, therefore, they do not see why every coin issuing from our mints should carry forth to the world an unofficial lie."[120]

161. That paragraph (which quite accurately represents the religious views of Plaintiffs here) was then deemed to be a "challenge" by Atheistic Americans, and "when such a challenge is put forth, … then I feel it is time to rise and declare, even by law, that **this is a God-fearing nation**, and that Congress can do no harm in making that declaration emphatic."[121]

162. Rep. Morris Sheppard (TX) also felt that affirmative rejection was warranted in regard to the views of Atheists. Therefore, "the fact that almost every infidel in the country has openly rejoiced over the removal of this motto"[122] was his focus:

> The fact that the infidels openly object to [the "In God we trust" phrase's] restoration, the fact that [its] removal would be used as an argument to destroy reverence rather than to inculcate it, ought to prompt Congress unanimously to restore the words, "In God we trust."[123]

163. After Rep. Charles Gordon Edwards (GA) spoke of how the motto favored "all churches, all creeds, who have a belief in God," he offensively proclaimed, "**A man who is not sound in his belief in God has no right in high office**."[124]

[118] *Id*. (statement of Rep. Moore) (emphasis added).
[119] *Id.*
[120] *Id*. (citation not provided by Rep. Moore).
[121] *Id*. (emphasis added).
[122] *Id*. at 3386-87 (statement of Rep. Sheppard).
[123] *Id*. at 3387.
[124] *Id*. (statement of Rep. Edwards) (emphasis added).

164. Speaking to his congressional colleagues, Rep. Edwards contended that **"[w]e represent God-fearing people, and we, their representatives, should be God-fearing representatives**."[125] Moreover (echoing Rep. James's earlier claim that the religious message was intended to be spread far beyond our borders, *see supra* ¶ 155), Rep. Edwards also argued that the "In God We Trust" phrase "is a declaration not only to our people at home, but to all peoples, and to all nations, all over the world, that **ours is a nation with a firm and steadfast faith in God**."[126]

165. It is noteworthy that Rep. Edwards saw the issue – which, of course, arose solely due to the acts of federal officials – as pitting Atheistic Americans against Americans who believed in God: "The removal of these words was a victory for infidelity. The restoration of them to our coin will be a blow to infidelity and **a victory for the God-fearing people** of this great nation."[127]

166. Obviously of the latter camp, the Congressman was apparently oblivious to the self-contradictory nature of his words when he wrote, "I dare say that every form of religious thought is represented in America, and **yet we are one in the recognition of a supreme and all-wise God**."[128]

167. Rep. Edwards concluded: "Let us not put an 'infidel money' out upon the world, but let us put out the coin that says to all the world '**Americans are a God-fearing and God-loving people**.'"[129]

168. Rep. George W. Gordon (TN) followed Rep. Edwards. Like Rep. Küstermann (and the President before him), Rep. Gordon also felt that the words "In God We Trust" were **too holy and sacrosanct** to be placed on "a medium of commerce … [and] of secular, and not sacred, transactions."[130]

169. The next speaker was the subcommittee chairman, George A. Pearre (MD), who sought to emphasize that there was not "any suggestion of irreverence or lack of **Christian spirit** upon the part of the President when he took that action."[131]

---

[125] *Id*. (emphasis added).
[126] *Id*. (emphasis added).
[127] *Id*. (emphasis added).
[128] *Id*. (emphasis added).
[129] *Id*. at 3389 (emphasis added).
[130] *Id*. (statement of Rep. Gordon) (emphasis added).
[131] *Id*. (statement of Rep. Pearre) (emphasis added).

170. On the contrary, stated Rep. Pearre, "[The President] **is a Christian man** in every relation of life; and not only a Christian man, but a practical Christian man, both as an individual and as a public servant, and he has endeavored to impress **Christian principles** upon public affairs."[132]

171. Last to speak was Rep. Washington Gardner (MI). He began by referencing children who were exposed – *by their parents* – to "literature [with] an avowed purpose to banish God from the minds of the rising generation."[133] Wishing "to put myself on record as against th[is] purpose," Rep. Gardner revealed that, to him, those minds should instead be taught – *by their government* – about "**[t]he ignominious cross** upon which was consummated the sublimest sacrifice in human history" and "[t]he sacrificial wood upon which was pinioned **the body of the Nazarene**."[134]

172. According to Rep. Gardner, "In God We Trust" on the nation's coinage would aid in this goal because:

> The teaching influence and the rallying power of emblems and mottoes have been recognized in all ages and by all nations. As a rule, they concrete in material form or express in briefest language some great thought or purpose or movement until they become dear to the people adopting them. The origin of these mottoes and emblems is often of greatest interest and lends enduring influence and value.[135]

173. The bill was voted upon after Rep. Gardner spoke. It contained the following language :

> That the motto "In God we trust," heretofore inscribed on certain denominations of the gold and silver coins of the United States of America, shall hereafter be inscribed upon all such gold and silver coins of said denominations as heretofore.[136]

174. It passed overwhelmingly, with the 268 Representatives who were present casting 259 yea votes, 5 nay votes, and 4 answering "present."[137]

175. Two months later, on May 18, 1908, President Roosevelt signed the bill into law.[138]

---

[132] *Id*. (emphases added).
[133] *Id*. (statement of Rep. Gardner).
[134] *Id*. (emphases added).
[135] *Id*.
[136] *Id*. at 3384.
[137] *Id*. at 3391.
[138] Act of May 18, 1908, Pub. L. 60-120, ch. 173, § 1, 35 Stat. 164, 164.

176. Thus, more than a century after the Framers wrote that "Congress shall make no law respecting an establishment of religion" (and more than seventy-five years after a congressional committee wrote "that the line cannot be too strongly drawn between Church and State"[139]), the purely religious phrase "In God We Trust" was not only permitted, but mandated to appear on United States money.

177. With that action designed to reflect "the … **religious conviction which underlies American citizenship**"[140] (which is itself founded "upon **a Christian patriotism**, which, recognize[es] the universal fatherhood of God[141]), it is incontrovertible that Congress not only intended to use the motto to advocate for (Christian) Monotheism, but that it also intended to exclude Atheists from the "We" in that four-word phrase.

#### (4) The Legislative Mandate for "In God We Trust" on <u>All</u> Coins and on the Currency

178. Because the Act of May 18, 1908, only required "In God we trust" to "be inscribed upon all such gold and silver coins of said denominations as heretofore,"[142] some coins continued to be minted without that religious language.

179. Additionally, the "In God We Trust" phrase was not being used on any of the nation's currency bills, as was noticed in 1953 by an Arkansas businessman and numismatist named Matthew H. Rothert "as the collection plate was being passed" in church.[143]

180. Mr. Rothert (acting in a manner not dissimilar to that of Rev. Watkinson nearly a century earlier, *see supra* ¶ 105) wrote to the Secretary of the Treasury, George M. Humphrey. In his letter, Rothert suggested placing those religious words on the currency in order to **"affirm our trust in God** in such a manner that it will be heard around the world and give moral and spiritual strength to those who realize **a great nation humbly and reverently places its trust in the Almighty**."[144]

---

[139] *See supra* ¶ 90.
[140] H.R. Rep. No. 1106, at 1 (1908) (emphasis added).
[141] *Id*. at 2 (emphasis added).
[142] *See supra* ¶ 173 (referencing the bill that became the Act of May 18, 1908).
[143] Fred Petrucelli, *Almighty Dollar Mentions God Because of Arkansan*, Ark. Gazette, Mar. 4, 1955, at 2F.
[144] *Camden Man Asks Treasury to Put Religious Motto on Bills*, Ark. Gazette, Dec. 6, 1953, at 10C (emphases added).

181. This matter – subsequently described as "**the affirmation of our nation's belief in Divine Guidance**"[145] – was also brought to the attention of the president of the Florida Bar, who in turn informed Congressman Charles E. Bennett (FL).[146]

182. Rep. Bennett contacted the Department of the Treasury. Upon learning that "In God We Trust" was not only not required on the currency, but that it was still permissible to mint some coins without that religious verbiage, Rep. Bennett introduced H.R. 619 ("the inscription 'In God We Trust' … shall appear on all United States currency and coins") on the first day of the first session of the 84th Congress.[147]

183. In his remarks explaining his purpose for sponsoring the legislation, Rep. Bennett stated:

> At the base of our freedom is **our faith in God** and the desire of Americans **to live by His will and by His guidance**. As long as this country **trusts in God**, it will prevail. To remind all of us of this self-evident truth, it is proper that our currency should carry these inspiring words, coming down to us through our history: "In God we trust."[148]

184. Obviously blind to the sincere beliefs of Atheists, Rep. Bennett later noted, "In God We Trust" was appropriate because "**the sentiment of trust in God is universal.**"[149]

185. Other legislators similarly disregarded the fact that many Americans hold contrary religious beliefs. Then-Senator Lyndon B. Johnson, for example, pushed for the Bill in the Senate, stating that the motto "**reflect[s] the spiritual basis** of our way of life."[150]

186. That "spiritual" was synonymous with "(Christian) Monotheistic" is evident from the words of Sen. Homer Ferguson, who had earlier pressed for a National Day of Prayer. "We must do something more than marshal our material strength," the Senator stated. "We must marshal all of our **spiritual** resources, as well."[151] The Senator then asked for unanimous consent to place in the record an article which had as its first sentence "The United States is generally classified as **a Christian Nation**."[152]

---

[145] Ed Rochette, *The Man Who Put God's Trust in Your Pocket*, Antiques & Collecting, July 1987, at 80.
[146] 101 Cong. Rec. 4384 (1955) (statement of Sen. Bennett).
[147] *Id*.
[148] *Id.* (emphases added).
[149] 101 Cong. Rec. 7796 (1955) (statement of Sen. Bennett) (emphasis added).
[150] 101 Cong. Rec. 9448 (1955) (statement of Sen. Johnson) (emphasis added).
[151] 97 Cong. Rec. 5863 (1951) (remarks of Sen. Ferguson) (emphasis added).
[152] *Id.* (emphasis added).

187. The article's second sentence was "If that means anything at all, it means that **the vast majority of our people accept the basic tenets of the Christian faith**."[153]

188. In this atmosphere of congressional advocacy for (Christian) Monotheism, the political disenfranchisement of Atheists, *see also infra* ¶¶ 213-275, was highlighted by the unanimous passage – in both the House and the Senate – of Rep. Bennett's resolution mandating "In God We Trust" on all currency and coins.[154]

189. Accompanying H.R. 619 was a Report of the House Committee on Banking and Currency.[155] This Report – as well as the key hearing that led to its creation – confirms (once again) that the use of "In God We Trust" was intended to be religious.

190. The main portion of the Report was entitled, "**Religious Inscriptions** on Coins in the United States."[156] Its prose referenced Rev. Watkinson's 1861 letter to Treasury Secretary Chase (stating "**You are probably a Christian**" and decrying the "fact touching our currency [that] has been seriously overlooked … **the recognition of the Almighty God** in some form in our coins.").[157]

191. At the hearing, Rep. Bennett stated, "as far as I know there is no opposition to this legislation,"[158] suggesting that he had very little exposure to (or interest in) those in his congressional district who were Atheists.

192. Accordingly, he contended that "this motto … expresses so tersely and with such dignity **the spiritual basis** of our way of life."[159]

193. Rep. Bennett then proclaimed that:

> Most of us agree wholeheartedly with the first advance of this motto, Secretary of the Treasury S. P. Chase, when he said: "No nation can be strong except in the strength of God, or safe except in His defense. **The trust of our people in God should be declared** on our national coins,"[160]

---

[153] *Id*. (emphasis added).
[154] *Id*.
[155] H.R. Rep. No. 662 (1955).
[156] *Id*. at 2 (emphasis added).
[157] *Id*. (emphases added).
[158] *H.R. 619: United States Currency Inscription*, in *Miscellaneous Hearings: Hearings Before the Comm. on Banking & Currency, House of Representatives,* 84th Cong., 47, 49 (1956).
[159] *Id*. at 48 (emphasis added).
[160] *Id*. (emphasis added)

194. Rep. Bennett then concluded with:

> At the base of our freedom is **our faith in God** and the desire of Americans **to live by His will and by His guidance**. As long as **this country trusts in God,** it will prevail.[161]

195. Rep. Abraham J. Multer (NY) spoke next. After stating "I don't want to get **into an argument on religion**,"[162] he echoed President Roosevelt's view from 1908:

> I think **I am as religious as any man** in this House … but I feel very strongly that it was a mistake to put it on coins in the first place, and this is perpetuating a grievous error. I think it is the base of **all of those who believe in God**; to put anything like that on anything so materialistic as our coins and our currency – I don't think anybody is made more religious by putting it on the coins and currency. … If we are going to have **religious concepts** – and I am in favor of them – I don't think the place to put them is on our currency or on our coins.[163]

196. Of note is that Rep. Multer's inclusion of "In God We Trust" among "**religious concepts**" was disputed by no one at the hearing.

197. No speaker showed any consideration for the religious view that God is nonexistent. Rather, Atheists were (at best) totally disregarded. Rep. William E. McVey (IL), for instance, maintained, "I can't possibly see any objection to having the inscription "In God We Trust" on all of our currency, and I am very glad to support it."[164]

198. The Committee chairman, Rep. Brent Spence (KY), joined in:

> I think if there ever was a nation that has, by its course, demonstrated that God had a hand in its making and its progress, it is this country. **I always believe that God was present in the Convention Hall where our Constitution was formed.**[165]

199. The desire to intrude Monotheism into our government was so pervasive that Rep. Gordon L. McDonough (CA) exclaimed, "I don't think we can insert that phrase in too many places in regard to the Government of the United States."[166]

---

[161] *Id*. at 49 (emphases added). *See also* 101 Cong. Rec. 4384 (1955) (statement of Rep. Bennett).
[162] *H.R. 619*, *supra* note 158, at 49 (emphasis added).
[163] *Id*. at 50 (emphases added).
[164] *Id*. at 51.
[165] *Id*. (emphasis added).
[166] *Id*. at 52.

200. Rep. Herman P. Eberharter (PA) showed his support for the "In God We Trust" language by placing in the record a resolution passed by the American Legion's National Convention that asserted that America "is **a God-fearing country**."[167]

201. Rep. Eberharter had just recently recovered from an illness. Accordingly, Rep. Barratt O'Hara (IL) commended him for coming "at great sacrifice to himself, to testify for this bill, which affirms his faith and **the faith of all others in our country, in God**."[168]

202. Rep. Oren Harris (AR) stated "It does not take the inscription on our coins for me to **proclaim my faith and trust in God**." Then, essentially illuminating how the action being considered violates the Establishment Clause, he explained that "[w]ith the inscription on our coins it is another expression, not only individually but collectively, in this country, **of our faith**."[169]

203. Rep. Harris, who also could "see no objection whatsoever to this further expression of this quotation on the currency that we use in this country,"[170] placed a Resolution in the record from the American Numismatic Association. That Resolution stated that "this legend relating to **the power of Almighty God** shall be placed upon the currency."[171]

204. Rep. Lawrence H. Fountain (NC) referred to the motto as one of the "many instances indicat[ing] **our belief in the existence of God**."[172]

205. Rep Fountain further noted that:

> **The Bible begins** with the words "In the beginning, God" and I think more and more it is essential for us to recognize the fact that we as individuals and as a nation are merely the custodians of the things which **God has so graciously granted** to us.[173]

206. That the motto refers to explicitly religious dogma was further evidenced when Rep. Fountain added that "by having this inscription on our coins and on our currency … we are indicating … because of **the goodness of God** we have become a prosperous and powerful nation."[174]

---

[167] *Id*. at 54 (emphasis added).
[168] *Id*. (emphasis added).
[169] *Id*. at 55 (emphases added).
[170] *Id*.
[171] *Id*. at 56 (emphasis added).
[172] *Id*. (emphasis added).
[173] *Id*. (emphases added).
[174] *Id*. (emphasis added).

207. He continued by contending that "that inscription indicates that even though this coin is necessary, it is not in this coin we trust, but **it is in God that we trust**."[175]

208. Rep. Harris spoke once again as the hearing was brought to a close. In signaling his agreement with the previous speaker, Rep. Harris demonstrated that it was not only Monotheism that Congress was endorsing, but Christian Monotheism, as he recalled a "very famous statement of **our Lord and Saviour**."[176]

209. Thus, it should be noted that not one person at the key hearing that led to the mandatory inscription of "In God We Trust" on all of the nation's coins and currency ever even suggested that the phrase was anything other than a "statement of faith [that] has appeared on billions of coins."[177]

210. As the House and the Senate both lauded the "**spiritual** basis of our way of life,"[178] the religious views of non-believer Americans were further ignored.

211. Thus, "An Act to provide that all United States currency shall bear the inscription 'In God We Trust'" became the law of the land on July 11, 1955.[179]

212. This Act is now codified at 31 U.S.C. § 5112 (d)(1) ("United States coins shall have the inscription 'In God We Trust'") and at 31 U.S.C. § 5114 (b) ("United States currency has the inscription 'In God We Trust' in a place the Secretary decides is appropriate.").

[175] *Id.*
[176] *Id*. (remarks of Rep. Harris) (emphasis added).
[177] S. Rep. No. 1287, at 2 (1954) (remarks of Sen. Ferguson).
[178] *See* H.R. Rep. No. 662, at 4 (1955) (emphasis added). *See also* S. Rep. No. 637, at 2 (1955), *reprinted in* 1955 U.S.C.C.A.N. 2417, 2417. *See also supra* note 186.
[179] Act of July 11, 1955, ch. 303, Pub. L. 84-140, 69 Stat. 290.

### C. THE LEGISLATIVE MANDATE FOR "IN GOD WE TRUST" ON ALL COINS AND CURRENCY REFLECTED THE (CHRISTIAN) RELIGIOUS FERVOR AND ANTI-ATHEISM OF THE 1950s

213. The 1950s were largely characterized by the Cold War and a national desire to distinguish our nation from the communistic Soviet Union.

214. A key distinguishing feature was religious freedom. Whereas that freedom was guaranteed to the our people, the Soviets demanded adherence to one religious view.

215. Although this difference – i.e., freedom versus totalitarianism – deserved to be celebrated, the nation actually denigrated the religious liberty upon which we rely by focusing instead on the Soviets' specific religious choice: Atheism.

216. In other words, a favored religious belief (i.e., (Christian) Monotheism) rather than a favored political principle (i.e., religious freedom) was officially touted by our governmental agents as the ideological difference between us and our rivals.

217. President Eisenhower was chief among such agents, as he (like Congress) demonstrated a total disregard for those Americans who adhere to Atheistic religious belief.

218. For instance, he placed **"God's Float"** at the fore in his 1953 inauguration.[180]

219. He also sought "legislative support for a national day of prayer, attend[ed] annual presidential prayer breakfasts, and appoint[ed] a minister to a new special presidential post for religious matters."[181]

220. Also on his Monotheistic agenda was participation in the American Legion's "Back to God" crusade,[182] where he made the extraordinary statement that:

> **Recognition of the Supreme Being is the first, the most basic, expression of Americanism. Without God, there could be no American form of government, nor an American way of life**.[183]

[180] J. Ronald Oakley, *God's Country: America in the Fifties* 320 (1986).
[181] Martin Marty, *Under God, Indivisible, 1941-1960* 302 (1996).
[182] It might be noted that the American Legion, through both its leadership and its members, had been largely responsible for the brutalization of Jehovah's Witnesses in the aftermath of the Supreme Court's ruling in *Minersville v. Gobitas*, 310 U.S. 586 (1940). *See* Richard J. Ellis, *To the Flag* 106-07 (2005).
[183] Dwight D. Eisenhower, *Remarks Recorded for the "Back-to-God" Program of the American Legion*, Feb. 20, 1955 (emphasis added), www.presidency.ucsb.edu/ws/index.php?pid=10414.

221. As one author put it:

> [The President] often used religious phrases and talked about the need for religious faith and spiritual values. He frequently called on divine aid for himself and his country in speeches, held prayer breakfasts, received church delegations in his office, and had Billy Graham and Norman Vincent Peale as overnight guests at the White House. He also began cabinet meetings with a prayer.[184]

222. Another wrote:

> His priesthood was part of his role as leader of a "crusade," as he called it, against "godless Communism" … "The things that make us proud to be Americans are of the soul and of the spirit," Eisenhower declared. And being American, for a president who was baptized and who joined a church for the first time after having been elected, meant being a theist.[185]

223. That the motto was a part of this Monotheistic religiosity was shown by the first stamp containing the "In God We Trust" phrase, which "was introduced to a nationwide television and radio audience during a 15-minute program in which President Dwight D. Eisenhower, Secretary of State John Foster Dulles and Postmaster General Arthur E. Summerfield participated **with the leaders of the Nation's three largest religious groups**."[186]

224. That 1954 event was described as "[t]he most impressive and most widely publicized ceremony of its kind in the history of the United States Post Office Department,"[187] and it marked "'the first time that **a religious tone** ha[d] been incorporated into a regular or ordinary stamp.'"[188]

225. This religious focus might be contrasted with the principles adhered to by Congress (in reference to the Postal Service) more than a century earlier. *See supra* ¶¶ 81-94.

226. Unfortunately, this new-found governmental sectarianism (advocating for (Christian) Monotheism) was not limited to the Postal Service.

---

[184] Oakley, *supra note* 180, at 153.
[185] Marty, *supra note* 181, at 296.
[186] *"In God We Trust" – New Postage Stamp to Carry Message to World*, The Gideon, May 1954, at 24, 25 (emphasis added), *available at* members.purespeed.com/~mg/images/IGWT_TheGideon195405.pdf.
[187] *Id*. at 24.
[188] *Id*. at 25 (citing Postmaster General Summerfield) (emphasis added).

227. On the contrary, it pervaded the executive branch. Secretary of State Dulles, for example, contended, "'there is no way to solve the great perplexing international problems **except by bringing to bear on them the force of Christianity**.'"[189]

228. Speaking to the nation's future servicemen, Deputy Assistant to the President Wilton B. Persons claimed that the purpose of our military academies was "**to build good, strong, God-fearing character in men like ourselves –** men who, before long, will have the job of running this great country of ours."[190]

229. Accordingly, President Eisenhower implemented the *Code of Conduct for Members of the Armed Forces*. Under that Code, "all members of the armed forces of the United States" were required to "**trust in my God and in the United States of America**."[191] An Atheist who sought to remain true to his religion, therefore, was essentially precluded from serving in the military.

230. In fact, the executive branch was so religious that one writer referred to the Secretary of Defense as "the only man in the Administration who doesn't talk about God."[192]

231. Thus, as it became "un-American to be unreligious,"[193] "Atheists or agnostics were not tolerated,"[194] and "being a Protestant, a Catholic, or a Jew [wa]s understood as the specific way, and increasingly perhaps the only way, of being an American and locating oneself in American society."[195]

232. In other words, "**in the fifties … atheists were automatically considered to be unpatriotic, un-American, and perhaps even treasonous**."[196]

---

[189] As quoted in William Lee Miller, *The 'Moral Force' Behind Dulles's Diplomacy*, The Reporter, Aug. 9, 1956, at 17, 18 (emphasis added).
[190] Wilton B. Persons, *Your Future: A Stupendous Stimulating Challenge* (May 30, 1954), in 20 *Vital Speeches of the Day* 688, 688 (1954) (emphasis added).
[191] *Executive Order 10631—Code of Conduct for Members of the Armed Forces* (Aug 17, 1955), www.presidency.ucsb.edu/ws/?pid=59249. *See also* 3 C.F.R. 266 (1954-1958).
[192] D.W. Brogan, *Unnoticed Changes in America*, Harper's Mag., Feb. 1957, at 27, 33.
[193] A. Roy Eckardt, *The New Look in American Piety*, 71 The Christian Century 1395, 1396 (1954).
[194] Douglas T. Miller & Marion Nowak, *The Fifties: The Way We Really Were* 92 (1977).
[195] Will Herberg, *Protestant-Catholic-Jew* 53 (1960).
[196] Oakley, *supra* note 180, at 324 (emphasis added).

233. As can be readily seen by reviewing the statements made by individual legislators, Congress eagerly joined in to take advantage of this religious revival.

234. Senator Homer Ferguson, for example, claimed in 1954 that "In God We Trust" over the door of the Senate "**recognizes that we believe there is a Divine Power, and that we, our children, and children's children should always recognize it**."[197]

235. That same year, Rep. Louis C. Rabaut (MI) placed in the Congressional Record the incredibly offensive claim that "**An atheistic American … is a contradiction in terms**."[198] Rep. Rabaut would later argue that "**[w]e cannot afford to capitulate to the atheistic philosophies of godless men**."[199]

236. Also in 1954, Rep. Francis E. Dorn (NY) referenced "In God We Trust" on United States coins by declaring that "**He is the God, undivided by creed, to whom we look, in the final analysis, for the well-being of our Nation**."[200]

237. To Rep. Peter Rodino (NJ), the religious motto "expresses the constant attitude of the American people … that **we wish now, with no ambiguity or reservation, to place ourselves under the rule and care of God**."[201]

238. After informing us that "**our citizenship is of no real value … unless we can open our souls before God** and before Him conscientiously say, 'I am an American,'" Rep. Hugh J. Addonizio (NJ) proclaimed that "**God is the symbol of liberty to America**."[202]

239. His colleague, Rep. Charles A. Wolverton (NJ), stated that "In God we trust," taken "in conjunction" with "under God" in the Pledge of Allegiance, "can be taken as evidence of **our faith in that divine source of strength** that has meant and always will mean so much to us as a nation."[203]

240. Moreover, contended Rep. Wolverton, **those who deny God purvey "forces of evil**."[204]

---

[197] 100 Cong. Rec. 7833 (1954) (statement of Sen. Ferguson) (emphasis added).
[198] 100 Cong. Rec. 1700 (1954) (statement of Rep. Rabaut) (emphasis added).
[199] 101 Cong. Rec. 8156 (1955) (statement of Rep. Rabaut) (emphasis added).
[200] 100 Cong. Rec. 6085 (1954) (statement of Rep. Dorn) (emphasis added).
[201] 100 Cong. Rec. 7764 (1954) (statement of Rep. Rodino) (emphasis added).
[202] 100 Cong. Rec. 7765 (1954) (statement of Rep. Addonizio) (emphases added).
[203] 100 Cong. Rec. 14919 (1954) (statement of Rep. Wolverton) (emphasis added).
[204] *Id*. (emphasis added).

241. The environment was so infused with (Christian) Monotheism that Vermont's Senator Ralph Flanders went so far as to propose a Constitutional Amendment stating that "**this nation devoutly recognizes the authority and law of Jesus Christ, Saviour and Ruler of Nations**, through whom are bestowed the blessings of Almighty God."[205]

242. Although that amendment never came to fruition, a barrage of (Christian) Monotheistic actions was spatchcocked into government by Congress in the 1950s.

243. In 1952, for instance, a National Day of Prayer was instituted.[206]

244. In 1953 a prayer room was constructed in the United States Capitol Building.[207]

245. In 1954 (**with "Onward Christian Soldiers" chosen as the music to be played** at the official ceremony as the flag was being raised[208]), "under God" was intruded into the previously secular Pledge of Allegiance.[209]

246. In 1955, the inscription of "In God We Trust" was mandated for every coin and currency bill produced by the Department of the Treasury.[210]

247. In 1956 the secular *de facto* national motto "E Pluribus Unum" was replaced with an official motto: "In God we trust."[211]

248. Of exceptional relevance to the gravamen of this lawsuit, 1956 was also the year that Defendant Congress authorized and directed the Architect of the Capitol to prepare a document (produced by the United States Government Printing Office) which succinctly clarified the purpose and effect of placing "In God We Trust" on the coins: to "**witness our faith in Divine Providence**."[212]

---

[205] William Lee Miller, *Piety Along the Potomac*. The Reporter, Aug. 17, 1954, at 25, 25.
[206] Act of April 17, 1952, Pub. L. 82-324, ch. 216, 66 Stat. 64 (now codified at 36 U.S.C. § 119 (2012)).
[207] H.R. Con. Res. 60, 83d Cong. (1953).
[208] 100 Cong. Rec. 8617 (1954).
[209] Act of June 14, 1954, Pub. L. 83-396, ch. 297, § 7, 68 Stat. 249. As noted, 1954 also marked a new Code of Conduct for the military, requiring every solder to "trust in my God and in the United States of America," *see supra* ¶ 229, and the first time a religious postage stamp was produced, *see supra* ¶¶ 223-224.
[210] Act of July 11, 1955. *See supra* ¶¶ 211-212.
[211] Act of July 30, 1956, Pub. L. 84-851, ch. 795, 70 Stat. 732 (now codified at 36 U.S.C. § 302 (2012)).
[212] Architect of the Capitol, *The Prayer Room in the United States Capitol*, H.R. Doc. No. 234, at 5 (1956) (emphasis added), *available at* digitalcollections.baylor.edu/cdm/compoundobject/collection/cs-vert/id/11518/rec/1.

249. This (Christian) Monotheistic bent can be graphically demonstrated by examining the entries placed in the Congressional Record. There, the number pertaining to (Christian) Monotheistic religion increased **fifty-fold** when the five years after 1954 are compared to the five prior years. *See* Appendix C.

250. The Index volumes starting in 1954 show such extraordinary titles as "Meditation, Christ, our hope," "Christians in Politics," "Duty of Christian Politician," "God's Answer to Communism," "Strengthening America Under God," "We Pray or We Perish," "Drive to Erect World's Largest Cross," "God Meant Us To Find Atom," "God and U.N.," "Great Christian," "Free Government Based on Faith," "President Honored for Religious Aim," "What Did Jesus Believe About Wealth?," "Who Are Disciples of Christ?," "I Speak for Christian Citizenship," "Communists versus God," "Seeking God's Way for World Peace," "Eisenhower Should Lead Godly Against Reds," "Our Home and God," "Religious Illiteracy Is Problem for Home," "Thanks Be to Providence," "The Christian Leader and Politics," "'I Met God There,'" "Bible ABC Verses," "Christ Did Not Wear Crown of Thorns To Teach Appeasement," "Threats to Christianity and Democracy," "Christianity, Patriotism, and Myth of National Communism," "Unfair Trial of Jesus," "Christian Survival at Stake," "Convert Russia Through Prayer," "God's Time," "Christian Impact," "Prayer Is Power," "Christian Life," "Christian and Jew," "Christ in Marketplace," "Politics and Christian Service," "Millennium of Christianization," "In the beginning God," "Why Not Teach Religion?," "Errors in trial of Jesus," "Atheistic Character of Communism," "Antichrists on Prowl," "Moses, Prophets, Jesus Fought To Erase Inequality," "Speak for Christian citizenship," "Subsidy for ministers," "Reaffirm Christian faith in Middle East crisis," "139 Joined Church During Crusade," "Aggressive Secularism Undermining Nation," "Can-Do Christians," "Christianity or Communism?," "For God and Country," "Christian Philosophy of Civil Government," "We Believe in Prayer," "With Faith and Flag They Called It America," "Lecture: Existence of God," "What Faith in God Has Meant to Me," "Christ and Politics," "Power of Prayer," "Union of Church and State," "Jesus, the Perfect Man," "Washington's Lady Ambassador for Christ," "Make yourself a rubberstamp for God," "Man Sent From God," and "Bible: eternal source of strength." *See* Appendix D.

251. Even the judicial branch engaged in this (Christian) Monotheistic religious bias.

252. Chief Justice Earl Warren, for example, spoke of the United States as "**a Christian land governed by Christian principles**."[213]

253. More egregious was the ruling by the Chief Judge for the United States District Court for the District of Hawaii when an Atheist petitioned to become a naturalized citizen.

254. To Judge J. Frank McLaughlin, belief in God was key among "the principles which delicately support our free government."[214] Thus, when the petitioner attempted to take the oath of citizenship without the "so help me God" language, Judge McLaughlin denied the petition.

255. Denial, wrote Judge McLaughlin, was appropriate because "**the atheist philosophy upon which petitioner predicates his position demonstrates a lack of attachment to the United States Government's first principle: a belief in a Creator**."[215]

256. Particularly relevant to this case is the fact that the judge specifically referenced "the inscription of 'In God We Trust' upon the Liberty half-dollar and other United States coins" to support his ruling.[216]

257. Precisely as the Framers of our Constitution feared, this pervasive governmental support for one religious ideology (and denigration of another) helped fuel similar sentiments in the public square. Thus, (Christian) Monotheism was officially supported (and Atheism officially disfavored) as "the conservative fifties saw a major revival of religion. Year after year the statistics pointed to unprecedented increases in church membership."[217]

258. In 1955, "of adult Americans … 96.9 per cent were found to identify themselves religiously (70.8 per cent Protestants, 22.9 per cent Catholics, 3.1 per cent Jews)."[218]

---

[213] *Eisenhower Joins in a Breakfast Prayer Meeting*, N.Y. Times, Feb. 5, 1954, A10 (emphasis added).

[214] *Petition of Plywacki*, 107 F. Supp. 593, 593 (1952), *rev'd* 205 F.2d 423 (9th Cir. 1953). *District Court opinion available at* www.leagle.com/xmlResult.aspx?xmldoc=1952700107FSupp593_1552.xml&docbase=CSLWAR1-1950-1985.

[215] *Petition of Plywacki*, 115 F. Supp. 613, 614 (1953) (emphasis added), *available at* www.leagle.com/xmlResult.aspx?page=3&xmldoc=1953728115FSupp613_1596.xml&docbase=CSLWAR1-1950-1985&SizeDisp=7.

[216] *Plywacki*, 107 F. Supp. at 593.

[217] Oakley, *supra* note 180, at 185.

[218] Herberg, *supra* note 195, at 78, n.2 (citing Pub. Opinion News Serv., Mar. 20, 1955).

259. From 1949 to 1953, "the distribution of Scripture in the United States increased 140 per cent."[219]

260. Clergymen – with remarkably successful books, radio shows, television shows, crusades and the like – became increasingly popular and influential.[220] Thus, Billy Graham,[221] Fulton Sheen[222] and Norman Vincent Peale,[223] for example, became household names.

261. Whereas religious leaders came in third when Americans were questioned about which groups did the most "good" for the country in 1942, "[n]o other group – whether government, congressional, business, or labor – came anywhere near matching the prestige and pulling power of the men who are the ministers of God" when the question was repeated in the mid-1950s.[224]

262. The Chairman of the Board of the Chamber of Commerce of the United States spoke unhesitatingly in stating that "our Christian religion and our competitive business system are in themselves the two most revolutionary forces in the world today."[225]

263. A new Little League Pledge, beginning with "I trust in God," was published in the February 1955 issue of the *Little Leaguer* magazine.[226]

---

[219] *Id.* at 14 (citing *Report of the American Bible Society at Its 138th Annual Meeting*, Time, May 24, 1954).

[220] Oakley, *supra* note 180, at 321-327.

[221] Billy Graham's masterful crusades are legendary. *See, e.g.*, *Billy Graham: A New Kind of Evangelist*, Time, Oct. 25, 1954, at 54. "Like many other evangelists of the day, [Rev. Graham] also often equated Christianity with Americanism and with anticommunism." Oakley, *supra* note 180, at 322. As Graham characterized it, "a great sinister and anti-Christian movement masterminded by Satan has declared war upon the Christian God." Peter Lewis, *The Fifties* 73-74 (1978).

[222] *Life Is Worth Living*, a TV show with Rev. Fulton J. Sheen, aired from 1952 to 1957. Rev. Sheen "warned that no peace was possible with Russia, the leader of international godless communism." Oakley, *supra* note 180, at 322-23.

[223] Peale's *The Power of Positive Thinking* (1952) "quickly went to the top of the nonfiction best-seller list and stayed there for 112 consecutive weeks. In 1954 it sold more copies than any other book except the Bible." Oakley, *supra* note 180, at 323.

[224] Polls conducted by Elmo Roper, as reported in Miller & Nowak, *supra* note 194, at 85-86.

[225] Clement D. Johnston, *The Spiritual Responsibility of American Business and Industry*, 22 Vital Speeches of the Day, Dec. 15, 1955, at 151.

[226] Little League, *Pledge*, www.littleleague.org/learn/about/pledge.htm (last visited Dec. 9, 2015).

264. So great was "the resurgence of religious feeling and practice in America" that the Ideal Toy Company manufactured "praying dolls" with flexible knees for kneeling.[227]

265. It should be recalled that the Bible (i.e., the book the (Christian) Monotheistic majority considers most holy) frequently denigrates Atheists. For instance, it:

(i) Claims that "[t]he fool hath said in his heart, There is no God. They are corrupt, they have done abominable works, there is none that doeth good." *Psalms* 14:1.
(ii) Associates unbelievers with "wickedness" and "darkness." 2 *Corinthians* 6:14.
(iii) Decrees that those who deny God's existence "shall surely be put to death." *Leviticus* 24:16.

266. Moreover, the dictionaries of the time included "sinful" and "wicked" among their definitions of "godless"[228] and "ungodly."[229]

267. Thus, not surprisingly, there was significant antipathy towards Atheists accompanying the era's pro-Christian, pro-God fervor.

268. This antipathy was intensified in the Cold War environment, where, "[b]elieving that 'atheistic Communism' threatened America both without and within, Americans saw the world in terms of good and evil, godly and godless."[230]

269. Accordingly, it was believed that "Communists were our mortal enemies and they were atheists. Religion, therefore, came to seem essential in the fight against communism."[231]

270. With media moguls molding public opinion by speaking of "atheism, anarchism and Godless despotism,"[232] data revealed the extent to which Atheists were reviled.

271. In 1954, for instance, a poll showed **that 60% of the population felt it was proper to deny Atheists the right to express their religious views in a speech**.[233]

---

[227] *Words and Works*, Time, Sept. 20, 1954, at 65.
[228] *See, e.g., Webster's New Twentieth Century Dictionary of the English Language – Unabridged* 749 (2d ed. 1956) and 1 *Funk & Wagnalls New Practical Standard Dictionary of the English Language* (1956).
[229] *See, e.g.,* 2 *The New Century Dictionary of the English Language* 2095 (1948).
[230] Miller & Nowak, *supra* note 194, at 82.
[231] *Id. at 91*.
[232] *William Randolph Hearst: A Portrait in his Own Words* 302-03 (Edmond D. Coblentz ed. 1952).
[233] Samuel Stouffer, *Communism, Conformity, and Civil Liberties: A Cross Section of the Nation Speaks Its Mind* 423-33 (1955) (citing a joint survey conducted in 1954 by Gallup and the Nat'l Op. Res. Ctr. of the Univ. of Chi.).

272. The same poll showed that **60% favored removing all books on Atheism from the public libraries**, and that a **whopping 84% believed that Atheists should be prohibited from teaching in colleges or universities**.[234]

273. In 1958, **more than three-quarters of the population stated they would not vote for an otherwise qualified candidate for President if that person were an Atheist**.[235]

274. In a 1962 treatise on the Supreme Court and the Religion Clauses, it was noted that, "Atheism is fair game for the sniper, and overtones of 'blasphemy' and 'sacrilege' still linger."[236]

275. In 1965, **27% of the population stated that they didn't think Atheists should even be allowed to vote**. This was more than four times the percentage who felt that basic right of citizenship should be denied to "people who have quit school and never completed high school."[237]

276. In sum, (Christian) Monotheistic religious fervor, and its associated anti-Atheism, characterized the Cold War era in the middle of the twentieth century. That milieu explains why the presence of "In God We Trust" – already unconstitutionally inscribed on every coin (albeit as a matter of discretion for some) – was mandated for all coins and currency bills in the Act of 1955.

---

[234] *Id*.

[235] The poll, which included figures for those who would not vote for candidates of other religions (and races as well), is revealing: Would not vote for a: "Baptist" (4%), "Catholic" (27%), "Jew" (29%), "Negro" (54%), "Atheist" (77%). *Id*.

[236] *The Supreme Court on Church and State* xxi (Joseph Tussman ed. 1962).

[237] Am. Inst. of Pub. Op., Gallup Poll conducted July 21, 1965.

## D. CURRENT CIRCUMSTANCES ARE LITTLE CHANGED FROM THE 1950s

### (1) "In God We Trust" on the Money Continues to Represent (Christian) Monotheism and to Be Utilized in Religiously Discriminatory Ways

277. The "In God We Trust" phrase has continued to be a tool used to perpetuate favoritism for (Christian) Monotheism. It has also continued to perpetuate anti-Atheistic bias.

#### (a) Presidents Continue to Use the Motto to Advocate for (Christian) Monotheism

278. Since President Eisenhower (shortly before he signed into law the congressional resolution establishing "In God We Trust" as the national motto[238]) stated:

> **Recognition of the Supreme Being is the first, the most basic, expression of Americanism. Without God, there could be no American form of government, nor an American way of life**,[239]

subsequent Presidents have expressed similar sentiments.

279. President John F. Kennedy, for instance, stated, "The guiding principle and prayer of this Nation has been, is now, and ever shall be 'In God We Trust.'"[240]

280. In his 1974 National Day of Prayer proclamation, President Gerald R. Ford began by stating that "Ours is a Nation built upon a belief in a Creator … and **faith in that Creator permeates every aspect of our way of life**."[241] This statement was followed by a reiteration of President Eisenhower's extraordinary words: "'**Without God, there could be no American form of government, nor an American way of life**.'"[242]

281. Speaking at a brunch two years later, President Ford contended that "'In God We Trust' is much more than a national motto."[243]

---

[238] Act of July 30, 1956, *see supra* note 211.
[239] *See supra* ¶ 220.
[240] As reported in H.R. Con. Res. 13, 112th Cong., at 3 (2011).
[241] Gerald Ford, *Proclamation 4338 – National Day of Prayer*, [Dec. 5,] *1974* (emphasis added), http://www.presidency.ucsb.edu/ws/index.php?pid=23888&st=4338&st1=.
[242] *Id.* (emphasis added).
[243] Gerald Ford, *Remarks at the Professional Athletes Prayer Brunch*, Feb. 16, 1976, www.presidency.ucsb.edu/ws/?pid=5492.

282. President Ford elaborated by speaking of "the religious life for which the ultimate reward is nothing less than a place in the kingdom of God." [244]

283. During a 1980 town hall meeting, President Jimmy Carter was asked about his being "a born-again Christian."[245]

284. In answering, the President found it relevant that "'In God We Trust' is on our coins."[246]

285. President Ronald Reagan's 1981 National Day of Prayer proclamation began by claiming, "**Our Nation's motto 'In God We Trust' … reflects a basic recognition that there is a divine authority in the universe to which this Nation owes homage**."[247]

286. At a subsequent event, President Reagan also referenced the religious verbiage on the money: "**And we are still a nation under God. It says so on our coins—'In God We Trust**.'"[248]

287. George H.W. Bush stated that "we are one nation under God. And **we were placed here on Earth to do His work**. And our work has gone on now for more than 200 years in the Nation -- a work **best embodied in four simple words: In God we trust**."[249]

288. In his 1997 National Day of Prayer proclamation (just prior to noting that Congress "has called our citizens to reaffirm annually our dependence on Almighty God"), President William J. Clinton asserted, "may our national resolve be matched **by a firm reliance on the Author of our lives—for truly it is in God that we trust**."[250]

---

[244] *Id*.

[245] Jimmy Carter, *Independence, Missouri Remarks and a Question-and-Answer Session at a Townhall Meeting*, Sept. 2, 1980, www.presidency.ucsb.edu/ws/index.php?pid= 44975.

[246] *Id*.

[247] Ronald Reagan, *Proclamation 4826 – National Day of Prayer*, [Mar. 19,] *1981* (emphasis added), www.presidency.ucsb.edu/ws/?pid=61699.

[248] *Question-and-Answer Session with Students at Farragut High School in Farragut, Tennessee*, June 14, 1983 (emphasis added), www.presidency.ucsb.edu/ws/index.php?pid=41473.

[249] George Bush, *Remarks at the Annual National Prayer Breakfast*, May 4, 1989 (emphases added), bushlibrary.tamu.edu/research/public_papers.php?id=388&year=1989&month= all.

[250] William J. Clinton, *Proclamation 6991, National Day of Prayer*, [Apr. 18,] 1997 (emphasis added), www.presidency.ucsb.edu/ws/index.php?pid=54013.

289. Commemorating the fiftieth anniversary of the "In God We Trust" phrase as our national motto, President George W. Bush in 2006 proclaimed that the words "**recognize the blessings of the Creator**."[251]

290. Stating as fact that there is "**a divine plan that stands above all human plans**,"[252] President Bush apparently missed the irony – glaringly obvious to Atheists such as Plaintiffs here – of his simultaneous proclamation that "our country stands strong as a beacon of religious freedom."[253]

291. Although President Obama has generally avoided discussions involving "In God We Trust," he has repeatedly demonstrated a complete lack of regard for the nation's Atheists. On November 2, 2011, for example, he alluded to "legislation reaffirming that 'In God We Trust' is our motto,"[254] and then completely ignored the anti-Atheist bias inherent in that legislation. Rather, he reminded everyone that "I trust in God."[255]

292. Just this month, in a keynote "Address to the Nation" concerning a terrorist attack that killed fourteen "fellow citizens … [who] were part of our American family,"[256] President Obama made it clear that the overwhelming number of Muslims who don't support terrorism are a welcome part of that family.

293. In doing so, he spoke of the importance of "the values of religious tolerance, mutual respect and human dignity"[257] and decried "divisiveness [as a] betrayal of our values."[258]

---

[251] George W. Bush, *50th Anniversary of Our National Motto, "In God We Trust,"* [July 27,] *2006* (emphasis added), http://georgewbush-whitehouse.archives.gov/news/releases/2006/07/20060727-12.html.
[252] *Id*. (emphasis added).
[253] *Id*.
[254] *Remarks by the President Urging Congress to Pass the Infrastructure Piece of the American Jobs Act* (Nov. 2, 2011), www.whitehouse.gov/the-press-office/2011/11/02/remarks-president-urging-congress-pass-infrastructure-piece-american-job.
[255] *Id.*
[256] *Address to the Nation by the President* (Dec. 6, 2015), available at www.whitehouse.gov/the-press-office/2015/12/06/address-nation-president.
[257] *Id.*
[258] *Id.*

294. Despite the foregoing, the President then proceeded to show complete disrespect for the religious views of Atheistic Americans such as Plaintiffs here, as he divided our nation on the basis of belief or disbelief in God by contending that "no matter … what religion you practice, you are equal in the eyes of God and in the eyes of the law."[259]

295. He then further insulted the millions of American nonbelievers as he concluded his speech with the now-standard line that completely denigrates their religious views: "God bless you, and may God bless the United States of America."[260]

296. Although the "In God We Trust" phrase issue has not yet appeared in the current race for president, it proved to be a major issue in at the last go-around.

297. For instance, Marco Rubio – a leading candidate for the Republican Party's presidential nomination in 2016 – introduced 2012 presidential nominee Mitt Romney at the party's National Convention by claiming **"[o]ur national motto, 'in God we trust', remind[s] us that faith in our creator** is the most important American value of them all."[261]

298. In response, the Democrats altered their party platform (which had not included any (Christian) Monotheistic material), proclaiming "**that our faith and belief in God is central to the American story** and informs the values we've expressed in our party's platform."[262]

299. Still, Republican candidate Romney opted to capitalize on the American majority's religious leanings by alluding to the Democrats' initial lack of favoritism for (Christian) Monotheism by subsequently stating, "**I will not take 'God' off our coins, and I will not take God out of my heart. We're a nation bestowed by God**."[263]

---

[259] *Id.*
[260] *Id.*
[261] *Transcript of Marco Rubio's Speech at the RNC,* Aug. 30, 2012 (emphasis added), www.foxnews.com/politics/2012/08/30/transcript-marco-rubio-speech-at-rnc/.
[262] Jessica Yellin, *Just In: Democrats Update Platform with Jerusalem, God Reference*, CNN.COM (Sept. 5, 2012, 4:53 pm) (emphasis added), politicalticker.blogs.cnn.com/2012/09/05/just-in-democrats-to-update-platform-with-jerusalem-reference/.
[263] Ashley Parker, *In Romney's Hands, Pledge of Allegiance is Framework for Criticism* (Sept. 9, 2012), at A16 (emphasis added), *available at* www.nytimes.com/2012/09/09/us/politics/romney-uses-pledge-of-allegiance-to-criticize-obama.html.

### (b) Congress Continues to Use the Motto to Advocate for (Christian) Monotheism

#### i. The Sequence of Events Regarding Edge-Incusion Demonstrates that the Motto Stands for (Christian) Monotheism

300. Evidence of the unique religious importance of the motto can be seen in the sequence of events regarding the edge-incusion design for the Presidential $1 coins, introduced pursuant to the Presidential $1 Coin Act of 2005:

> In order to revitalize the design of United States coinage and return circulating coinage to its position as not only a necessary means of exchange in commerce, but also as an object of aesthetic beauty in its own right, it is appropriate to move many of the mottos and emblems, the inscription of the year, and the so-called ''mint marks'' that currently appear on the 2 faces of each circulating coin to the edge of the coin, which would allow larger and more dramatic artwork on the coins reminiscent of the so-called ''Golden Age of Coinage'' in the United States, at the beginning of the Twentieth Century, initiated by President Theodore Roosevelt, with the assistance of noted sculptors and medallic artists James Earle Fraser and Augustus Saint-Gaudens.[264]

301. Accordingly, it was decided that "[t]he inscription of the year of minting or issuance of the coin and the inscriptions 'E Pluribus Unum' and 'In God We Trust" shall be edge-incused into the coin."[265]

302. What turned out to be most "reminiscent" of the Roosevelt/Saint-Gaudens era, however, were the objections to the lack of prominence of the "In God We Trust" phrase.

303. For instance, Rep. Dan Burton of Indiana complained about "people in this country who have tried to get … **belief in God** taken off of all … coins and currency."[266]

304. Decrying the notion of "putting 'In God We Trust' in an obscure place on coins so that people can't read it," he continued by stating "This country was formed with a firm reliance on God Almighty, and **when we start taking God out of everything, as some people want to do, we run the risk of having him turn his back on us**."[267]

---

[264] Publ. L. 109-145, 119 Stat. 2664, 2665 (2005), § 101(10).
[265] *Id.* at 2666, § 102(n)(2)(C)(i).
[266] 153 Cong. Rec. H10311 (daily ed. Sept. 7, 2007) (statement of Rep. Burton) (emphasis added). It is noteworthy that this snippet speaks of "belief in God" and not "Godly heritage."
[267] *Id*. (emphasis added).

305. Rep. Burton thus introduced legislation to "demand or mandate that 'In God We Trust' be maintained and retained on our coinage in a prominent place."[268]

306. Rep. Burton prevailed in his religious quest. As a result, the religious motto is no longer permitted to be edge-incused: "The design **on the obverse or the reverse** shall bear the inscription 'In God We Trust'."[269]

307. The non-religious motto, on the other hand (i.e., "E Pluribus Unum," which embraced all Americans, which arose from within a committee created on July 4, 1776, and which was devised by John Adams, Benjamin Franklin and Thomas Jefferson[270]) could remain "in an obscure place."

### ii. The 62 Congressmen who Sponsored H. Con. Res. 411 Reveal that Our Legislators Continue to Believe the Motto Stands for (Christian) Monotheism

308. In 2006, Rep. John Duncan (TN) introduced H. Con. Res. 411 in the House of Representatives. That resolution, co-sponsored by 61 of his congressional colleagues, was entitled, "Commemorating the anniversary of, commending, and reaffirming the national motto of the United States on the 50th anniversary of its formal adoption."[271]

309. Accordingly, more than 14% of the members of the House of Representatives were willing to place in the Congressional Record their belief that the "In God We Trust" motto reflects and/or relates, among other things, to "the fundamental trust of the American people upon **the God of the Bible**," "American trust in **the Christian deity**," the fact that "**Psalm 33:12** states, 'Blessed is the nation whose **God is the Lord**;'" the fact that "**Psalm 127:1** says, 'Unless **the Lord builds the house**, its builders labor in vain. Unless **the Lord watches over the city**, the watchmen stand guard in vain;'" the fact that the colonial charter of Virginia referenced "**the Providence of Almighty God**" and "the Glory of his Divine Majesty, in **propagating of Christian Religion** to such People, as yet live in Darkness and miserable Ignorance of the **true Knowledge and**

---

[268] *Id*.
[269] 31 U.S.C. § 5112 (2012). *See also* Consolidated Appropriations Act of 2008, Pub. L. 110-161, § 623(a)(2), 121 Stat. 1844 (2007).
[270] *See infra* ¶¶ 558-561.
[271] H. Con. Res. 411, 109th Cong. (2006). *See at* www.congress.gov/bill/109th-congress/house-concurrent-resolution/411/all-info#cosponsors.

**Worship of God**;" the fact that "Virginia settlers acknowledged **the hand of God** as central to the success of their endeavor;" and the fact that "the Mayflower Compact of 1620, written and signed by the Pilgrims, established 'for the glory of God, and **advancement of the Christian faith**' a 'civil body politick' that rested on their **firm reliance on God** for its success."[272]

310. Those congressmen concluded by admitting that, to them, there is "the concept embodied in that motto: the proper role of **civil government as under the authority and protection of the Lord**, and its success fully dependent upon divine sovereignty," and that the "right understanding of **the appropriate place of civil society [is] under the authority of the Almighty**."[273]

311. Thus, they unabashedly sought to have **a Congress that "encourages … love of God," "personal acts of piety," "sacred assembly," "prayer," and "a rededication of trust in God.**"[274]

### iii. Congress's Motto "Reaffirmations" Reveal that Our Legislators Continue to Believe the Motto Stands for (Christian) Monotheism

312. In 2011, with 396 "yeas" and 9 "nays," the entire House of Representatives passed a "reaffirmation" of the motto.[275]

313. That "reaffirmation" contended that "in times of national challenge or tragedy**, the people of the United States have turned to God as their source for sustenance, protection, wisdom, strength, and direction**."[276]

314. Of course, only some of "the people of the United States" have done this, just as only some have turned to Jesus, the Koran or the myriad other religious figures and texts that are inherently exclusive in terms of religious belief and practice.

315. The legislators felt it was appropriate to recall the remarkably exclusionary statement of President Eisenhower (later repeated by President Ford) that, "'**Without God, there could be no American form of government, nor, an American way of life**.'"[277]

[272] H. Con. Res. 411, 109th Cong. (2006).
[273] *Id*.
[274] *Id*.
[275] H.R. Con. Res. 13, 112th Cong. (2011).
[276] 157 Cong. Rec. H7169 (daily ed. Nov. 1, 2011) (emphasis added).
[277] *Id*. (emphasis added).

316. That "reaffirmation" resolved that Defendant Congress "supports and encourages the public display of ['In God we trust'] in all public buildings, public schools, and other government institutions."[278]

317. Although Rep. Jerrold Nadler of New York noted that "this country is a country for all people—whether they are religious or not, whether they believe in God or not, whether they believe in one God or not,"[279] Rep. Lamar Smith of Texas contended that it was important "to show that we still believe and recognize" that "'God intended for us to be free,'" that **"'the rights of man come** not from the generosity of the state, but **from the hand of God**,''' and that "'upon the spirit of God shall our democracy be founded.'"[280]

318. Rep. Daniel Lungren of California spoke of "**the God in whom we trust**."[281]

319. Rep. Jeff Miller of Florida reminded his colleagues that "'if we ever forget that **we are one nation under God**, that we will then be one nation gone under.'"[282]

320. **"[I]n God we must continue to trust now**," stated Rep. Ted Poe of Texas.[283]

321. Speaking of the motto representing "Judeo-Christian principles" and "the inclusion of these [Judeo-Christian] principles into our government," Rep. Gregg Harper of Mississippi asserted that "we are indeed endowed by our Creator with certain inalienable rights,"[284] and seemed to take pride in being "**constantly surrounded by the reminders of God's presence**" in the "Nation's Capitol."[285]

322. Rep. Paul Broun of Georgia felt the motto should be reaffirmed because "**we must continue to affirm that God has a place in blessing our government**, in guiding our lawmakers, and that He has the ability to lead our Nation back to a path of righteousness and prosperity."[286]

---

[278] *Id.*
[279] *Id.* at H7170 (remarks of Rep. Nadler).
[280] *Id.* at H7171 (remarks of Rep. Smith) (citations omitted) (emphases added).
[281] *Id*. (remarks of Rep. Lungren) (emphasis added).
[282] *Id*. at H7172 (remarks of Rep. Miller) (citation omitted) (emphasis added).
[283] *Id.* at H7173 (remarks of Rep. Poe) (emphasis added).
[284] *Id.* at H7173 (remarks of Rep. Harper).
[285] *Id.* (emphasis added).
[286] *Id*. (remarks of Rep. Broun) (emphasis added).

323. Oklahoma Rep. James Lankford's support for the motto "reaffirmation" stemmed from his claim that "**[w]e as Americans believe our rights are from God. It is in God we trust**."[287]

324. Insulting Plaintiffs here and millions of other Americans, Rep. Trent Franks of Arizona stated:

> If man is God, then an atheist state is as brutal as the thesis that it rests upon and there is no longer any reason for us to gather here in this place. We should just let anarchy prevail because, after all, we are just worm food. So indeed we have the time **to reaffirm that God is God and in God do we trust**.[288]

325. Under the version of history adhered to by Alabama's Rep. Robert B. Aderholt, "the Founding Fathers … fully endorsed the idea of the acknowledgement of God."[289] That version also presumes that those Founding Fathers sought to create "**a Christian and godly Nation**."[290]

326. Meanwhile, Rep. Nadler noted that the resolution served "to make people who may not agree with it feel that they're not as American as we are."[291]

327. After the resolution's chief sponsor, Rep. Randy Forbes of Virginia, responded to Rep. Nadler, Indiana's Rep. Mike Pence thanked Rep. Forbes "for his tireless and ongoing **defense of America's Christian heritage**."[292]

328. According to Rep. Pence, one cannot "adequately explain the near boundless prosperity and advancement of the United States of America since 1776 other than the hand of Providence."

329. Rep. Sheila Jackson Lee of Texas apparently missed the oxymoron involved in contending that the "In God we trust" phrase "reflects our nation's rich history of religious freedom and tolerance" and "is an acknowledgement of our nation's unwavering commitment to religious freedom."[293]

---

[287] *Id*. (remarks of Rep. Lankford) (emphasis added).
[288] *Id*. (remarks of Rep. Franks) (emphasis added).
[289] *Id*. at H7174 (remarks of Rep. Aderholt).
[290] *Id*. (emphasis added).
[291] *Id*. (remarks of Rep. Nadler).
[292] *Id*. (remarks of Rep. Pence) (emphasis added).
[293] *Id*. (remarks of Rep. Jackson Lee).

330. After referencing "**the Supreme Being, the creator and ruler of the universe**," Rep. Jackson Lee extolled the virtues of our nation's diversity, with its "many different religions, faiths and customs."[294] Unfortunately, Americans such as Plaintiffs here – whose religious beliefs specifically deny the existence of any "creator" or "Supreme Being" – are apparently outside of the Representative's diversity community:

> Reaffirming 'In God We Trust' as the national motto is a reaffirmation of faith, a reaffirmation of a creator and Supreme Being, and uniting all religions under the comfort this brings.[295]

331. Rep. Mike McIntyre of North Carolina argued that "our continued trust in God is critical and must not wane" and that "**our faith in God must remain steadfast** through the dark times."[296] He followed this by citing to a Thanksgiving proclamation made by the Continental Congress in 1777, which spoke "**of that kingdom which consisteth in righteousness, peace and joy in the Holy Ghost.**"[297]

332. Of note is that the actual "reaffirmation" itself had seven historical (Christian) Monotheistic references juxtaposed to the motto to show its propriety.

333. Similar "reaffirmations" of the "In God we trust" phrase – with similar (Christian) Monotheistic religious juxtapositions – were passed by the Senate in 2006, and by both the House and the Senate in 2002.[298]

334. In the 2002 "reaffirmation," the motto was supported by juxtaposing eight historical (Christian) Monotheistic references,[299] and in 2006 (while writing that "the success of civil government relies firmly on the protection of divine Providence") the Senate opted to "commemorate, celebrate, and reaffirm" the motto by juxtaposing thirteen historical (Christian) Monotheistic references to it.[300]

---

[294] *Id.* (emphasis added).
[295] *Id.*
[296] *Id.* at H7174-75 (remarks of Rep. McIntyre) (emphasis added).
[297] *Id*. at H7175 (emphasis added).
[298] Other bills that were proposed but not passed also demonstrate the religious essence of the "In God we trust" phrase. For instance, a House concurrent resolution that was referred to the Subcommittee on the Constitution in 2005 highlighted that "belief in a Supreme Power and the virtue of seeking strength and protection from that Power is … inscribed on our currency." H.R. Con. Res. 253, 109th Cong. (2005).
[299] An Act to Reaffirm the Reference to One Nation Under God in the Pledge of Allegiance, Pub. L. No. 107-293, 116 Stat. 2057 (2002).
[300] S. Con. Res. 96, 109th Cong. (2006).

335. The Supreme Court, however, has written that "juxtaposing … other documents with highlighted references to God as their sole common element [reveals an] unstinting focus … on religious passages, showing … an impermissible purpose."[301]

336. Thus, certain members of the House Committee on the Judiciary that considered the 2011 "reaffirmation" determined that the resolution "transgressed the clear line between government and religion in violation of the Establishment Clause,"[302] that it "does prefer religion over non-religion, which violates the Constitution,"[303] and that "**it endorses a specific type of religion, monotheism, over other religions**, which likewise is unconstitutional.[304]

337. In other words, members of Congress, themselves, highlighted that the government's use of "In God We Trust" violates the Constitution.

### iv. Individual Congressmen Continue to Demonstrate that the Motto Stands for (Christian) Monotheism

338. Of course, other congressmen still do not hesitate to use the motto for its purely religious aspects, as shown by the following small sampling just from the past three years.

339. Immediately after he noted that "I'm standing under 4 words: 'In God We Trust,'" Rep. Jim Himes, in 2013, chose to "observe that the minister this morning opened the House with a prayer to our Lord and Savior, Jesus Christ."[305] The remainder of the Congressman's remarks consisted of nothing more than biblical citations.

340. Later that year, Rep. Tim Walberg (MI) demonstrated his unabashed prejudice against sincere nonbelievers (such as Plaintiffs here) as he referred to the "In God We Trust" motto while quoting President Eisenhower's vile contention that "Atheism … leads inevitably to domination and dictatorship."[306]

---

[301] *McCreary County v. ACLU of Kentucky*, 545 U.S. 844, 870 (2005).
[302] H.R. Rep. 112-47 (2011) ("Dissenting Views") at 6.
[303] *Id.* ("Dissenting Views") at 8.
[304] *Id.* (emphasis added).
[305] 159 Cong. Rec. H3371 (daily ed. June 13, 2013) (remarks of Rep. Jim Himes).
[306] 159 Cong. Rec. H5410 (daily ed. Sep. 9, 2013) (remarks of Rep. Tim Walberg).

341. In his remarks regarding the 2014 National Day of Prayer, then Rep. Lankford (OK) found it appropriate to point out that "[t]he words of our national motto, 'In God We Trust,' are emblazoned on the wall right over my right shoulder," while espousing his belief that "the gift of God is eternal life through Christ Jesus, our Lord."[307]

342. Joining him that day was Rep. Mike McIntyre (NC), who repeatedly alluded to the motto as he contended that "[t]he true source of power is found on our knees before the throne of grace, before almighty God," and that "the power of prayer knows no bounds. May we be a Nation that does stand for our motto, 'In God We Trust.' Indeed, we pray, may God bless America."[308]

343. In June of this year, Rep. Barry Loudermilk (GA) contended that "In God We Trust" above the Speaker's rostrum refers to "the rights that God has given."[309]

344. Rep. Roger Williams (TX) called for the end to congressional funding of Planned Parenthood because ""When I first ran for Congress, I promised that I would vote with my conscience and use God's word as my guide."[310]

345. In October, now Sen. James Lankford (OK) referred to the fact that "[i]n this Chamber, the words "In God We Trust" are written right above the main doors as we walk in, the same as it is in the House Chamber above the Speaker's chair" to support a public school teacher's decision to join with students in Christian prayer (while that teacher was serving as a governmental agent). Sen. Lankford ended his statement with, "Thank You, Jesus, for the way that You sustain our Nation and for the freedom that we have. We ask Your help in protecting us. In Your Name I pray. Amen."[311]

346. Last month, in a statement entitled "Persona Faith," Rep. Randy Forbes (VA) highlighted that "In God We Trust" is placed even higher than the American flag in the House chamber. He did this in a statement entitled "Personal Faith," in which he worried about governmental agents that "trample on the religious freedom and the religious liberty of all of us."[312]

[307] 160 Cong. Rec. H3246 (daily ed. Apr. 29, 2014) (remarks of Rep. James Lankford).
[308] 160 Cong. Rec. H3247 (daily ed. Apr. 29, 2014) (remarks of Rep. Mike McIntyre).
[309] 161 Cong. Rec. H4536 (daily ed. June 18, 2015) (remarks of Rep. Barry Loudermilk).
[310] 161 Cong. Rec. H6124 (daily ed. Sep. 17, 2015) (remarks of Rep. Roger Williams). Rep. Williams apparently ends all of his remarks with "In God We Trust."
[311] 161 Cong. Rec. S7561 (daily ed. Oct. 28, 2015) (remarks of Sen. James Lankford).
[312] 161 Cong. Rec. H7628 (daily ed. Nov. 4, 2015) (remarks of Rep. Randy Forbes).

**v. "In God We Trust" Clearly Has a (Christian) Monotheistic Meaning to Congress's Chaplains**

347. Those who are arguably the official religious deans of the nation – Congress's chaplains – often employ the "In God We Trust" language to further (Christian) Monotheistic messages.

348. A good example is the February 16, 2011, prayer offered by that day's guest chaplain, Rev. Bill Shuler. Before reaching his "**In Jesus' name**" conclusion, he stated:

> Heavenly Father, we … worship You, for **You are an awesome and personal God**. Make us ever mindful of the words engraved over the Speaker's chair, **"In God We Trust**." … It is in You we trust. You are the God who founded our Nation, the God who gave us liberty, and **it is by turning to You that we are blessed**.[313]

349. Two months later, Bishop Henry Fernandez (who also used the "**In Jesus' name**" conclusion) addressed his "**Heavenly Father**" by saying, "And let Your peace rest upon them and this great Nation, as we continue to live out the words written over the chair of the Speaker of the House: "**In God we trust**."[314]

350. In the middle of his tenure, Rev. Daniel P. Coughlin (the official House Chaplain from 2000 to 2011) claimed that "this Chamber proclaims what America prays: 'In God we trust' now and forever."[315]

351. Moreover, speaking specifically about money, Rev. Coughlin inquired, "[W]hat is the meaning of money? Does money really talk? In the United States the dollar bill says 'In God we trust.' So be it now and forever. Amen."[316]

352. In his June 11, 2013 prayer, guest chaplain Rabbi Moshe Feller twice referenced "In God We Trust" as he spoke with reverence of the goal "to make all mankind aware of Your sacred presence."[317]

---

[313] 157 Cong. Rec. H949 (daily ed. Feb. 16, 2011) (prayer by Rev. Shuler) (emphases added).
[314] 157 Cong. Rec. H2334 (daily ed. Apr. 6, 2011) (prayer by Bishop Fernandez) (emphases added).
[315] 151 Cong. Rec. H6386 (daily ed. July 25, 2005) (prayer by Rev. Coughlin).
[316] 153 Cong. Rec. H2674 (daily ed. Mar. 20, 2007) (prayer by Rev. Coughlin).
[317] 159 Cong. Rec. S4069 (daily ed. June 11, 2013) (prayer by Rabbi Feller).

353. Senate Chaplain Barry Black specifically noted, "Lord, on our coins and currency, we have placed the words 'In God We Trust,'" as he noted that "We pray in Your great Name. Amen."[318]

354. These examples, provided by chaplains as they lead others in prayer to God, make it abundantly clear that the "In God We Trust" language is treated as it was meant to be treated – i.e., as purely (Christian) monotheistic religious verbiage.

### (c) Society Continues to Use the Motto for (Christian) Monotheistic Advocacy

355. Endorsing (Christian) Monotheism is how society sees the motto as well.

356. The 2012 Honorary Chairman of the National Task Force, for example (in his official prayer that ended "**[i]n the name of Your Son, and our Savior**"), noted that "[o]ur currency proclaims **'In God We Trust**,'… ."[319]

357. In God We Trust~America, another advocacy group, seeks to have "Elected Officials to 'Vote Yes' to Legally Display Our Congressionally Approved National Motto *IN GOD WE TRUST* In Every City, County Chamber and State Capitol In America."[320]

358. The group explained its purposes: "to keep God's name in America, and acknowledge and affirm the role that **faith in God** plays in the public lives of the citizens in this country, and in the core values of our nation."[321]

359. Congressional Prayer Caucus Foundation, Inc., is yet one more organization that uses the motto to serve religious ends. For its members, the "In God We Trust" phrase means "that **God our Creator is still the foundation of our nation's trust**, not man."[322]

360. The Family Research Council (FRC) states its mission is "to advance faith, family and freedom in public policy and the culture **from a Christian worldview**."[323]

---

[318] 159 Cong. Rec. S7433 (daily ed. Oct. 13, 2013) (prayer by Chaplain Black).

[319] Dr. David Jeremiah, *2012 National Prayer*, www.nationaldayofprayer.org/2012_dr_david_jeremiah_bio (last visited on Dec. 10, 2015).

[320] In God We Trust~America, *Our Mission*, 0168828.netsolhost.com/ingodwetrust/our-mission/ (last visited Dec. 13, 2015).

[321] *Id*. (emphasis added).

[322] Congressional Prayer Caucus Foundation, Inc., *About the Cause: Why Is This Significant?* www.ingodwetrustmotto.us/about-the-cause (emphasis added) (last visited Dec. 10, 2015).

[323] Family Research Council, www.frc.org/mission-statement (emphasis added) (last visited Dec. 10, 2015).

361. In an email sent on September 14, 2012, FRC president Tony Perkins wrote about the organization's recent "Value Voters Summit." Under the heading "Value Voters Accept God to their Platform," Perkins wrote: "I opened our "Values Voters Convention" by amending our theme of "Limit government, reduce spending, champion traditional values and protect America" by adding at the end – "**No apologies: In God We Trust**."[324]

362. This amendment was "approved following three unanimous votes by those gathered in the hall."[325]

363. Internet searches of "'In God We Trust' products" show overwhelming use of that phrase related to (Christian) Monotheistic religious products proffered by (Christian) Monotheistic enterprises.

364. Internet searches of "'In God We Trust' books" show overwhelming use of that phrase related to (Christian) Monotheistic religious books by (Christian) Monotheistic authors.

### (2) In Extolling (Christian) Monotheism, "In God We Trust" Contributes to a Culture that Denigrates Atheism and Atheists

365. By espousing the motto "In God We Trust" and placing it on every coin and currency bill, Defendants contribute to the fact that Atheists are viewed unfavorably by more than half of their fellow Americans merely on the basis of their deeply felt religious views.[326]

366. The (Christian) Monotheistic coinage is also partly responsible for the astounding 57% of the population holding the view that nonbelievers are incapable of being moral.[327]

367. In fact, research has shown that our society finds that Atheists – solely on the basis of their disbelief in God – are felt to be less trustworthy than rapists![328]

---

[324] Emphasis added. Email in files of the undersigned (Michael Newdow).
[325] *Id*.
[326] Pew Forum on Religious & Pub. Life, *Public Expresses Mixed Views of Islam,* Mormonism (Sept. 25, 2007), pewforum.org/Public-Expresses-Mixed-Views-of-Islam-Mormonism.aspx.
[327] Pew Res. Ctr., The Pew Global Attitudes Project 33, Oct. 4, 2007, pewglobal.org/files/pdf/258.pdf.
[328] Will M. Gervais et al., *Do You Believe in Atheists? Distrust Is Central to Anti-Atheist Prejudice*, 101 J. of Personality & Soc. Psychol. 1189, 1195-96 (2011).

368. The environment created by the pervasive and persistent governmental employment of "In God We Trust" has also helped create "symbolic boundaries that clearly and sharply exclude atheists in both private and public life."[329]

369. "[N]ot only [are] atheists … less accepted than other marginalized groups but … attitudes toward them have not exhibited the marked increase in acceptance that has characterized views of other racial and religious minorities over the past forty years."[330]

370. This notion was corroborated by a recent Gallup poll which found that (as has been the case since the question was first asked by the Gallup organization in 1958) fewer people would vote for a generally well-qualified Atheist than for a member of any other religious minority.[331] A full 43% stated they would not vote for such a person.[332]

371. This marginalization of Atheists, perpetuated by the inscription of "In God We Trust" on the coins and currency, is also responsible for the persistence – in the year 2015 – of patently discriminatory anti-Atheistic provisions **in the constitutions** of eight states.[333]

---

[329] Penny Edgell et al., *Atheists as "Other": Moral Boundaries and Cultural Membership in American Society*, 71 Am. Soc. Rev. 211, 212 (2006).

[330] *Id*.

[331] Jeffrey M. Jones, Gallup, *Atheists, Muslims See Most Bias as Presidential Candidates* (June 21, 2012), www.gallup.com/poll/155285/Atheists-Muslims-Bias-Presidential-Candidates.aspx (citing a poll conducted June 7-10, 2012).

[332] *Id*.

[333] Ark. Const. art. XIX, § 1 ("No person who denies the being of a God shall hold any office in the civil departments of this State, nor be competent to testify as a witness in any court."); Md. Const. art. XXXVII ("That no religious test ought ever to be required as a qualification for any office of profit or trust in this State, other than a declaration of belief in the existence of God."); Miss. Const. art. XIV, § 265 ("No person who denies the existence of a Supreme Being shall hold any office in this state."); N.C. Const. art. VI, § 8 ("The following persons shall be disqualified for office: First, any person who shall deny the being of Almighty God."); Pa. Const. art. I, § 4 ("No person who acknowledges the being of a God and a future state of rewards and punishments shall, on account of his religious sentiments, be disqualified to hold any office or place of trust or profit under this Commonwealth."); S.C. Const. art. XVII, § 4 ("No person who denies the existence of a Supreme Being shall hold any office under this Constitution."); Tenn. Const. art. IX, § 2 ("No person who denies the being of God, or a future state of rewards and punishments, shall hold any office in the civil department of this state."); Tex. Const. art. I, § 4 ("No religious test shall ever be required as a qualification to any office, or public trust, in this State; nor shall any one be excluded from holding office on account of his religious sentiments, provided he acknowledge the existence of a Supreme Being.").

372. Surely no state constitutional provision discriminating in a similar manner against Jews, Catholics, women, blacks, Latinos, Asians, or any other minority group would ever be proposed, and, were such provisions in place, none would ever be tolerated.

373. Only such bigotry against Atheists – signaled as permissible by the pervasive national motto – is deemed acceptable.

**(3) Pursuant to Their Religious Beliefs, Plaintiffs Are Burdened by "In God We Trust" on the Money**

374. The U.S. Code states that "it is important that the Nation's coinage and currency bear dignified designs of which the citizens of the United States can be proud … ."[334]

375. Atheists, however, are no more proud of "In God We Trust" than Christians would be of "God is a Product of Human Weakness"[335] or "God is a Childish Superstition."[336]

376. This is especially true when the "In God We Trust" phrase is inextricably linked with the (Christian) Bible (as James Pollock's "King of Kings and Lord of Lords" reference, *see supra* note 69, demonstrates is the case).

377. In addition to the insulting and threatening language previously noted, *see supra* ¶ 265, that book – deemed to be holy and worshipped by the (Christian) Monotheistic majority responsible for the use of the phrase on our money – states "Trust in the LORD with all your heart and lean not on your own understanding." *See Proverbs* 3:5.

378. Trust in some "Lord" (i.e., God) represents the antithesis of Plaintiffs' religious ideals.

379. To Plaintiffs, trust in God was largely responsible for the slavery that stains our nation's history.[337]

380. To Plaintiffs, trust in God allowed the United States Supreme Court to deny women the right to practice law.[338]

---

[334] 31 U.S.C. § 3112 (t)(3)(E) (2012).

[335] *See* Letter of Albert Einstein to Erik Gutkind (Jan. 3, 1954), www.lettersofnote.com/2009/10/word-god-is-product-of-human-weakness.html.

[336] *Id*.

[337] *See* Raymund Harris, *Scriptural Researches on the Licitness of the Slave-Trade, Shewing Its Conformity with the Principles of Natural Religion, Delineated in the Sacred Writings of the Word of God* (1788).

[338] "The paramount destiny and mission of woman are to fulfill the noble and benign offices of wife and mother. This is the law of the Creator." *Bradwell v. State*, 83 U.S. 130, 141 (1873) (Bradley, J., concurring).

381. To Plaintiffs, trust in God allowed the people of Virginia to criminalize interracial marriage.[339]

382. To Plaintiffs, trust in God has also led to the hugely embarrassing fact that currently some 46% of Americans believe "God created human beings pretty much in their present form at one time within the last 10,000 years or so."[340]

383. Thus, rather than pride, Plaintiffs sense shame in having "In God We Trust" displayed on the money, and they bridle at the fact that they must bear that motto as they engage in the routine commercial transactions that occur in daily life.

384. Moreover, they are constantly placed in the position of either abstaining from those transactions (and thus undergoing the burden of finding alternatives to using the sole legal coins and currency bills provided by their government) or violating their religious tenets.

385. Accordingly, "In God We Trust" on the money substantially burdens Plaintiffs in the free exercise of their religious beliefs.

386. Such burdening of religious beliefs violates 42 U.S.C. § 2000bb through § 2000bb-4, the Religious Freedom Restoration Act (RFRA), which states in pertinent parts:

> § 2000bb(a)(3): "The Congress finds that … governments should not substantially burden religious exercise without compelling justification."
>
> § 2000bb(b)(1) and (b)(2): "The purposes of this chapter are … to restore the compelling interest test … and to guarantee its application in all cases where free exercise of religion is substantially burdened; and … to provide a claim or defense to persons whose religious exercise is substantially burdened by government."
>
> § 2000bb-1(b)(1) and (b)(2): "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person … is in furtherance of a compelling governmental interest; and … is the least restrictive means of furthering that compelling governmental interest."

[339] "Almighty God created the races white, black, yellow, malay and red, and he placed them on separate continents. … The fact that he separated the races shows that he did not intend for the races to mix." *Loving v. Virginia*, 388 U.S. 1, 3 (1967) (quoting Judge Leon Bazile).
[340] Frank Newport, Gallup Politics, *In U.S., 46% Hold Creationist View of Human Origins* (June 1, 2012) (citing a Gallup poll conducted May 3-6, 2012, www.gallup.com/poll/155003/Hold-Creationist-View-Human-Origins.aspx).

387. To do as Defendants have done, forcing individuals to bear a religious message that is contrary to what they believe to be religious truth, unquestionably burdens them in the exercise of their religion.

388. As Rep. Emanuel Cleaver of Missouri stated, "**no respectable atheist would walk around with something in his pocket that said 'In God We Trust**.'"[341]

389. Rep. Cleaver apparently recognized that just as there would be substantial burdens on the exercise of religion for Jews forced to bear the message "Jesus is Our Saviour," for Catholics forced to bear "Abhor that arrant whore of Rome,"[342] or for Monotheists to bear "God is a Myth," Atheists are substantially burdened in the exercise of their religion by being forced to bear the message "In God We Trust."[343]

390. Atheists are also substantially burdened by being forced to proselytize for this religious claim that is completely contrary to their personal religious beliefs.

391. This proselytization is both expected and desired by Defendants, as can be seen in a number of the statements they have made.

392. Early last century, for instance, Rep. Ollie M. James stated "we are engaged in sending to foreign countries and to distant people our missionaries **to preach the religions of Jesus Christ,**" and sending the nation's money "across the ocean" will teach others that "'**Here are the dollars of the greatest nation on earth, one that does not put its trust in floating navies or in marching armies, but places its trust in God.'**"[344]

393. Rep. Charles G. Edwards similarly maintained that the "In God We Trust" phrase "is a declaration not only to our people at home, but to all peoples, and to all nations, all over the world, that **ours is a nation with a firm and steadfast faith in God**."[345]

---

341 Congressman Urges Respect for Nonbelievers … but Doesn't Think Atheists Truly Exist in America (May 5, 2012), www.goddiscussion.com/96308/congressman-urges-respect-for-nonbelievers-but-doesnt-think-atheists-truly-exist-in-america/.

342 This phrase comes from what was the nation's most commonly-used schoolbook. *See* Sabbath Sch. Soc., *New England Primer, or, An Easy and Pleasant Guide to the Art of Reading: Adorned with Cuts; to Which is Added, the Catechism* 25 (rev. ed. 1843). Thus, it, too, is part of our nation's history and "heritage." *See infra* ¶¶ 415-418 and 554-568.

343 Rep. Cleaver, a United Methodist pastor, was one of the very few congressmen to vote against the motto's reaffirmation. Reaffirming "In God We Trust" as the Official Motto of the United States: Roll Vote No. 816, 157 Cong. Rec. H7186 (Nov. 1, 2011).

344 *See supra* ¶ 155 (emphases added).

345 *See supra* ¶ 164 (emphasis added).

394. When Matthew H. Rothert first wrote to the Secretary of the Treasury, he noted that placing "In God We Trust" on the currency would "**affirm our trust in God** in such a manner that it will be heard around the world."[346]

395. At a hearing before the House Banking and Currency Committee (on Mr. Rothert's proposal), Rep. Herman P. Eberharter (PA) echoed this idea:

> [T]he American dollar travels all over the world, into every country of the world, and frequently gets behind the Iron Curtain, and if it carries this message in that way I think it would be very good. I think that is one of the most compelling reasons why we should put it on our currency.[347]

396. Rep. Eberharter then sought permission to place in the record "[a] resolution which was unanimously passed by the American Legion Convention."[348]

397. When that permission was granted, the resolution's contention that "the principles laid down by God and the teachings of our way of life should be kept alive in the hearts and minds of our friends enslaved behind the Iron Curtain" was entered into the Congressional Record as well.[349]

398. Advocating also for global diffusion of the religious ideals incorporated within the "In God We Trust" language, Rep. Lawrence Fountain (NC) stated that "that inscription … indicates **to the world** that … **the material is not the thing upon which we should rely, but it is God.**"[350]

399. Barely over a decade ago, the idea of proselytization was reiterated yet once more on the inner front cover of the United States Mint Annual Report:

> **Wherever United States coins travel**, they serve as reminders of **the values that all Americans share**. The words and symbols that define us as Americans have a permanent place in our coins: "Liberty" … "**In God We Trust**" … "E Pluribus Unum" ….[351]

---

[346] *See supra* ¶ 179 (emphasis added).
[347] *United States Currency Inscription*, *supra* note 158, at 53.
[348] *Id.* at 54.
[349] *Id.*
[350] *Id*. at 56 (emphases added).
[351] U.S. Mint, *2003 United States Mint Annual Report*, inner front cover, *available at* www.usmint.gov/downloads/about/annual_report/2003AnnualReport.pdf (first two ellipses in original) (emphases added).

400. The Report continued by claiming that:

> Our coins are small **declarations of our beliefs**. They showcase how we see ourselves and our sense of sovereign identity. And **they serve as ambassadors of American values and ideals**.[352]

401. Thus, it is again seen that Defendants consider "In God We Trust" as being one of the "**declarations of our beliefs**."

402. Moreover, Defendants ignore Atheists such as Plaintiffs by viewing the motto as being a declaration "**that all Americans share**." Plaintiffs definitely do not share the belief that there is a God or that they trust in such an entity.

403. Above all, Plaintiffs do not wish to proselytize for such a declaration of belief.

404. For the foregoing reasons – especially when the "In God We Trust" inscriptions further the anti-Atheist prejudices they have been forced to endure in this alleged "beacon of religious freedom"[353] – Plaintiffs are substantially burdened.

405. Defendants have no compelling interest to justify these burdens they have imposed.

406. This is readily seen by noting that the currency of myriad other nations functions just fine without religious advocacy.

407. This is also seen by noting that this nation's money functioned just fine, as well, for more than seventy years without the motto having ever been inscribed.

408. Additionally, during the subsequent ninety-plus years (through the 1955 mandate that required the motto's inscription on all coins and currency bills), there was no dysfunction resulting from the secular coinage and bills that Defendants continued to manufacture.

409. In fact, Defendant Congress just recently acknowledged that "it is appropriate to move many of the mottos and emblems, the inscription of the year, and the so-called 'mint marks' that currently appear on the 2 faces of each circulating coin to the edge of the coin, which would allow larger and more dramatic artwork … ." *See supra* ¶ 300.

410. This acknowledgement, too, demonstrates that there is no compelling interest to having "In God We Trust" on the money.

[352] *Id*.

[353] *See supra* ¶ 290. As noted, "Atheists – solely on the basis of their disbelief in God – are felt to be less trustworthy than rapists!" *See supra* ¶ 367.

411. Even if there were a compelling interest, Defendants would need to show they furthered that interest in the least restrictive manner. This is another requirement that Defendants have never met.

412. Whatever the compelling interest Defendants may claim, it is likely that some other motto would serve it without burdening Plaintiffs' religious exercise.

413. For instance, the European Union's motto, "United in Diversity,"[354] serves its purposes without infringing upon the religious rights of anyone within its very large jurisdiction.

414. In fact, even limiting the motto to the current format, a virtually endless number of nonreligious choices exist. "In Equality We Trust," "In Liberty We Trust," "In Diversity We Trust," and so on, all embrace the noble principles underlying our governmental structure without compromising (or even implicating) constitutional mandates.

415. It is likely that Defendants will claim (as Rep. Pence did, *see supra* ¶ 327) that the government's endorsement of "In God We Trust" is justified because it reflects "America's Christian heritage."

416. Even if this "heritage" argument were to be accepted, the fact that this particular heritage item was chosen from the thousands that exist is problematic. America has a "heritage" of discovery, innovation, foreign aid, exploration of space, the welcoming of immigrants and a host of other heritage items (including such things as slavery, denial of suffrage for the poor, racial discrimination, pollution, and the absence of property rights for married women).

417. That only belief in God was chosen from among the myriad potential candidates indicates that it was not merely "heritage" (or history) that led to the selection of "In God We Trust."

418. On the contrary, "In God We Trust" was chosen because it supports and advances a particular "heritage" – namely, the heritage of the specific religious belief that there exists a (Christian) god.

---

[354] Wikipedia, *Symbols of Europe*, en.wikipedia.org/wiki/European_symbols#Motto (last visited Dec. 9, 2015).

419. Defendants are surely aware that many citizens find this choice highly objectionable.

420. This awareness is apparent on the Treasury Department's website, where it is written that "[t]his use of the national motto has been challenged in court many times over the years that it has been in use … ."[355]

421. Despite this awareness, Defendant Lew's Treasury Department has been almost defiant as it snubs those who seek nothing more than to have their fundamental rights of religious liberty and equal protection upheld: "The Department of the Treasury and the Department of Justice intend to actively defend against challenges to the use of the national motto."[356]

422. This attitude, expressed while acknowledging that "[t]he motto IN GOD WE TRUST was placed on United States coins largely **because of … increased religious sentiment**,"[357] highlights the need for putting an end to this constitutional violation.

---

[355] Bureau of Engraving & Printing, U.S. Dep't of the Treas., *FAQs: "Why is the phrase In God We Trust on U.S. currency?"* www.moneyfactory.gov/resources/faqs.html (last visited Dec. 12, 2015). The Treasury Department contends at this website that "[t]his use of the national motto … has been … upheld by … the U.S. Supreme Court as recently as 1977." Apparently referring to *Wooley v. Maynard*, 430 U.S. 705 (1977), this is a flagrant and specious mischaracterization.

In fact, Chief Justice Burger's majority opinion in *Wooley* emphatically supports Plaintiffs here. *See*, *e.g.*, 430 U.S., at 714 ("A system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts") and *id*., at 717 ("[T]he State's interest ... to disseminate an ideology ... cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message") (This was the penultimate prose, given in the last sentence before the Chief Justice's conclusion). What occurred in *Wooley* was that then-Associate Justice Rehnquist responded to those statements by applying them to the situation where "an atheist carries and uses United States currency." 430 U.S. at 722 (Rehnquist, J., dissenting). In other words, Justice Rehnquist readily foresaw that, under the majority opinion, Atheists would be justified in arguing that they have a right not to carry objects inscribed with "In God We Trust."

Specifically noting that "[t]hat question is not before us today," 430 U.S. at 717 n.15, Chief Justice Burger simply deflected Justice Rehnquist's point by stating that the "In God We Trust" phrase "need not be displayed to the public." *Id*. That statement, however, is a *non sequitur*. Religious items that individuals find to be of importance – such as crucifixes, Stars of David, St. Christopher medals and the like – are often not "displayed to the public." Yet surely neither Congress nor the federal judiciary has any power to decree that the government may interfere with an individual's decision to carry (or to not carry) such religious items. Nor may they properly deny that such interference would substantially burden that individual's religious exercise.

[356] U.S. Dep't of the Treas., *supra* note 355.

[357] U.S. Dep't of the Treas., *supra* note 51 (emphasis added).

## CLAIMS FOR RELIEF

### CLAIM 1. DEFENDANTS' ACTS SUBSTANTIALLY BURDEN PLAINTIFFS' EXERCISE OF RELIGION IN VIOLATION OF RFRA

423. The allegations set forth in the preceding paragraphs are realleged herein.

424. This cause of action is pled against each and all Defendants.

425. Pursuant to 42 U.S.C. § 2000bb through § 2000bb-4, the Religious Freedom Restoration Act of 1993 (RFRA), government may not substantially burden any individuals in the exercise of their religious beliefs.

426. It is noteworthy that RFRA was intended to prevent government from substantially burdening religious exercise when government has acted in a religiously neutral manner. In this case, Defendants have gone far beyond that expected reach of RFRA, having acted (as both history and the text "In God We Trust" incontrovertibly make clear) in a purely (Christian) Monotheistic religious manner.

427. By placing "In God We Trust" on the nation's coins and currency bills, Defendants have substantially burdened Plaintiffs in the exercise of their Atheistic beliefs by requiring them to personally bear a religious message that is the antithesis of what they believe is religious truth as the price to pay for using the nation's coins and currency bills.

428. By placing "In God We Trust" on the nation's coins and currency bills, Defendants have substantially burdened Plaintiffs in the exercise of their Atheistic beliefs by requiring them to proselytize for a religious claim that is completely contrary to their personal religious beliefs as the price to pay for using the nation's coins and currency bills.

429. By placing "In God We Trust" on the nation's coins and currency bills, Defendants have substantially burdened Plaintiffs in the exercise of their Atheistic beliefs by requiring them to engage in activity that they believe furthers the anti-Atheist religious prejudices that pervade this nation's society.

430. Defendants have no compelling interest to justify these burdens.

431. Thus, by inscribing "In God We Trust" on the nation's coins and currency bills, Defendants have violated the Religious Freedom Restoration Act.

**CLAIM 2. DEFENDANTS HAVE PLACED RELIGIOUS VERBIAGE ON THE NATION'S MONEY WITHOUT ANY ENUMERATED POWER AUTHORIZING THAT ACTIVITY**

432. The allegations set forth in the preceding paragraphs are realleged herein.

433. This cause of action is pled against each and all Defendants.

434. "If no enumerated power authorizes Congress to pass a certain law, that law may not be enacted … ." *National Federation of Independent Business v. Sebelius*, 132 S. Ct. 2566, 2577 (2012).

435. Thus, "[t]he Federal Government … must show that a constitutional grant of power authorizes each of its actions." *Id*. at 2578.

436. No constitutional grant of power authorizes Defendants to make religious claims.

437. By inscribing "In God We Trust" on the nation's coins and currency bills, Defendants are making the religious claims that (i) there is a "God," and (ii) the people of this nation do (and should) "trust" in that "God."

438. Thus, by inscribing "In God We Trust" on the nation's coins and currency bills, Defendants have violated the Constitution under the "enumerated power" test.

**CLAIM 3. DEFENDANTS HAVE VIOLATED PLAINTIFFS' EQUAL PROTECTION RIGHTS**

439. The allegations set forth in the preceding paragraphs are realleged herein.

440. This cause of action is pled against each and all Defendants.

441. Perhaps the most incontrovertible of the "personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs," *Obergefell v. Hodges*, 135 S. Ct. 2584, 2597 (2015), are the choices related to religion.

442. By placing "In God We Trust" on the money, Defendants are clearly disrespecting Plaintiffs' religious views, while supporting the majority's Monotheistic religious beliefs. Plaintiffs thus "ask for equal dignity in the eyes of the law." *Id*. at 2608. "The Constitution grants them that right." *Id*.

443. Defendants also impose upon the child plaintiffs in this case "the stigma of knowing their families are somehow lesser … [and] thus harm and humiliate the children," *Id*. at 2600-01.

444. Thus, by inscribing "In God We Trust" on the nation's coins and currency bills, Defendants have violated Plaintiffs' Equal Protection rights under the Due Process Clause of the Fifth Amendment. *Adarand Constructors, Inc. v. Mineta*, 534 U.S. 103, 105 (2001).

## CLAIM 4. DEFENDANTS HAVE VIOLATED THE CONSTITUTIONAL LIMITS PLACED ON GOVERNMENT SPEECH

445. The allegations set forth in the preceding paragraphs are realleged herein.

446. This cause of action is pled against each and all Defendants.

447. Just this year the Supreme Court stated that "the First Amendment stringently limits [governmental] authority to compel a private party to express a view with which the private party disagrees." *Walker v. Sons of Confederate Veterans* (2015).

448. Moreover, although generally "[w]hen government speaks, it is not barred by the Free Speech Clause from determining the content of what it says," *Walker v. Texas Division, Sons of Confederate Veterans*, 135 S. Ct. 2239, 2245 (2015), it is barred by the Establishment Clause from "lend[ing] its power to one or the other side in controversies over religious … dogma." *Employment Div. v. Smith*, 494 U.S. 872, 877 (1990).

449. Government is also barred by the Free Exercise Clause and RFRA from speech that substantially burdens anyone's exercise of their religious views.

450. Moreover, "the Free Speech Clause itself may constrain the government's speech if, for example, the government seeks to compel private persons to convey the government's speech." *Walker*, 135 S. Ct. at 2246.

451. Defendants have lent the government's power to one side of what is perhaps the greatest controversy of all time over religious dogma, they have substantially burdened Plaintiffs in the exercise of their religious views, and they have compelled Plaintiffs here to convey the government's speech (which is completely contrary to their religious views).

452. Thus, by inscribing "In God We Trust" on the nation's coins and currency bills, Defendants have exceeded the constitutional limits on government speech, violating Plaintiffs rights under the Establishment Clause, the Free Exercise Clause, RFRA and the Free Speech Clause.

**CLAIM 5. DEFENDANTS HAVE ESTABLISHED MONOTHEISM**

453. The allegations set forth in the preceding paragraphs are realleged herein.

454. This cause of action is pled against each and all Defendants.

455. Establishment Clause cases have generally focused on the "respecting" aspect of the First Amendment's first clause (i.e., "Congress shall make no law **respecting** an establishment of religion …").

456. This case goes well beyond that prohibition. The official declaration of a religious belief as the nation's motto is, in fact, an establishment per se.

457. Defendants have officially decreed: "'In God we trust' is the national motto." 36 U.S.C. § 302. They have mandated that motto's inscription on every coin, 31 U.S.C. § 5112 (d)(1), and currency bill, 31 U.S.C. § 5114(b), they produce.

458. A motto is "a sentence, phrase, or word inscribed on something as appropriate to or indicative of its character or use" and/or "a short expression of a guiding principle."[358] A nation's motto, therefore, is a phrase indicative of that nation's character and expresses its guiding principle.

459. In short, by definition, a religious claim officially decreed as a nation's motto is an establishment of religion.

460. That this argument is correct can be immediately recognized by considering the constitutionally equivalent motto: "In Jesus Christ We Trust."

461. Just as that phrase would be stating that belief in Jesus Christ is indicative of the nation's character and its "guiding principle," "In God We Trust" states that belief in God is indicative of the nation's character and its "guiding principle."

462. In other words, just as the former motto would be an absolute establishment of Christianity, the latter is an absolute establishment of Monotheism.

463. Thus, by inscribing "In God We Trust" on the nation's coins and currency bills, Defendants have violated the First Amendment by establishing Monotheism as the official religious belief of the nation.

---

[358] *Merriam-Webster*, *Dictionary*, www.merriam-webster.com/dictionary/motto (last visited Dec. 9, 2015).

**CLAIM 6. DEFENDANTS HAVE VIOLATED THE NEUTRALITY REQUIRED BETWEEN "RELIGION" AND "NONRELIGION"**

464. The allegations set forth in the preceding paragraphs are realleged herein.

465. This cause of action is pled against each and all Defendants.

466. The Supreme Court – specifically referencing belief in God as it applies to the Establishment Clause – has announced that "[t]he touchstone for our analysis is the principle that the 'First Amendment mandates governmental neutrality between … religion and nonreligion.'" *McCreary County v. ACLU of Kentucky*, 545 U.S. 844, 860 (2005) (citation omitted).

467. It is obvious that, by placing "In God We Trust" on the nation's coins and currency bills, Defendants have shown a preference for belief in God (i.e., "religion") over disbelief in God (i.e., "nonreligion.").

468. Phrased alternatively, Defendants have shown a preference for Monotheism over Atheism.

469. Thus, by inscribing "In God We Trust" on the nation's coins and currency bills, Defendants have violated the Establishment Clause of the Constitution under this "neutrality touchstone" test.

**CLAIM 7. DEFENDANTS HAVE ACTED WITH A RELIGIOUS PURPOSE**

470. The allegations set forth in the preceding paragraphs are realleged herein.

471. This cause of action is pled against each and all Defendants.

472. On November 13, 1861, a "Minister of the Gospel" wrote to the Secretary of the Treasury requesting that "the recognition of the Almighty God" be placed upon the nation's coins. *See supra* ¶ 105.

473. Within a week, the Secretary of the Treasury responded by contending that "The trust of our people in God should be declared on our national coins." *See supra* ¶ 108.

474. The Director of the Mint wrote (in the official annual Mint Director's Report) that "We claim to be a Christian nation. … Our national coinage … should declare our trust in God -- in Him who is the 'King of Kings and Lord of Lords.'" *See supra* ¶ 113.

475. The Director of the Mint then made suggestions which the Treasury Secretary modified slightly, so that "In God We Trust" became the chosen phrase. *See supra* ¶¶ 118-118.

476. As evidenced by the foregoing (and by the extensive record that exists relating to the removal of those words from a coin in 1908, *see supra* ¶¶ 132-177; by the record relating to the placement of those words on the currency bills, *see supra* ¶¶ 178-212; and by the blatant religious advocacy which pervaded Defendant Congress's halls when that placement occurred, *see supra* ¶¶ 233-250), the unequivocal purpose of having "In God We Trust" on the nation's money was to promote (Christian) Monotheism.

477. In this case, "no legislative recitation of a supposed secular purpose can blind us to that fact." *Stone v. Graham*, 449 U.S. 39, 41 (1980).

478. Under the Establishment Clause, government is prohibited from "abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters." *Corporation of Presiding Bishop v. Amos*, 483 U.S. 327, 335 (1987).

479. In other words, "[t]he Establishment Clause of the First Amendment … prevents [government] from enacting laws that have the 'purpose' … of advancing or inhibiting religion." *Zelman v. Simmons-Harris*, 536 U.S. 639, 648-49 (2002).

480. Thus, by inscribing "In God We Trust" on the nation's coins and currency bills, Defendants have violated the Establishment Clause of the Constitution under the "purpose" test.

**CLAIM 8. CONSISTENT WITH THEIR RELIGIOUS PURPOSE, DEFENDANTS' ACTS HAVE RELIGIOUS EFFECTS**

481. The allegations set forth in the preceding paragraphs are realleged herein.

482. This cause of action is pled against each and all Defendants.

483. "In God We Trust" on the money – at its inception – was intended to have the effect of furthering "the recognition of the Almighty God," of declaring "[t]he trust of our people in God," and of declaring "our trust in … Him who is the 'King of Kings and Lord of Lords.'" *See supra* ¶¶ 472-474.

484. Defendants have since reported that the challenged phrase has that effect. Congress, for example, has noted that the phrase "reflects the reverent and religious conviction which underlies American citizenship." H.R. Rep. No. 1106, at 1 (1908) (emphases added).

485. Defendant Jeppson's Mint (just a decade ago) wrote in its official Annual Report that, by being placed into the circulation, our coins "serve as reminders of the values that all Americans share." *See supra* note 352.

486. Specifically mentioning "In God We Trust," the Report continued by noting that the coins convey "declarations of our beliefs … [and] serve as ambassadors of American values and ideals." *Id.*

487. Clearly, then, the challenged practice "viewed in its totality by an ordinary, reasonable observer, convey[s] the view that the [government] favor[s] or disfavor[s] certain religious beliefs." *Galloway v. Town of Greece*, 681 F.3d 20, 29 (2012). Specifically, "In God We Trust" shows governmental favoritism for belief (and trust) in God.

488. Simultaneously, that phrase shows disfavor for disbelief in such a religious entity.

489. "The Establishment Clause of the First Amendment … prevents [government] from enacting laws that have the … 'effect' of advancing or inhibiting religion." *Zelman*, 536 U.S. at 648-49.

490. Thus, by inscribing "In God We Trust" on the nation's coins and currency bills, Defendants have violated the Establishment Clause of the Constitution under this "effects" test.

## CLAIM 9. DEFENDANTS HAVE ENDORSED THE RELIGIOUS BELIEF THAT THERE EXISTS A GOD

491. The allegations set forth in the preceding paragraphs are realleged herein.

492. This cause of action is pled against each and all Defendants.

493. The Supreme Court has referenced "endorsement" as relevant for determining whether or not a governmental practice is constitutional under the Establishment Clause.

494. The Establishment Clause "does preclude government from conveying … a message that … a particular religious belief is favored or preferred. Such an endorsement infringes the religious liberty of the nonadherents … ." *Wallace v. Jaffree*, 472 U.S. 38, 70 (1985) (O'Connor, J., concurring).

495. The "particular religious belief" that there exists a God (plus the notion that "we" Americans "trust" in "Him") is clearly favored and preferred by placing "In God We Trust" on each coin and currency bill.

496. Although this favoritism is obvious from the motto's verbiage, a poll was commissioned in 1994 to quantify the percentage of Americans who recognize this favoritism.

497. Phrasing the issue in terms of "endorsement," the pollsters found that, by a 3:1 margin, Americans overwhelmingly hold the opinion that the "In God We Trust" phrase "endorses a belief in God." *See* Appendix E.

498. An added "endorsement" concern relates to children:

> An important concern of the effects test is whether the symbolic union of church and state effected by the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices. The inquiry into this kind of effect must be conducted with particular care when many of the citizens perceiving the governmental message are children in their formative years.

*Grand Rapids School District v. Ball*, 473 U.S. 373, 390 (1985).

499. The New Doe, New Roe, New Boe, New Poe and New Coe children are all "children in their formative years." *See* Appendix F for sample letters from affected minor children.

500. Thus, by inscribing "In God We Trust" on the nation's coins and currency bills, Defendants have violated the Establishment Clause of the Constitution under this "endorsement" test.

## CLAIM 10. DEFENDANTS' ACTS TURN PLAINTIFFS INTO POLITICAL OUTSIDERS ON THE BASIS OF THEIR RELIGIOUS BELIEFS

501. The allegations set forth in the preceding paragraphs are realleged herein.

502. This cause of action is pled against each and all Defendants.

503. James Madison's *Memorial and Remonstrance*[359] (described as "the most important document explaining the Founders' conception of religious freedom"[360]) has been cited by the Supreme Court in more than thirty Establishment Clause cases.

---

[359] James Madison, *A Memorial and Remonstrance, Presented to the General Assembly of the State of Virginia, at Their Session in 1785, in Consequence of a Bill Brought into That Assembly for the Establishment of Religion by Law* (1786).

[360] Michael W. McConnell, *Symposium: New Directions in Religious Liberty: "God is Dead and We Have Killed Him!": Freedom of Religion in the Post-Modern Age*, 1993 BYU L. Rev. 163, 169 (1993).

504. That document spoke on religion in society. In it, Madison referred to equality no less than thirteen times. He argued that governmental association with and/or support for any religious idea is impermissible because it "degrades from the equal rank of Citizens all those whose opinions in religion do not bend to those of the Legislative Authority." Madison, *supra* note 359, at 9.

505. The Supreme Court has referred to this situation by warning that "[governmental] sponsorship of a religious message is impermissible because it sends the ancillary message to members of the audience who are nonadherents 'that they are outsiders, not full members of the political community … .'" *Santa Fe Independent School District v. Doe*, 530 U.S. 290, 309-10 (2000) (citation omitted).

506. Plaintiffs, who specifically deny that there exists a god (and who find it offensive to be included among those who would trust in what they believe is a pure fiction) have been "degrade[d] from the equal rank of citizens" and turned into "outsiders, not full members of the political community" by Defendants' inscriptions of the opposite religious belief on the nation's coins and currency bills.

507. These damaging effects can be shown, for example, by the countless incidents – to be shown at trial – where those among the (Christian) Monotheistic majority point to the "In God We Trust" phrase on the money as justification for telling Plaintiffs they should leave the country on account of their religious beliefs.

508. More egregiously, it can also be shown by the verbiage used to extol the supposed virtues of faith in God. Obviously, Plaintiffs – who specifically do **not** trust in God – cannot possibly be included among the "We" in "In God We Trust." Accordingly, by its inherent nature, the motto turns Plaintiffs into outsiders.

509. As Justice Kennedy has noted, "it borders on sophistry to suggest that the '"reasonable"' Atheist would not feel less than a '"full membe[r] of the political community"' … [as a result of seeing 'In God We Trust'] reproduced on every coin minted and every dollar printed by the Federal Government." *Allegheny County v. Greater Pittsburgh ACLU*, 492 U.S. 573, 673 (1989) (Kennedy, J., concurring in part and dissenting in part).

510. Thus, by inscribing "In God We Trust" on the nation's coins and currency bills, Defendants have violated the Establishment Clause of the Constitution under the "outsider" test.

**CLAIM 11. DEFENDANTS' ACTS PLACE THE POWER, PRESTIGE AND FINANCIAL SUPPORT OF GOVERNMENT BEHIND THE PARTICULAR RELIGIOUS BELIEF THAT THERE EXISTS A GOD**

511. The allegations set forth in the preceding paragraphs are realleged herein.

512. This cause of action is pled against each and all Defendants.

513. Not only does "In God We Trust" on the money turn Plaintiffs into political outsiders, it sends "an accompanying message to adherents that they are insiders, favored members of the political community." *Lynch v. Donnelly*, 465 U.S. 668, 688 (1984) (O'Connor, J., concurring).

514. This message is particularly strong when "the power, prestige and financial support of government is placed behind a particular religious belief … ." *Engel v. Vitale*, 370 U.S. 421, 431 (1962).

515. In this case, "the power, prestige and financial support of government is placed behind [the] particular religious belief" that there exists a "God."

516. Thus, by inscribing "In God We Trust" on the nation's coins and currency bills, Defendants have violated the Establishment Clause of the Constitution under this "power, prestige and financial support" test.

**CLAIM 12. DEFENDANTS HAVE LENT THEIR POWER TO ONE SIDE IN WHAT IS ARGUABLE THE GREATEST CONTROVERSY OVER RELIGIOUS DOGMA**

517. The allegations set forth in the preceding paragraphs are realleged herein.

518. This cause of action is pled against each and all Defendants.

519. The Supreme Court has written that "[t]he government may not … lend its power to one or the other side in controversies over religious … dogma." *Employment Div. v. Smith*, 494 U.S. at 877 (citations omitted).

520. Whether there does or does not exist a "God" is perhaps the greatest controversy of all over religious dogma.

521. By claiming "In God We Trust" on every coin and currency bill they manufacture, Defendants have lent their power to the side of that religious controversy that says "God" does exist.

522. Thus, by inscribing "In God We Trust" on the nation's coins and currency bills, Defendants have violated the Constitution under the "lent governmental power to one side" test.

**CLAIM 13. DEFENDANTS HAVE DETERMINED THE PLAUSIBILITY OF THE RELIGIOUS CLAIM THAT "GOD" EXISTS**

523. The allegations set forth in the preceding paragraphs are realleged herein.

524. This cause of action is pled against each and all Defendants.

525. "Repeatedly and in many different contexts, we have warned that courts must not presume to determine … the plausibility of a religious claim." *Employment Div. v. Smith*, 494 U.S. 872, 887 (1990).

526. By asserting that "In God We Trust," Defendants are, of necessity, claiming that "God" exists. Accordingly, they are determining the plausibility of that religious claim.

527. Specifically, by attributing the trust in God to the people of the nation, Defendants have determined (at a minimum) that God's existence is plausible.

528. Thus, by inscribing "In God We Trust" on the nation's coins and currency bills, Defendants have violated the Constitution under the "religious claim plausibility" test.

**CLAIM 14. DEFENDANTS' ACTS PLACE GOVERNMENT'S IMPRIMATUR ON THE RELIGIOUS IDEA THAT THERE EXISTS A GOD**

529. The allegations set forth in the preceding paragraphs are realleged herein.

530. This cause of action is pled against each and all Defendants.

531. Government violates the Establishment Clause when it is "perceived as conferring the imprimatur of the State on religious doctrine or practice … ." *Westside Community Bd. of Ed. v. Mergens*, 496 U.S. 226, 264 (1990) (Marshall, J., concurring).

532. Defendants' inscription of "In God We Trust" on every coin and currency bill places government's imprimatur on the religious doctrine that there exists a God (and that the United States' citizens trust in that God).

533. Thus, by inscribing "In God We Trust" on the nation's coins and currency bills, Defendants have violated the Establishment Clause of the Constitution under this "imprimatur" test.

**CLAIM 15. DEFENDANTS' ACTS APPLY COERCION TO PLAINTIFFS IN REGARD TO THEIR RELIGIOUS BELIEFS**

534. The allegations set forth in the preceding paragraphs are realleged herein.

535. This cause of action is pled against each and all Defendants.

536. The motto unquestionably has religiously coercive effects.

537. This is perhaps best demonstrated by an admission made during its latest congressional "reaffirmation." The day after the House voted on the resolution, one of its most politically powerful members, Rep. Charles Rangel (NY), stated, "Yesterday, the House overwhelmingly passed a bill that would support the motto 'In God We Trust.' I reluctantly supported it because I didn't want anyone to believe that I didn't trust God." 157 Cong. Rec. H7215 (daily ed. Nov. 2, 2011).

538. This sentiment is hardly surprising. After all, as the history documented in this Complaint makes abundantly clear, "In God We Trust" was placed on the money as "an attempt to employ the machinery of the State to enforce a religious orthodoxy." *Lee v. Weisman*, 505 U.S. 577, 592 (1992).

539. Such coercive effects are especially problematic when children are involved, since "nonconformity is not an outstanding characteristic of children. The result is an obvious pressure upon children … ." *McCollum v. Board of Education*, 333 U.S. 203, 227 (1948) (Frankfurter, J., concurring).

540. Accordingly, "even devout children may well avoid claiming their right and simply continue to participate in exercises distasteful to them because of an understandable reluctance to be stigmatized as atheists … ." *Abington School District v. Schempp*, 374 U.S. 203, 290 (1963) (Brennan, J., concurring). *See also Lee*, 505 U.S. at 593 ("This pressure, though subtle and indirect, can be as real as any overt compulsion.").

541. The New Doe, New Roe, New Boe, New Poe and New Coe children in this case are all especially susceptible to these coercive effects because they are "impressionable youngsters." *Grand Rapids School District v. Ball*, 473 U.S. 373, 385 (1985).

542. Thus, by inscribing "In God We Trust" on the nation's coins and currency bills, Defendants have violated the Establishment Clause of the Constitution under this "coercion" test.

**CLAIM 16. DEFENDANTS' ACTS VIOLATE PLAINTIFFS' FREE EXERCISE RIGHTS**

543. The allegations set forth in the preceding paragraphs are realleged herein.

544. This cause of action is pled against each and all Defendants.

545. Defendants have repeatedly stated that they have placed "In God We Trust" on the money for the purpose of furthering (Christian) Monotheistic religious belief.

546. Moreover, the text, the legislative history and the actual effect of having those words on the money show that the statutes at issue are neither religiously neutral nor of general applicability.

547. Due to Defendants' actions, Plaintiffs have only two alternatives to simply using the nation's sole legal tender: (i) Utilize a relatively burdensome alternative method, or (ii) Bear a religious message they believe to be untrue and completely contrary to their sincerely held religious beliefs.

548. Thus, by inscribing "In God We Trust" on the nation's coins and currency bills, Defendants have violated Plaintiffs' Free Exercise rights.

**CLAIM 17. ANY AND ALL SECULAR JUSTIFICATIONS FOR DEFENDANTS' ACTS ARE SHAMS AND/OR PRETEXTS**

549. The allegations set forth in the preceding paragraphs are realleged herein.

550. This cause of action is pled against each and all Defendants.

551. "[A]lthough a legislature's stated reasons will generally get deference, the secular purpose required has to be genuine, not a sham, and not merely secondary to a religious objective." *McCreary County v. ACLU of Kentucky*, 545 U.S. 844, 864 (2005).

552. The history provided in this Complaint shows that there has been an exclusively religious purpose behind Defendants' inscriptions of "In God We Trust" on each of the nation's coins and currency bills.

553. Any proffered non-religious objective is a sham and/or a pretext.

554. For instance, Defendants may contend that "In God We Trust" is on the money not for religious purposes, but to honor our nation's "heritage." *See, e.g.*, *supra* ¶¶ 415-417.

555. Yet, in the edge-incusion episode, *see supra* ¶¶ 300-306, for example, not one of the congressmen complained about the edge-incusion of "[t]he inscription of the year of minting or issuance of the coin." *See supra* ¶ 301.

556. The year, of course, has a "heritage" of placement on the obverse or reverse of every coin minted since 1792. *See supra* ¶¶ 98-99.

557. Nor did any congressman complain about the edge-incusion of "E Pluribus Unum." *See supra* ¶ 301.

558. The "heritage" of "E Pluribus Unum" dates back to **July 4, 1776**, when a committee was created "to bring in a device for a seal for the United States of America." 5 *Journals of the Continental Congress 1774-1789*, at 517-18 (1904).[361]

559. That committee was comprised of none other than **Benjamin Franklin, Thomas Jefferson and John Adams**. *Id.*

560. Those three giants in the creation of this nation proposed "E Pluribus Unum" as the motto on August 20, 1776. *Id.* at 690.[362]

561. "E pluribus Unum" was officially recognized as the motto on "the great seal for the United States in Congress assembled" on June 20, 1782. 22 *Journals of the Continental Congress 1774-1789*, at 338-39 (1914).[363] It became the *de facto* motto of this nation after its formation in 1789, and remained as such until "In God We Trust" was made the official motto in 1956. *See* Act of July 30, 1956, Pub. L. 84-851, 70 Stat. 732 (now codified at 36 U.S.C. § 302).

562. Thus, of the three edge-incused items, Congress chose only the one with the least claim to being a reminder of our "heritage" – i.e., the one that shows favoritism for the religious beliefs of the (Christian) Monotheistic majority – to move to a more prominent location on the Presidential $1 coins.

563. Moreover, in the years prior to 1971 (when the Supreme Court announced that truthfulness in terms of religious purposes would invalidate governmental religious activity, *Lemon v. Kurtzman*, 403 U.S. 602 (1971)), our government agents readily admitted that "In God We Trust" existed to serve (Christian) Monotheism.

---

[361] *Available at* memory.loc.gov/cgi-bin/ampage?collId=lljc&fileName=005/lljc005.db&recNum=101&itemLink=r%3Fammem%2Fhlaw%3A%40field%28DOCID%2B%40lit%28jc0051%29%29%230050001&linkText=1.

[362] *Available at* memory.loc.gov/cgi-bin/ampage?collId=lljc&fileName=005/lljc005.db&recNum=274&itemLink=D?hlaw:2:./temp/~ammem_jTDf::%230050274&linkText=1.

[363] *Available at* memory.loc.gov/cgi-bin/ampage?collId=lljc&fileName=022/lljc022.db&recNum=348&itemLink=r%3Fammem%2Fhlaw%3A%40field%28DOCID%2B%40lit%28jc0221%29%29%230220001&linkText=1.

564. In 1863, for instance, the official Mint Director's Annual Report decreed, "We claim to be a Christian nation -- … Our national coinage … should declare our trust in God -- in Him who is the 'King of Kings and Lord of Lords.'" *See supra*, note 69.

565. In 1908, for instance, 268 of 273 congressmen voted to follow the unanimous conclusion of a subcommittee that, "In God We Trust" inspires "a Christian patriotism, which, recognize[es] the universal fatherhood of God." *See supra* ¶¶ 147, 174.

566. In 1955, for instance, Congress classified "In God We Trust" among "Religious Inscriptions," *supra* ¶ 190, declaring a year later that those words, "witness our faith in Divine Providence," supra ¶ 248

567. The foregoing reveal that the claim that "In God We Trust" is on the money to exalt our nation's "heritage" is a sham and/or a pretext. So, too, are all other non-religious reasons given for having the motto on our coins and currency bills. As has been abundantly demonstrated throughout this Complaint, "In God We Trust" is on the money for its religious meaning and purposes.

568. By inscribing "In God We Trust" on the nation's coins and currency bills and claiming that the inscriptions have been made to honor our nation's "heritage" (or for any other secular reason), therefore, Defendants have violated the Establishment Clause of the Constitution under the "cannot be a sham and/or a pretext" test.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request relief and judgment as follows:

I. To declare that the inscription of “In God We Trust” on the nation’s coins and currency (pursuant to 31 U.S.C. § 5112 (d)(1) and 31 U.S.C. § 5114 (b)) violates 42 U.S.C. § 2000bb through § 2000bb-4, the Religious Freedom Restoration Act (RFRA);

II. To declare that the inscription of “In God We Trust” on the nation’s coins and currency (pursuant to 31 U.S.C. § 5112 (d)(1) and 31 U.S.C. § 5114 (b)) violates the Fifth Amendment’s Due Process clause;

III. To declare that the inscription of “In God We Trust” on the nation’s coins and currency (pursuant to 31 U.S.C. § 5112 (d)(1) and 31 U.S.C. § 5114 (b)) violates the Establishment Clause of the United States Constitution;

IV. To declare that the inscription of “In God We Trust” on the nation’s coins and currency (pursuant to 31 U.S.C. § 5112 (d)(1) and 31 U.S.C. § 5114 (b)) violates the Free Exercise Clause;

V. To permanently enjoin Defendants from minting coins and/or printing currency on which is engraved “In God We Trust;”

VI. To allow Plaintiffs – pursuant to 42 U.S.C. § 1988, 28 U.S.C. § 2412 (the Equal Access to Justice Act), and as may otherwise be allowed by law – to recover all reasonable costs, expert witness fees, attorney fees, and other expenses; and

VII. To provide such other and further relief as the Court may deem proper.

Respectfully submitted,

| | |
|---|---|
| /s/ - Michael Newdow | /s/ - Morgan Smith |
| ______________________________ | ______________________________ |
| Michael Newdow | Morgan Smith |
| *Pro hac vice* (pending) | Smith & Raver |
| 2985 Lakeshore Blvd. | 2900 Washington Ave North |
| Upper Lake, CA 95485 | Minneapolis, MN 55411 |
| (916) 273-3798 | (612) 379-0674 |
| NewdowLaw@gmail.com | smith_and_raver@elitemail.org |

# LIST OF APPENDICES

APPENDIX A

H.R. REPORT 271 (1830) (SUNDAY MAIL DELIVERY) ....................... APP-02

APPENDIX B

JUSTICE WILLIAM STRONG'S 1873 STATEMENT ............................ APP-11

APPENDIX C

CONGRESSIONAL RECORD (CIRCA 1955) ........................................ APP-14

APPENDIX D

SELECTED EXCERPTS FROM THE CONGRESSIONAL RECORD .... APP-21

APPENDIX E

1994 SURVEY: AMERICAN VIEWS OF "IN GOD WE TRUST"........... APP-31

APPENDIX F

SAMPLE LETTERS FROM MINORS ..................................................... APP-38

APPENDIX G

SUPREME COURT REFERENCES TO "IN GOD WE TRUST" ............. APP-41